# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| EVERETT DE'ANDRE ARNOLD, *et al*.<br><br>　　　　　　　Plaintiffs,<br><br>v.<br><br>BARBERS HILL INDEPENDENT SCHOOL DISTRICT, *et al*.<br><br>　　　　　　　Defendants. | CIVIL ACTION NO. 4:20-CV-01802<br><br>JURY TRIAL REQUESTED |

**DECLARATION OF PROFESSOR D. WENDY GREENE IN SUPPORT OF K.B.'S MOTION FOR A PRELIMINARY INJUNCTION**

I, D. Wendy Greene, J.D., LL.M. declare as follows:

1. I am a tenured Professor of Law at Drexel University's Thomas R. Kline School of Law. I earned a Bachelor of Arts degree in English (with Honors) and a double-minor in African-American Studies and Spanish from Xavier University of Louisiana. I also earned a Juris Doctor from Tulane University School of Law and a Masters in Law from the George Washington University School of Law where I specialized in employment discrimination law and comparative slavery and race relations in the Americas and Caribbean.[1]

2. Over the past 12 years as a law professor, I have taught Constitutional Law, Equitable Remedies, Race and American Law, Critical Race Theory, Employment Discrimination, Employment Law, and a seminar on Appearance and Grooming Codes

---
[1] Attached hereto as Exhibit A is my curriculum vitae ("Greene CV").

1

Discrimination—currently, to my knowledge, the only course of its kind offered in U.S. law schools.

3. I have published an authoritative body of legal scholarship on the social construction of race and the contemporary operation of racial discrimination in the Americas and Caribbean. Recently, I proposed a definition of race in the context of anti-discrimination law in my 2008 publication, "Title VII: What's Hair (and Other Race-Based Characteristics) Got to Do with It?,"[2] that was endorsed by the Ninth Circuit of Appeals[3] and cited by the Eleventh Circuit Court of Appeals in *EEOC v. Catastrophe Management Solutions*.[4] This definition of race has been adopted in the landmark C.R.O.W.N. Acts,[5] which are now law in California, New York, New Jersey, Virginia, Colorado, Washington State, and Maryland. I co-drafted the federal C.R.O.W.N. Act recently introduced in the United States House of Representatives and the United States Senate and parallel legislation in South Carolina. I have served as a legal consultant and expert in both legislative and litigation proceedings.

**NATURAL HAIR IS AN EXPRESSION OF BLACK IDENTITY.**

4. K.B. is a Black high school student.[6] His locs are an expression of his racial identity.

---

[2] D. Wendy Greene, *Title VII: What's Hair (and Other Race-Based Characteristics) Got to Do with It?*, 79 U. COLO. L. REV. 1355 (2008).
[3] *Guam v. Davis*, 932 F.3d 822, 835 (9th Cir. 2019).
[4] *Equal Employment Opportunity Commission v. Catastrophe Management Solutions, Inc*., 876 F.3d 1273 (11th Cir. 2017).
[5] Such Acts are further described below.
[6] In connection with my engagement in this matter, I have reviewed declarations of De'Andre Arnold and K.B., Barbers Hill Independent School District's recent dress and grooming policies as outlined in the Barbers Hill Independent School District's Student Handbook for the 2016-2017, 2017-2018, and 2019-2020 school years, and have had multiple conversations with counsel for the Plaintiffs.

2

**A.     Plaintiff's Locs are an Expression of Black Culture and Identity.**

5.     African descendants around the world commonly describe hairstyles like cornrows, locs, and Afros as "natural hairstyles." This description denotes hairstyles that are often achieved by the unimpeded growth of their naturally curly or coily hair texture. K.B.'s claim that his natural hairstyle is an expression of his racial identity is routinely asserted by African Americans today and is entirely consistent with African descendants' culture that has been widely understood in America since the era of slavery.

6.     According to Ayana D. Byrd and Lori L. Tharps:

> The name [dredlock] derives from the days of the slave trade. When Africans emerged from the slave ships after months spent in conditions adverse to any personal hygiene, Whites would declare the matted hair that had grown out of their kinky unattended locks to be "dreadful". (For that reason, many today wearing the style choose to drop the *a* in *dredloc* to remove all negative connotations.)[7]

7.     Throughout the era of racial slavery, slave traders, slave owners, and overseers fully understood the personal and cultural meaning of hair to Africans and their descendants. Historians Shane White and Graham White explain:

> [i]n African cultures, the grooming and styling of hair have long been important social rituals. Elaborate hair designs, reflecting tribal affiliation, status, sex, age, occupation, and the like, were common, and the cutting, shaving, wrapping, and braiding of hair were centuries-old arts. In part, it was the texture of African hair that allowed these cultural practices to develop; as the historian John Thornton has observed, "the tightly spiraled hair of Africans makes it possible to design and shape it in many ways impossible for the straighter hair of Europe."[8]

---

[7] Ayana D. Byrd and Lori L. Tharps, HAIR STORY: UNTANGLING THE ROOTS OF BLACK HAIR IN AMERICA 121 (St. Martin's Press 2d ed. 2014).
[8] Shane White and Graham White, *Slave Hair and African American Culture in the Eighteenth and Nineteenth Centuries*, 61 J. OF SOUTHERN HIST., 45, 49–50 (1995).

8. Journalist Michele Howe even noted braided hairstyles have been

> routine among blacks for nearly 3000 years . . . African sculptures dating back to 900 B.C. feature women wearing braids and cornrows. Pictures in history books also featured women wearing that style, some with beads and jewelry intertwined in the hair. Those styles are still common among some African [and African descended] women.[9]

9. The longstanding African traditions and subordination of African descendants are inextricably connected to the racial, cultural, and social significance of African descendants' natural hairstyles in more recent decades. Starting in the 1960s and 1970s, African descendants around the world began to don natural hairstyles more frequently for myriad reasons, but a common impetus was to reaffirm their African heritage and ancestry or to evince what was often communicated as "Black pride."[10]

10. Natural hairstyles like braids and locs continue to very much be a defining feature of African descendants' racial and cultural identities and commonly form the basis of claims like K.B.'s. For example, in 1981, a San Francisco news reporter, who was suspended from her employment for wearing cornrows and locs, contended that her employer's mandate, "'no cornrows or dreadlocks' is [racial] discrimination and denies me the right to express my heritage through hairstyle."[11] Similarly, in a seminal federal civil rights case, the plaintiff, a Black woman who challenged her employer's ban against all-braided hairstyles, contended that discrimination against her cornrow braids (similar to if

---

[9] Michele Howe, *The Braid Makes the Grade*, Daily Record (March 6, 1980).
[10] *See, e.g.*, Susan Berman, *Afro Sweeps Country: Whites and Blacks Really Dig It*, COURIER POST (March 19, 1971) (describing how Black men and women were increasingly wearing "the natural, or Afro-hairdo" as a symbol of "Black pride" and a rejection of Eurocentric appearance norms like straightened hair for women and short hair for men).
[11] *Cornrow Controversy*, THE MIAMI NEWS (Jan. 30, 1981).

4

a Black woman is discriminated against for wearing an Afro) constitutes racial and sex discrimination. According to the plaintiff in that case, an all-braided hairstyle "has been historically, a fashion and style adopted by Black American women, reflective of cultural, historical essence of the Black women in American society."[12]

11. African descendants, then and now, have reclaimed a physical characteristic—which once was legally and socially classified as a marker of racial inferiority and a justification for racial subjugation—as a positive expression of African ancestry and traditions.

**B.    Natural Hair and Locs are an Expression of West Indian Culture.**

12. K.B. also maintains that BHISD's grooming policy that prohibits locs infringes upon his cultural expression as a Black person.

13. In addition, K.B. has extended family members of Trinidadian descent who have long locs. Locs are a symbol of reverence to West Indian ancestors. West Indian cultural traditions prohibit cutting or trimming of locs.

14. K.B.'s extended family's beliefs are commonly held amongst Afro-Caribbeans or people of West Indian descent around the world. For example, in a case decided in 2011 by the High Court of London's Royal Courts of Justice, the claimant, an 11-year-old boy of African-Caribbean ancestry, was barred from matriculating in a Catholic school in London, England.[13] Like the instant case, school administrators

---

[12] *Rogers v. American Airlines*, 527 F. Supp. 2d 229, 231-32 (S.D.N.Y. 1981).
[13] *G v. St. Gregory's Catholic Sci. Coll*. [2011] EWHC 1452 (Eng.).
http://www.bailii.org/ew/cases/EWHC/Admin/2011/1452.html

enforced its grooming policy that mandated "hair should not be so long as to fall below the collar." [14]   The claimant also contended the grooming policy constituted racial discrimination in violation of the Equality Act of 2010 (which is the functional equivalent of the Civil Rights Act of 1964).[15]  In so doing, the claimant explained that he was unwilling to cut his hair, which he had never cut, because doing so would violate beliefs and traditions that were espoused and sincerely held within his Afro-Caribbean family and more broadly amongst Afro-Caribbean families throughout the African diaspora. The claimant presented evidence by two experts who affirmed his contention. One expert, Dr. Richard Majors—an educational psychologist and a visiting professor at the University of Colorado during the adjudication of the case—specifically explained the following:

> I know families in both the US and Britain who have a family tradition (i.e., non-religious beliefs) where the men in the family . . . do not cut their boys' hair. There are examples of such family traditions as well in the Caribbean…Haircutting in this context is unacceptable because hair is viewed as sacred by these families. These families wear their hair for non-religious reasons, rather than for religious beliefs.[16]

15.     Persuaded by the expert reports, the High Court ruled that the claimant presented sufficient evidence "that there are those of African-Caribbean ethnicity who do for reasons based on their culture and ethnicity regard the cutting of their hair to be wrong."[17]

---

[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.* (The High Court declined to rule that the claimant had to present evidence that all individuals of African-Caribbean descent held this belief or that the belief had to be religious in nature to establish an actionable claim of race discrimination.)

6

16. Similarly, in 2018, a five-year old girl in Kingston, Jamaica was also banned from attending primary school unless she cut off her locs.[18] The child's mother clarified she was not Rastafarian; however, her refusal to cut off her daughter's locs—which the child had been growing since she was a year old—was no less fundamental to her racial and cultural identity. According to her mother, cutting off her daughter's locs would contravene her family's beliefs.[19] Petitioners argued that the school's grooming policy infringed upon her freedom of cultural and racial expression.[20] The Supreme Court of Jamaica agreed and issued a preliminary order that the five year-old be permitted to enroll and attend the primary school.[21] JFJ The Executive Director aptly conveyed the significance of the Supreme Court's decision:

> [t]his is an important first victory that will allow the child to attend school and receive an education which she has a constitutional right to. Without this court order, she faced the prospect of being denied an education simply for refusing to remove her dreadlocks.[22]

### **FORCING BLACK PEOPLE TO CUT THEIR HAIR IS A FORM OF DISCRIMINATION AND RACISM.**

17. Like skin color, hair texture is imbued with racial meaning. Plaintiffs' assertion that the grooming policy, exacted to forbid their natural hairstyle, constitutes racial discrimination is consistent with historical examples of discrimination and racism exerted upon African descendants.

---

[18] Kate Chappell, *Jamaican Schoolgirl Banned for Dreadlocks Can Go to Class, Court Rules*, THE GUARDIAN (Aug. 28, 2018) https://www.theguardian.com/global-development/2018/aug/28/kingston-jamaica-girl-banned-from-school-for-dreadlocks-will-return-to-class-court-rules
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*

18.     During the era of slavery, the hair of Africans and their descendants served as a critical site upon which slave owners, traders, and overseers re-inscribed their physical, social, and legal control.  Alongside the grotesque practices of shackling and branding, the hair of Africans and African descendants was shorn to cement their legally subjugated status devoid of cultural identity, individual liberty, agency, and autonomy. White and White report:

> some eighteenth-century owners did resort to hair cropping, or shaving the head, as a form of punishment—for instance, the young slave Hannah had had "her Hair . . . lately cut in a very irregular Manner, as a Punishment for Offences," and Peter, a frequent runaway, had been branded "S on the cheek, and R on the other," and had had his hair cut entirely off.[23]

19.     Once slavery was abolished, locs continued to be determinative of racial classification and serve as a basis for race discrimination. Beginning very early in American history, distinguishable, observable features—like the natural hairstyles worn by African descendants—signified "whiteness" and "non-whiteness" and facilitated the development of a hierarchical social system based upon "race," whereby whiteness represented the superior status and non-whiteness the inferior.  Race provided the basis for racial slavery, racial segregation, and the attainment or denial of political, social, legal, and economic privileges and rights, including voting, owning property, traveling freely, receiving an education, and even becoming a citizen. Accordingly, lawmakers, philosophers, and scientists among other actors promulgated hierarchical systems that assigned physical and behavioral characteristics to people they perceived as having a

---

[23] *Id.* at 49.

common geographical and/or ancestral origin, i.e., "races."[24] Significantly, the developers of these racial classification systems did not simply mark physical and behavioral characteristics as signifiers of racial difference, but they also attached different social meanings to these traits which bolstered the social, political, legal, and economic subordination of one racial group by another.

20. Like individuals possessing a darker skin complexion, legal and social institutions imputed a badge of perpetual servitude upon people who possessed a tighter curl pattern or "woolly" hair texture, *i.e.* Africans or African descendants. For example, in a widely examined freedom suit, *Hudgins v. Wrights*, three women argued before the Virginia Supreme Court in 1806 that they were wrongfully enslaved because they were the daughter, granddaughter, and great-granddaughter of an indigenous woman named Butterwood Nan.[25] The Virginia Supreme Court pronounced these three women free in part because they possessed a white skin complexion yet more importantly, straight, long, black hair which judges reasoned was evidence of indigenous ancestry and not African ancestry.[26] Appreciating the reality of interracial intimacy, the Court espoused a persisting belief that despite one's skin complexion, a "woolly head of hair…was so strong an ingredient in the African constitution," it marked a person as African descendant and

---

[24] Recently, the Ninth Circuit Court of Appeals endorsed a similar understanding of race for the purposes of constitutional decision-making, declaring "as a legal concept, a racial category is generally understood as a group, designated by itself or others, as socially distinct based on perceived common physical, ethnic, or cultural characteristics." *Guam v. Davis*, 932 F.3d 822, 835 (9th Cir. 2019).
[25] *Hudgins v. Wrights*, 11 Va. (1 Hen. & M.) 133, 133–34 (1806)
[26] *Id.* at 139–40 (opining that indigenous people were marked by "copper coloured [skin complexion] with long jetty black, straight hair).

9

presumptively enslaveable.[27] Alternatively, a person who possessed white skin and hair texture "not woolly or inclining thereto" among other physical characteristics would be presumed European descendant and free.[28] Therefore, in *Hudgins*, early American judges pronounced that an individual's hair texture—despite her lighter skin color—could determine a legal classification as African descendant and thus enslaveable, or a legal designation as white or "Caucasian" and thus free.

21. Accordingly, hair texture, like one's skin color, has long served as a racial marker and consequently the basis for racial segregation, exclusion, harassment, and discrimination in myriad spheres. As is seen in the instant case and countless others around the world,[29] this unfortunate state of affairs persists in the 21st century. Currently, state legislators across the country and members of the United States Congress are clarifying civil rights protections against race discrimination in schools, workplaces, public accommodations, and housing so that the definition of race used when interpreting these laws reflects this historical and contemporary reality.

---

[27] *Id*. at 139.
[28] *Id*. at 140.
[29] *See, e.g*., Calla Wahlquist, *School Will Allow Black Students to Keep Hair Braids After "Ban" Furore*, The Guardian (Mar. 31, 2017) https://www.theguardian.com/australia-news/2017/mar/31/melbourne-school-allows-black-students-to-keep-braids-after-furore (discussing the rescission of a school's decision in Melbourne, Australia to suspend twin sisters of Sudanese descent if they did not remove their braids because their hairstyle, which the sisters claimed was an expression of their African culture, did not comport with the school's uniform policy and image); Krista Mahr, *Protests Over Black Girls' Hair Rekindle Debate about Racism in South Africa*, The Washington Post (Sept. 3, 2016) https://www.washingtonpost.com/world/africa/protests-over-black-girls-hair-rekindle-debate-about-racism-in-south-africa/2016/09/02/27f445da-6ef4-11e6-993f-73c693a89820_story.html?wpisrc=nl_headlines&wpmm=1 (discussing how school administrators in Pretoria, South Africa engaged in the hyper-regulation and stigmatization of Black female students' natural hairstyles, which generated student protests and comparisons to racial classification methods and accompanying racial segregation during racial apartheid).

22. Beginning with California in July 2018, nearly half of the states' legislatures, two municipal legislatures, and the United States Congress have either enacted or introduced what is known as the "C.R.O.W.N. Acts" (Creating a Respectful and Open Workplace/World for Natural Hair Acts) or parallel legislation to address the systematic racial discrimination that African descendants uniquely endure on the basis of their natural hairstyles like Afros, locs, braids, and twists. These historic pieces of legislation clarify that in addition to one's skin color, race-based discrimination is animated by mutable characteristics like one's hair texture, hairstyle, dress, language, among others.[30]

23. Hence, these legislative interventions provide a definition of race that embodies this understanding. For example, the C.R.O.W.N. Acts that are now in effect in California,[31] New Jersey,[32] New York,[33] Virginia,[34] and Montgomery County, Maryland[35] define race as "traits historically associated with race, including, but not limited to, hair texture and protective hairstyles" and specify that the term, "'protective hairstyles,' includes, but is not limited to, such hairstyles as braids, locks, and twists." Washington State's law defines race as inclusive of "traits historically associated or perceived to be associated with race including, but not limited to, hair texture and protective hairstyles."[36] In December 2019, the federal C.R.O.W.N. Act was introduced in the United States House

---

[30] See generally, D. Wendy Greene, *Title VII: What's Hair (and Other Race-Based Characteristics) Got to Do with It?*, 79 U. COLO. L. REV. 1355 (2008).
[31] S.B. No. 188, § 2 (Cal. 2019).
[32] S. 3945 (N.J. 2019).
[33] Assemb. B. A007, 2019-20 (N.Y. 2019).
[34] H.B. 1514, 2020 (Va. 2020).
[35] Montgomery County Md. City Council Bill 30-19 (2019). https://www.montgomerycountymd.gov/council/Resources/Files/agenda/col/2019/20191105/20191105_4B.pdf
[36] H.B. 2602, 2019-20 (Wash. 2020).

of Representatives and the United States Senate.  If passed, race and national origin for the purposes of federal civil rights statutes prohibiting discrimination in workplaces, housing, public accommodations, and institutions receiving federal funds would be defined as "characteristics commonly associated with race and national origin" inclusive of, but not limited to, natural and protective hairstyles African descendants commonly wear. [37] Maryland's C.R.O.W.N. Act which was passed in March of this year, simply defines race as "characteristics associated with race inclusive of naturally occurring texture and style."[38]

### BHISD'S HAIR POLICY IS DISCRIMINATORY.

24. Policies like BHISD's grooming policy are precisely the discriminatory measures which the federal CROWN Act and its parallel state legislation around the country aim to prohibit.  Through the enforcement of the BHISD grooming policy, the plaintiffs are being arbitrarily denied educational opportunities for wearing locs—a deeply rooted racial and cultural expression of their Black identity and African ancestry.

25. BHISD's enforcement of its grooming policy marks Plaintiffs' natural locs as a discrete site of racial and cultural stigmatization and in turn, a means to control, if not extinguish, a fundamental aspect of their racial and cultural personhood.  The BHISD's grooming policy, which penalizes Plaintiffs because they wear natural locs and essentially compels them to cut off their hair, bears a striking connection to the practices African descendants endured during the era of racial slavery, which were aimed to dehumanize and disempower them by quashing a critical feature of their racial and cultural identity.

---

[37] H.R. 5309 (U.S. 2019) and S. 3167 (U.S. 2019).
[38] H.B. 1444 (Md. 2020).

26. The enforcement of school grooming codes like BHISD's usurps many African-descended children's autonomy and freedom to express a deeply rooted feature that shapes their personal identification as Black as well as broader society's classification of them as such.[39] Therefore, BHISD's grooming policy that effectively compels Plaintiffs to cut off their locs infringes upon the Plaintiffs' expression of their sincerely held cultural and racial expression and their right to be free from racial discrimination.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 29th day of June, 2020 in Columbia, South Carolina

_____
Professor D. Wendy Greene

---

[39] This observation in no way means to suggest that a person's identity as a Black person is diminished if they do not wear natural hairstyles, or conversely, that only African-descended people wear natural hairstyles. It is only meant to explain that in a society where hair texture, like skin color, is associated with race, both characteristics are a critical part of how one's racial identity is informed and perceived, and in turn, how one is treated.

13