United States District Court
Southern District of Texas
**ENTERED**
August 17, 2020
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| EVERETT DE'ANDRE ARNOLD, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 4:20-CV-1802 |
| | § | |
| BARBERS HILL INDEPENDENT | § | |
| SCHOOL DISTRICT, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is a motion for a preliminary injunction filed by Plaintiff K.B. The Court held an evidentiary hearing on the motion over the three days spanning July 22, 2020 through July 24, 2020. (Dkt. 77–Dkt. 79) After careful consideration of the parties' written submissions, the extensive evidentiary record developed at the hearing, and the other filings in the case, K.B.'s motion (Dkt. 44) is **GRANTED**.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

K.B. is preparing to enter his junior year of high school and has enrolled at Barbers Hill High School in the Barbers Hill Independent School District ("BHISD"). BHISD has an excellent reputation in the Texas educational community and Barbers Hill High School is the home of the award-winning Soaring Eagle Marching Band. K.B. has attended BHISD schools since the first grade, excepting part of his sophomore year of high school, when the events giving rise to this lawsuit forced him to transfer from Barbers Hill High School to Sterling High School in the Goose Creek Consolidated Independent School District. (Dkt. 44-4 at pp. 3, 7) K.B. has testified that, while he was

enrolled at Sterling High School, he missed Barbers Hill High School, where he was an A/B student and played trombone in the marching band, and wished to return to complete his education there. (Dkt. 44-4 at pp. 7–8)

The dispute that forced K.B.'s transfer to Sterling and ultimately led to this lawsuit revolves around K.B.'s hair. K.B. is African-American and wears his hair in locs[1] "because it is part of [his] Black culture and heritage" and because he wants to emulate "[his] loved ones, including extended family members with West Indian roots, [who] have locs." (Dkt. 44-4 at p. 3) K.B. formed his natural hair into locs in the seventh grade and has not cut them since. (Dkt. 44-4 at p. 3; Transcript of preliminary injunction hearing, day one, pages 56–57) K.B. testified that "[l]ocs are meant to grow long" and that "[y]ou don't cut locs" because "they would unravel," undoing "all the hair process and growth" that the wearer spends years cultivating. (Dkt. 44-4 at p. 7; Transcript of preliminary injunction hearing, day one, pages 56–57)

Professor D. Wendy Greene, who testified as an expert for K.B., supported K.B.'s testimony with persuasive historical and sociological evidence showing that "hair texture, like one's skin color, has long served as a racial marker." (Dkt. 44-2 at p. 11) Professor Greene testified that locs are a long-recognized expression both of African-American identity and West Indian identity. (Dkt. 44-2 at pp. 4–8) According to Professor Greene, "K.B.'s claim that his natural hairstyle is an expression of his racial identity is routinely

---

[1] A common term for "locs" is "dreadlocks." However, Professor D. Wendy Greene, who testified as an expert for K.B., pointed out that the term "dreadlocks" has its origins in slave traders' describing slaves' unattended hair as "dreadful" when those slaves emerged from slave ships after spending months at sea during the Middle Passage. (Dkt. 44-2 at p. 4)

asserted by African Americans today and is entirely consistent with African descendants' culture that has been widely understood in America since the era of slavery." (Dkt. 44-2 at p. 4) Professor Greene also clarified that "[l]ocs are a symbol of reverence to West Indian ancestors" and that, furthermore, "West Indian cultural traditions prohibit cutting or trimming of locs." (Dkt. 44-2 at p. 6)

When K.B. began his freshman year at Barbers Hill High School, BHISD had a hair-length policy, applicable only to male students, mandating that:

> [b]oys' hair will not extend, at any time, below the eyebrows, below the ear lobes, or below the top of a t-shirt collar. Corn rows and/or dread locks are permitted if they meet the aforementioned lengths.
> Dkt. 44-4 at p. 3.

To comply with this hair-length requirement without having to cut his locs, K.B. wore a "thin headband and t[ied his] locs up and back, so they did not extend past [his] earlobes, neck, or eyebrows." (Dkt. 44-4 at p. 3) K.B. testified that his hair was scrutinized frequently and extensively by BHISD officials when he was a freshman. During that school year, Barbers Hill High School Assistant Principal Ryan Rodriguez "removed [K.B.] from class at least once per week to ensure [his] locs complied with the hair policy." (Dkt. 44-4 at p. 4) K.B. testified that the intrusive monitoring continued into the fall semester of his sophomore year, when he "was regularly called out of class" so that school administrators could gauge his compliance with the hair-length policy. (Dkt. 44-4 at p. 4) K.B. "received verbal warnings . . . regarding [his] hair length" but was allowed to return to class because he "always complied with the hair policy." (Transcript of preliminary injunction hearing, day one, pages 60–62; Dkt. 44-4 at p. 4)

But then BHISD changed its hair-length policy midway through K.B.'s sophomore year, in December of 2019. The new policy—still applicable only to male students—mandated that:

> [m]ale students' hair will not extend, at any time, below the eyebrows, or below the ear lobes. Male students' hair must not extend below the top of a t-shirt collar or be gathered or worn in a style that would allow the hair to extend below the top of a t-shirt collar, below the eyebrows, or below the ear lobes when let down.
> Dkt. 44-8 at p. 56.

The addition of the "when let down" language prevented K.B. from complying with the hair-length policy by tying his locs up and required K.B. to cut his locs to avoid punishment. K.B. did not cut his locs, and was punished with in-school suspension, which he described as being "what [he would] imagine prison to be like." (Transcript of preliminary injunction hearing, day one, pages 65–69) While in in-school suspension, students were completely isolated; they were not allowed to leave the room, talk to any other students, or participate in extracurricular activities. (Dkt. 44-4 at pp. 6–7; Transcript of preliminary injunction hearing, day one, pages 65–69) Students in in-school suspension did not receive instruction from certified teachers and "had to figure out [their] schoolwork and homework on [their] own." (Dkt. 44-4 at p. 7) Eventually, K.B. transferred to Sterling High School to finish out his sophomore year so that he could receive an education and continue to grow his locs without suffering further punishment. (Dkt. 44-4 at p. 7)

BHISD defends the mid-year hair policy change that resulted in K.B.'s transfer by asserting that it has a "legally acceptable right to still have gender-specific hair

expectations" and to prevent students from "circumventing" them. (Transcript of preliminary injunction hearing, day two, pages 555–58) Dr. Greg Poole ("Dr. Poole"), the Superintendent of BHISD, testified that the addition of the "when let down" language to the hair-length policy was needed to give "clarity that circumventing and manipulating the dress code policy is not permitted." (Transcript of preliminary injunction hearing, day two, page 531) Dr. Poole also used the term "circumvent" when asked specifically about K.B.'s method of complying with the previous iteration of the hair-length policy by tying his locs up, saying of K.B., "He's a great kid. I know that. But my impression he's circumventing the process to get by the dress code." (Transcript of preliminary injunction hearing, day two, page 554) Pressed on the meaning of these statements, Dr. Poole explained that he and the BHISD Board of Trustees aim to make BHISD's students "clean-cut" and "presentable." (Transcript of preliminary injunction hearing, day two, pages 555–58) Yet Dr. Poole also conceded that K.B. looked "clean-cut" and "very presentable" with his locs tied up. (Transcript of preliminary injunction hearing, day two, page 556) Pressed further, Dr. Poole ultimately simply asserted that, to his knowledge, BHISD "ha[s] a legal right to have gender-specific hair dress expectations." (Transcript of preliminary injunction hearing, day two, page 558)

K.B. and his co-plaintiffs[2] subsequently filed this suit against BHISD, alleging the following causes of action: (1) intentional race discrimination under the Fourteenth Amendment's Equal Protection Clause; (2) intentional race discrimination under Title VI

---

[2] K.B.'s lawsuit is brought on his behalf by his mother, Cindy Bradford. K.B.'s co-plaintiffs are his cousin, De'Andre Arnold, and De'Andre's mother, Sandy Arnold.

of the Civil Rights Act of 1964; (3) sex discrimination under the Fourteenth Amendment's Equal Protection Clause; (4) sex discrimination under Title IX; (5) violation of his First Amendment right to free speech; (6) retaliation in violation of the First Amendment; (7) retaliation in violation of Title VI; (8) retaliation in violation of Title IX; (9) intentional race discrimination in violation of Section 106.001 of the Texas Civil Practice and Remedies Code; and (10) sex discrimination in violation of Section 106.001 of the Texas Civil Practice and Remedies Code. (Dkt. 1 at pp. 29–49) In the complaint, K.B. and his co-plaintiffs ask the Court to, among other things, enjoin BHISD from enforcing its hair-length policy against K.B.; enjoin BHISD and the other defendants in this case from making disparaging comments about K.B. to anyone; and enjoin BHISD and the other defendants in this case from retaliating against K.B. for refusing to cut his locs. (Dkt. 1 at pp. 49–50; Dkt. 44 at pp. 40–41)

"Irrespective of race, creed, and gender, education makes it possible for people to stand out as equal with all the other persons from different walks of life." *Anon*. BHISD classes begin in two days on August 19, 2020. On that day, when K.B. arrives to attend his first class, he will be isolated from his classmates, placed in in-school suspension for violation of BHISD's hair policy, and remain there until the end of the school year. In the pending motion K.B. seeks to enjoin BHISD from denying him the opportunity to attend class and receive the same education, without fear of punishment or retaliation, as his classmates until a final judgment has been entered regarding his claims in this case. For the reasons stated in detail below, the motion for a preliminary injunction is granted.

## II.     THE LEGAL STANDARD

The purpose of a preliminary injunction is to preserve the status quo and prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits. *City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 285 (5th Cir. 2017). In the Fifth Circuit, the following well-established framework generally governs the determination of whether to grant a preliminary injunction:

> To be entitled to a preliminary injunction, the movant must satisfy each of the following equitable factors: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) the threatened injury to the movant outweighs the threatened harm to the party sought to be enjoined; and (4) granting the injunctive relief will not disserve the public interest. Because a preliminary injunction is an extraordinary remedy, it should not be granted unless the movant has clearly carried the burden of persuasion on all four requirements. Failure to sufficiently establish any one of the four factors requires this Court to deny the movant's request for a preliminary injunction.
> *Id.*

In presiding over a preliminary injunction hearing, a district court may "give even inadmissible evidence some weight when it is thought advisable to do so in order to serve the primary purpose of preventing irreparable harm before a trial can be held[.]" *Federal Savings & Loan Insurance Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1987) (quoting 11 C. Wright & A. Miller, *Federal Practice & Procedure* § 2949 at 471). In particular, "[a]ffidavits and other hearsay materials are often received in preliminary injunction proceedings. The dispositive question is not their classification as hearsay but whether, weighing all the attendant factors, including the need for expedition, this type of evidence was appropriate given the character and objectives of the injunctive proceeding." *Dixon*,

835 F.2d at 558 (quoting *Asseo v. Pan American Grain Co., Inc.*, 805 F.2d 23, 26 (1st Cir. 1986)).

### III.   <u>ANALYSIS</u>

K.B. has carried his burden of persuasion on all four of the required elements.

### a.   **Substantial likelihood of success on the merits**

"To show a likelihood of success, the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." *Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). "To assess the likelihood of success on the merits, [courts] look to standards provided by the substantive law." *Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011) (quotation marks omitted). When the plaintiff has brought multiple causes of action, he need only present a prima facie case on one of them. *Kalsi Engineering, Inc. v. Davidson*, No. 4:14-CV-1405, 2014 WL 12540550, at *2 & n.2 (S.D. Tex. Sept. 2, 2014); *Texas v. U.S.*, 95 F. Supp. 3d 965, 981 (N.D. Tex. 2015); *see also Butler v. Alabama Judicial Inquiry Commission*, 111 F. Supp. 2d 1224, 1230 (N.D. Ala. 2000) ("Under the first requirement for obtaining a temporary restraining order, the court does not have to find that Plaintiffs have a substantial likelihood of success on every claim set forth in their Complaint."). K.B. has clearly shown a substantial likelihood of success on the merits of at least one claim.

### 1.   *Sex discrimination in violation of the Equal Protection Clause*

K.B. has asserted a cause of action under 42 U.S.C. § 1983 for sex discrimination in violation of the Equal Protection Clause (Dkt. 1 at p. 36), and he has clearly shown a substantial likelihood of success on the merits on that cause of action. "To state a claim

under §1983, a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Piotrowski v. City of Houston*, 51 F.3d 512, 515 (5th Cir. 1995). The parties do not dispute that K.B. may use Section 1983 to vindicate his rights under the Equal Protection Clause, nor is there any dispute that the "color of state law" requirement is met. Such disputes would be fruitless. *See, e.g., Arceneaux v. Assumption Parish School Board*, 733 Fed. App'x 175, 177 (5th Cir. 2018) (noting that student's claim against principal and school board for sex discrimination under the Equal Protection Clause "is actionable under 42 U.S.C. § 1983").

The parties are in further agreement that the challenged hair-length policy applies only to male students and was explicitly intended to create a gender-based distinction; in its own papers, BHISD acknowledges that one "express distinction made in the dress code is between male and female students: girls may wear their hair long, boys may not." (Dkt. 12 at p. 12) The parties diverge, however, on the question of whether this Court should apply the Supreme Court's demanding intermediate-scrutiny standard in evaluating the Constitutionality of the challenged hair-length policy. The Supreme Court has described the intermediate-scrutiny standard in the following way:

> To summarize the Court's current directions for cases of official classification based on gender: Focusing on the differential treatment for denial of opportunity for which relief is sought, the reviewing court must determine whether the proffered justification is exceedingly persuasive. The burden of justification is demanding and it rests entirely on the State. The State must show at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives. The justification must be genuine, not hypothesized or invented *post hoc* in

>response to litigation. And it must not rely on overbroad generalizations
>about the different talents, capacities, or preferences of males and females.
>*U.S. v. Virginia*, 518 U.S. 515, 532–33 (1996) (quotation marks, brackets,
>and citations omitted).

The Supreme Court has further clarified that "the classification must substantially serve an important governmental interest *today*, for in interpreting the equal protection guarantee, we have recognized that new insights and societal understandings can reveal unjustified inequality that once passed unnoticed and unchallenged." *Sessions v. Morales-Santana*, 137 S.Ct. 1678, 1690 (2017) (quotation marks, brackets, and ellipsis omitted; emphasis in original). The Supreme Court's "case law evolving since 1971 reveals a strong presumption that gender classifications are invalid." *Virginia*, 518 U.S. at 532 (quotation marks and brackets omitted) (citing Justice Kennedy's concurrence in *J.E.B. v. Alabama ex rel T.B.*, 511 U.S. 127, 152 (1994)). The Supreme Court recently reiterated that this "heightened scrutiny . . . attends all gender-based classifications." *Morales-Santana*, 137 S.Ct. at 1689 (quotation marks omitted).

In its early filings, BHISD did not contest the applicability of the intermediate-scrutiny standard and admitted that, "because it makes distinctions based on sex, [BHISD's] dress code is subject to intermediate scrutiny." (Dkt. 12 at p. 12) However now, relying on the holding in *Karr v. Schmidt*, 460 F.2d 609 (5th Cir. 1972), BHISD argues that "binding precedent precludes the Court from applying that standard." (Dkt. 57 at p. 31) BHISD argues that this case requires the Court to apply a rational-basis review to its hair-length policy. Even assuming that a half-century-old opinion "precludes" the use of a standard that the Supreme Court said just three years ago is applicable to all

gender-based classifications, *Karr* does not address sex discrimination; to the contrary, it explicitly distinguishes a Seventh Circuit case, *Crews v. Cloncs*, 432 F.2d 1259, 1266 (7th Cir. 1970), that does discuss sex discrimination. The relevant passage of *Karr* states that:

> [t]he Equal Protection clause has not generally been relied upon as a basis for invalidating hair-length regulations with the exception of a Seventh Circuit case [*Crews*] which held that hair regulations are violative of the Equal Protection clause because they apply solely to male students and not to female students. *In this case, however,* the theory of the district court is that, *as between male students*, any classification based upon hair length contravenes the Equal Protection guarantee.
> *Karr*, 460 F.2d at 616 (footnote omitted) (emphasis added).

*Karr* did not discuss the questions presented by K.B.—let alone resolve them adversely to K.B.—because the *Karr* Court was not presented with those questions. It is materially distinguishable from this case. In any event, it predates the Supreme Court precedent the application of which it purportedly precludes. *See Virginia*, 518 U.S. at 558 (Rehnquist, C.J., concurring) (noting that the Supreme Court has applied the intermediate-scrutiny standard to classifications by sex since 1976, when it issued *Craig v. Boren*, 429 U.S. 190, 197 (1976)). *Karr* simply does not bar K.B.'s claims.

Next, relying on the Supreme Court's plurality opinion in *Parham v. Hughes*, 441 U.S. 347, 351 (1979), BHISD argues that K.B. must prove "invidious discrimination [a]s a threshold inquiry" before intermediate scrutiny applies. (Dkt. 89 at p. 6) The Court finds this argument unmeritorious. The opinion does not create a threshold burden for

K.B. of proving "invidious discrimination;" only three other justices joined that opinion,[3] and the more recently decided cases of *J.E.B.*, *Virginia*, and *Morales-Santana* neither cite *Parham* nor mention such a threshold inquiry. Accordingly, the Court will apply the intermediate-scrutiny standard articulated in *J.E.B.*, *Virginia*, and *Morales-Santana*.

Under this standard BHISD has the "demanding" burden of presenting an "exceedingly persuasive" justification for the hair-length policy, meaning that the hair-length policy must "at least" be "substantially related to the achievement" of "important governmental objectives[.]" *Virginia*, 518 U.S. at 532–33 (quotation marks omitted).[4] Here, the evidence does not meet this burden.

Under the Supreme Court's intermediate-scrutiny standard, K.B. has clearly shown a substantial likelihood of success on the merits on his cause of action for sex discrimination in violation of the Equal Protection Clause. In its briefing, BHISD proffers

---

[3] The concurring and dissenting Justices in *Parham* all simply cited and applied intermediate-scrutiny cases. *See Parham v. Hughes*, 441 U.S. 347, 359 (1979) (Powell, J., concurring) (citing *Craig v. Boren*, 429 U.S. 190, 197 (1976)); *see also id.* at 362 (White, J., dissenting, joined by Brennan, Marshall, and Blackmun, JJ.) (citing *Caban v. Mohammed*, 441 U.S. 380, 388 (1979), which quoted *Craig*). In his concurring opinion, Justice Powell specifically clarified that he "arrive[d] at this conclusion by a route somewhat different from that taken by Mr. Justice Stewart." *Id.* at 359 (Powell, J. concurring).

[4] BHISD argues that K.B. should not prevail because "K.B. has not shown that BHISD will not be able to demonstrate that its hair length regulation is substantially related to important governmental objectives" (Dkt. 57 at p. 37). This statement flips the burden of justification, which, according to the Supreme Court, "rests entirely on the State." *U.S. v. Virginia*, 518 U.S. 515, 533 (1996). Additionally, since "[t]he justification must be genuine, not hypothesized or invented *post hoc* in response to litigation[,]" *Id.*, BHISD is bound by the justifications that actually led it to create the hair-length policy and may not craft justifications during the course of this litigation just to stymie K.B. *See Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011) ("To assess the likelihood of success on the merits, [courts] look to standards provided by the substantive law.") (quotation marks omitted). K.B. is not required now, and will not be required later, to defeat proffered justifications that had nothing to do with the formulation of the policy, much less to defeat every conceivable justification for it. *Virginia*, 518 U.S. at 533.

as justifications for its hair-length policy that the policy helps to "maintain a standard of excellence[;]" "maintain . . . an atmosphere conducive to learning[;]" "[p]repar[e] students for success in college, the military, and the workplace[;]" and "promot[e] educational goals." (Dkt. 12 at p. 12; Dkt. 57 at p. 37) BHISD's website states that "[t]he District's dress code is established to teach grooming and hygiene, prevent disruption, avoid safety hazards, and teach respect for authority." (Dkt. 61 at bates number 16) But at the hearing on K.B.'s motion, BHISD administrators could not articulate facts establishing any discernible relationship between the hair-length policy—particularly the most recently enacted iteration of the policy, which regulates the length of male students' hair "when let down"—and the stated justifications for the dress code. Rather, Barbers Hill High School Principal Rick Kana testified that a male Native American Barbers Hill High School student was granted an exemption from the hair-length policy with no apparent effect on BHISD's educational goals:

> Q:   Did allowing the Native American student to come to school with uncut hair interfere with your ability to cultivate a disciplined culture within your high school?
>
> A:   No.
>
> Q:   Did allowing the Native American student to come to school with uncut hair negatively affect the safety of the school?
>
> A:   Not that I'm aware of.
>
> Q:   Did allowing the Native American student to come to school with uncut hair affect his or any other student's ability to academically achieve?
>
> A:   I don't think I can answer that question, because I can't speak on behalf of all students in that case.

. . .

Q:    Did allowing a Native American student to come to school with uncut hair affect teachers' ability to teach hygiene?

A:    I don't know if I can answer that for the teachers. I did want to say one thing on it. That when it first happened, it took a lot of—there were a lot of questions by students wondering why does this student get to have it, and we had to be very careful in how we answered that. But it did—it did disrupt for a while until students were used to it.

Q:    And once students became used to seeing one of their school mates with uncut hair, did it continue to be a disruption to have a Native American student with uncut hair at your school?

A:    No.

Transcript of preliminary injunction hearing, day two, pages 306–07.

Principal Kana testified that the exemption granted to the male Native American student was the only exemption to the hair-length policy that he had granted in his eight years as Principal. (Transcript of preliminary injunction hearing, day two, page 305)

BHISD Career & Technical Education Instructor Kirven Tillis seconded Principal Kana's testimony regarding the male Native American student and conceded that a male student could wear uncut locs let down without interfering with BHISD's goals:

Q:    You testified yesterday that Native Americans having uncut hair was not problematic because the rest of the student population understood that it was for religious reasons, correct?

A:    Correct.

Q:    Would that not be also true for an individual who was wearing locks?

A:    As I said, potentially, yes.

Transcript of preliminary injunction hearing, day three, page 751; *see also* transcript of preliminary injunction hearing, day two, page 683.

Moreover, Principal Kana, when questioned specifically about the connection between the hair-length policy and BHISD's educational goals, provided no support for such a connection and at times denied one:

Q:   In your opinion, does the length of a male student's hair or, you know, whether it's all below the eyebrows, the earlobes, or the shirt collar, have anything to do with the male student's hygiene?

A:   No.

. . .

Q:   Does the length of a male student's hair have anything to do with whether they can display discipline?[5] Besides self-control.

A:   No.

Q:   Does the length of a male student's hair have anything to do with their likelihood of success at school and after they graduate from high school?

A:   I can't really determine that. I can't really determine any of the questions. I don't know.

Q:   In your opinion, does the length of a male student's hair have anything to do with whether they can achieve academically?

A:   I'm not sure.

Transcript of preliminary injunction hearing, day one, pages 209–10.

---

[5] At this point, defense counsel objected, saying, "Objection. 'Discipline?'" The basis of the objection was not clear, and the questioning continued without defense counsel securing a ruling or further pressing the issue.

Dr. Poole, during a similar line of questioning, was unable to identify any peer–reviewed research linking the hair-length policy to BHISD's educational goals:

> Q:   Superintendent Poole, are you aware of any peer-reviewed research that shows that limiting the length of a boy's hair fosters excellence?
>
> A:   I am aware of research that indicates dress code and high expectations and standards, but, no, I'm not aware of that specific thing that you asked.
>
> Q:   And, Superintendent Poole, are you aware of any peer-reviewed research that shows that limiting the length of a boy's hair instills discipline?
>
> A:   No.
>
> Q:   And are you aware of any peer-reviewed research that shows that limiting the length of a boy's hair teaches hygiene?
>
> A:   No.
>
> Q:   Are you aware of any peer-reviewed research that shows that limiting the length of a boy's hair teaches respect for authority?
>
> A:   No.
>
> Q:   And are you aware of any peer-reviewed research that shows that limiting the length of a boy's hair fosters academic achievement?
>
> A:   No. ma'am.
>
> Transcript of preliminary injunction hearing, day two, pages 562–63.

The present iteration of the hair-length policy, which regulates the length of male students' hair "when let down," seems particularly unmoored from any of BHISD's stated objectives. Before the current policy was enacted, K.B. was able to comply with the BHISD hair-length code by tying his locs so that they did not exceed the maximum

length. Principal Kana was unable to explain how K.B.'s tying his locs up created any sort of problem for K.B., BHISD, or K.B.'s fellow students:

Q:      And had he cut his locks by the start of the fall 2019 school year?

A:      Not that I was aware of, no, ma'am.

Q:      So he had long—he had uncut locks at this time, but he was attending his regular classes?

A:      Yes, ma'am.

Q:      And he was—and he was participating in band?

A:      Yes, ma'am.

Q:      During that time, did KB's uncut locks prevent teachers from fostering academic excellence in their students?

A:      I can't answer that.

Q:      At that time, did KB's uncut locks prevent teachers from maintaining high standards for their students?

A:      I can't answer for those teachers.

Q:      Did KB's uncut locks cause a disruption?

A:      I can't answer that. Not that I was aware of. I can answer that, yes, I can. Not that I was aware of.

. . .

Q:      Would KB's uncut locks, or did KB's uncut locks cause a safety threat to anyone?

A:      Can't answer that.

Q:      Did KB's uncut locks threaten or hurt anyone in any way?

A:      I have no idea.

Q:     Would KB's uncut locks hurt anyone if he was allowed to return to school without cutting them in the fall of 2020?

A:     Would they harm anyone?

Q:     Yes. Would they harm anyone if he were to return to school into his regular classes and to band without cutting them, in the fall of 2020 semester?

A:     What do you mean by "harm?"

Q:     Would they hurt anyone in any way?

A:     Not that I would be aware of, no.
Transcript of preliminary injunction hearing, day one, pages 188–90.

Notably, during closing arguments, BHISD's counsel admitted that the hair-length policy "seem[s] arbitrary" but contended that it still meets the requisite Constitutional standard because it is part of a proven "formula" that must be unquestioningly accepted:

They got something special going on here, and it's good. And to create, to tamper with their formula because you don't understand every jot and tittle of how the formula works, and say, "I don't understand what length has to do with it." It's like parenting. Children don't have to understand everything the parent does, but the parent has that exclusive authority to make some rules that seem arbitrary, but are supported by rational experience.
Transcript of preliminary injunction hearing, day three, page 991.

The lack of a persuasive justification for the hair-length policy establishes a substantial likelihood that K.B. will prevail on his cause of action under 42 U.S.C. § 1983 for sex discrimination in violation of the Equal Protection Clause.

2.     *Race discrimination in violation of the Equal Protection Clause*

Next, K.B. has asserted a cause of action under 42 U.S.C. § 1983 for race discrimination in violation of the Equal Protection Clause. (Dkt. 1 at p. 29) Based on the

evidence discussed above and additional evidence discussed below, he has clearly shown a substantial likelihood of success on the merits on that cause of action. Although it makes an explicit distinction based on gender, the BHISD hair-length policy does not make explicit distinctions based on race. The Court will accordingly apply the Supreme Court's *Arlington Heights* analysis to evaluate K.B.'s likelihood of succeeding on the merits of his cause of action for race discrimination in violation of the Equal Protection Clause.

K.B.'s race-discrimination claim under the Equal Protection Clause requires him to provide proof of a racially discriminatory intent or purpose. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265 (1977). "However, racial discrimination need only be one purpose, and not even a primary purpose, of an official action for a violation to occur." *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016) (quotation marks and brackets omitted); *see also Arlington Heights*, 429 U.S. at 266 n.14 ("A single invidiously discriminatory governmental act . . . would not necessarily be immunized by the absence of such discrimination in the making of other comparable decisions."). "In *Arlington Heights*, the Supreme Court set out five nonexhaustive factors to determine whether a particular decision was made with a discriminatory purpose, and courts must perform a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id*. at 230–31 (quotation marks and footnotes omitted). The *Arlington Heights* Court wrote that:

> [t]he historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes. The specific sequence of events leading up to the challenged

decision also may shed some light on the decisionmaker's purposes. For example, if the property involved here always had been zoned R-5 but suddenly was changed to R-3 when the town learned of MHDC's plans to erect integrated housing, we would have a far different case. Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.

The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports.

. . .

The foregoing summary identifies, without purporting to be exhaustive, subjects of proper inquiry in determining whether racially discriminatory intent existed.

*Arlington Heights*, 429 U.S. at 267–68 (citations and footnotes omitted).

K.B. bears the burden "to show that racial discrimination was a substantial or motivating factor" behind the creation of the hair-length policy. *Veasey*, 830 F.3d at 231 (quotation marks omitted). If K.B. meets that burden, the burden shifts to BHISD "to demonstrate that the [policy] would have been enacted without this factor." *Id.* (quotation marks omitted). This Court has observed that a plaintiff relying on the *Arlington Heights* analysis to demonstrate discriminatory intent through direct or circumstantial evidence "need provide very little such evidence" to raise a genuine issue of material fact and that "*any indication of discriminatory motive*" may suffice to raise a jury question. *Rollerson v. Port Freeport*, No. 3:18-CV-235, 2019 WL 4394584, at *6 (S.D. Tex. Sept. 13, 2019), *adopted*, 2019 WL 6053410 (S.D. Tex. Nov. 15, 2019) (quotation marks omitted; emphasis in *Rollerson*).

Although the hair-length policy is facially race-neutral, K.B. has presented sufficient statistical and testimonial evidence that could establish, under the *Arlington Heights* analysis, that BHISD's hair-length policy—particularly the most recent iteration of that policy—was enacted with a racially discriminatory motive. First, K.B. has presented statistical evidence showing that, both before and after the most recent iteration of the hair-length policy was enacted, BHISD disproportionately enforced its hair-length policy against African-American students. K.B.'s attorneys have examined BHISD disciplinary records, which are contained in the evidentiary record at bates numbers 116 to 365 of docket entry 61, and calculated that, during K.B.'s sophomore year, African-American students at Barbers Hill High School were three times more likely than their white classmates to lose at least one day of instruction to hair-related in-school suspension. (Dkt. 92 at p. 1) According to those same calculations, African-American students at Barbers Hill High School who were placed in in-school suspension during K.B.'s sophomore year lost an average of 3.5 days of instruction; white students who were placed in in-school suspension lost an average of one day of instruction. (Dkt. 92 at p. 1) In other words, there is credible statistical evidence in the record showing that African-American students were more likely than white students to be punished, and to be punished harshly, on account of the hair-length policy.[6]

---

[6] This morning the parties submitted further briefing and evidence regarding the background of the numbers provided by BHISD and used for K.B.'s statistical calculations. While BHISD provided argument and evidence that these calculations may not paint a clear view of the policy's effects, the Court finds that there is sufficient evidence at this stage of the litigation to find that these calculations are credible and relevant to the Court's adjudication of the pending motion.

The statistics compiled from BHISD's disciplinary records reflect the experiences described by K.B. and his cousin and co-plaintiff, De'Andre Arnold ("De'Andre"),[7] in their testimony. Both K.B. and De'Andre have testified that they were singled out by school officials for near-constant scrutiny, and were often pulled out of class, because of their locs during their time at Barbers Hill High School, even though they complied with the hair-length policy by tying their locs up before BHISD made compliance in that manner impossible in December of 2019. (Dkt. 44-4; Dkt. 44-7) K.B. testified that he did not see anyone other than himself and De'Andre subjected to such scrutiny, and De'Andre testified that he saw white male students whose hair violated the hair-length policy but who were not pulled out of class. (Dkt. 44-4 at p. 4; Dkt. 44-7 at p. 7)

One particularly illustrative example of the alleged disparity in scrutiny between K.B. and De'Andre and their white classmates is a striking intersection between the statistics compiled from BHISD's disciplinary records and the events that caused K.B. and De'Andre to transfer to Sterling High School. In December 2019, BHISD amended its hair-length policy to bar male students from wearing any hairstyle that would allow the hair to extend below the top of a t-shirt collar, below the eyebrows, or below the ear lobes "when let down." (Dkt. 44-8 at p. 56) In his testimony, Dr. Poole justified the addition of the "when let down" language to the hair-length policy by claiming that the change was needed to give "clarity that circumventing and manipulating the dress code policy is not permitted." (Transcript of preliminary injunction hearing, day two, page

---

[7] De'Andre was a senior during the 2019-20 school year. Like K.B., he transferred to Sterling High School, from which he graduated, so that he could continue receiving an education without cutting his locs. (Dkt. 44-7 at p. 9)

531) K.B. and De'Andre testified that their hair was again subject to intense scrutiny when the change was made: when school started on January 7, 2020 after Winter Break, they were told they would be sent to in-school suspension because of their locs. (Dkt. 44-4 at p. 6; Dkt. 44-7 at p. 9) However, *after* De'Andre gave an interview about the hair-length policy to a local news show on January 17, 2020, the number of disciplinary actions against *other* students increased to an apparently unprecedented level. (Dkt. 92 at pp. 2–3) K.B.'s analysis of the BHISD disciplinary statistics indicates that Barbers Hill High School personnel issued 91 hair-policy disciplinary referrals in the nine school days after De'Andre's interview, which was more hair-policy disciplinary referrals than they had issued in each of the three prior full school years. (Dkt. 92 at p. 3)[8] During the 2019-20 school year, African-American students comprised only 3.94% of students at Barbers Hill High School and 3.82% of students in BHISD overall. (Dkt. 61 at bates number 115) This evidence would support a conclusion that numerous white male students had continued "circumventing and manipulating" the hair-length policy after the December 2019 amendment but had only been punished after De'Andre highlighted BHISD's alleged unconstitutional conduct and generated unfavorable media coverage for BHISD.

The process by which the hair-length policy was amended in December 2019 also supports K.B.'s claim. The December 2019 amendment to the hair-length policy was the culmination of a string of increasingly more restrictive recent amendments. De'Andre, who was two years ahead of K.B. and spent three and a half years at Barbers Hill High

---

[8] In the 2018-19 school year, there were 66 hair-policy-related disciplinary referrals. In the 2017-18 school year, there were 43. In the 2016-17 school year, there were 36 (Dkt. 92 at p. 7).

School, testified that the hair-length policy was amended several times during his time at Barbers Hill High School, and it appears that each amendment was intended to be more restrictive than the last. (Dkt. 44-7 at pp. 5, 7) BHISD changed the hair-length policy before De'Andre's sophomore year so that male students were no longer allowed to use hair accessories, such as the headbands that De'Andre had been using, to tie their hair up, and before De'Andre's junior year BHISD changed its policy again to prohibit male students' hair from extending below the maximum length "at any time." (Dkt. 44-7 at p. 5)

The December 2019 amendment stands out not only for being the most restrictive iteration of the policy but also because of the procedure by which it was enacted. As Dr. Poole and Principal Kana both conceded, the hair-length policy is typically revised before the school year begins, not in December, which is in the middle of the school year. (Transcript of preliminary injunction hearing, day one, page 169, and day two, pages 569–70) Principal Kana could not recall seeing a mid-school-year revision of the hair-length policy in his eight years as principal, while Dr. Poole thought that he had seen such a revision in his 15 years as superintendent but could not be certain. (Transcript of preliminary injunction hearing, day one, page 169, and day two, pages 569–70)[9]

Moreover, there is evidence that the BHISD Board imposed restrictions on citizens' ability to put items on the agenda at the meeting at which the December 2019

---

[9] BHISD officials testified that they understood the timing of the policy change was due to the conclusion of a Department of Justice investigation into the BHISD hair policy. However, there was no evidence provided that either the timing of the changes or the policy's new language was required because of the investigation.

revision to the hair-length policy was enacted. Sandy Arnold, De'Andre's mother, testified that she attempted to add public comment regarding the proposed hair policy as an agenda item for the December 2019 Board meeting. (Dkt. 44-5 at pp. 8–9) Ms. Arnold was told that she had to complete the required steps a month in advance of the Board meeting, but the BHISD Board's written policies state that the deadline is seven days in advance of the meeting. (Dkt. 44-5 at p. 9; Dkt. 44-16 at p. 2)

This evidence in the record of selective enforcement, procedural irregularities, and increasingly restrictive amendments, coupled with the lack of a persuasive justification for the hair-length policy, establishes a substantial likelihood that K.B. will satisfy the *Arlington Heights* analysis and prevail on his cause of action under 42 U.S.C. § 1983 for race discrimination in violation of the Equal Protection Clause.

### 3. *First Amendment right to free speech*

Finally, K.B. has asserted a cause of action under 42 U.S.C. § 1983 for violation of his right to free speech under the First Amendment (Dkt. 1 at p. 40), and he has clearly shown a substantial likelihood of success on the merits on that cause of action. As a threshold matter, the Court agrees with K.B., based on K.B.'s testimony and Professor Greene's testimony, that K.B.'s locs are sufficiently communicative to warrant First Amendment protection. "Visibly wearing one's hair in a particular manner is capable of communicating one's religion or heritage." *Gonzales v. Mathis Independent School District*, No. 2:18-CV-43, 2018 WL 6804595, at *7 (S.D. Tex. Dec. 27, 2018); *see also A.A. ex rel. Betenbaugh v. Needville Independent School District*, 701 F. Supp. 2d 863,

882 (S.D. Tex. 2009) ("A.A.'s braids convey a particularized message of his Native American heritage and religion.").

When examining content-neutral restrictions on expressive activities, the Court must determine whether: (1) the restriction is within the Constitutional power of the government; (2) the restriction furthers an important or substantial governmental interest; (3) the government's important or substantial interest is unrelated to the suppression of student expression; and (4) the incidental restrictions on First Amendment activities are no more than is necessary to facilitate the government's important or substantial interest. *Littlefield v. Forney Independent School District*, 268 F.3d 275, 286 (5th Cir. 2001). There is scant evidence in the record tying the hair-length policy to any important or substantial government interest. Even if such an interest can be shown, the incidental restrictions on K.B.'s expressive conduct go far beyond what is necessary to facilitate that interest because the current iteration of the hair-length policy necessarily regulates the length of K.B.'s hair when he is not at school. *Cf. id.* at 287 (holding that a school uniform policy did not place an unconstitutional burden on First Amendment activities because the policy only governed student attire during school hours).

The lack of a persuasive justification for the hair-length policy, coupled with the overinclusive nature of the December 2019 amendment, establishes a substantial likelihood that K.B. will prevail on his cause of action under 42 U.S.C. § 1983 for violation of his right to free speech under the First Amendment.

K.B. has clearly shown a substantial likelihood of success on the merits of at least one claim. He has accordingly satisfied the first of the four equitable factors required to obtain preliminary injunctive relief.

### b.  Threat of irreparable injury

K.B. has clearly shown a substantial threat of irreparable injury. "To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable. The plaintiff need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986) (footnotes omitted). "It has repeatedly been recognized by the federal courts at all levels that violation of constitutional rights constitutes irreparable harm as a matter of law[,]" *Cohen v. Coahoma County, Mississippi*, 805 F. Supp. 398, 406 (N.D. Miss. 1992) (collecting cases), and that principle includes violation of rights under the Equal Protection Clause. *Killebrew v. City of Greenwood, Mississippi*, 988 F. Supp. 1014, 1016 (N.D. Miss. 1997). In the educational context, courts have also found a substantial threat of irreparable harm when students have shown that they will be placed in in-house detention and as a result "given inferior instruction[.]" *Alabama and Coushatta Tribes of Texas v. Trustees of Big Sandy Independent School District*, 817 F. Supp. 1319, 1336–37 (E.D. Tex. 1993).

K.B. has presented ample evidence demonstrating a substantial threat of irreparable injury. For one, he has shown a substantial likelihood that his rights under the Equal Protection Clause and the First Amendment will be violated if his motion for a

preliminary injunction is not granted. Furthermore, if K.B. returns to Barbers Hill High School for the 2020-21 school year without cutting his locs, he will be either forced to do his schoolwork at home or punished with in-school suspension, which is exactly what happened to him when he did not cut his locs during the 2019-20 school year. K.B. described the experience during the hearing on his motion:

> Q:   And did you return to school or to campus the following day for in-class instruction?
>
> A:   No, I didn't.
>
> Q:   And why not?
>
> A:   Because I would be put into in school suspension if I were to return to the high school.
>
> Q:   So how did you receive continued instruction if you didn't report to class?
>
> A:   My mother went to the high school, and she picked up all of my homework and brought it to me, and I completed it to my best abilities.
>
> Q:   And did the homework that you received have accompanying instructions?
>
> A:   It had little to none explanations of what the new lesson was.
>
> Q:   And were you able to keep up with the instruction that was happening in class?
>
> A:   No, I was not.
>
> . . .
>
> A:   I returned to school in the early days of February, when I had learned that I was in danger of losing credit.
>
> Q:   Okay. And what happened when you returned to school?

A:   When I returned to school, I had been sent to ISS, in-school suspension.

Q:   And can you explain for us what your in-school suspension experience was like?

A:   My experience in ISS, the first word I can think of was it was a horrible experience. It's almost what I'd imagine prison to be like to take a social kid like myself who enjoys being around friends and, you know, talk with people and to isolate them from the rest of my peers.
     ISS is you're in a separate classroom from everyone else, you're secluded from even the other students in ISS. You have your back facing toward the ISS teacher, and they even take your backpack away from you and they put it in a small cubby. There's no leaving the room for anything, there's no participating in any extracurriculars at all, there's absolutely no talking at all. And there's no going to any teacher's classrooms with any help or questions. You're in the classroom from the beginning of the day to end of the day. And it was a really hard and tough experience for me.

          . . .

Q:   And so, how was the instruction you received while in ISS? Can you just elaborate on that a little bit more? Was it akin to or similar to regular in-class instructions?

A:   It wasn't like regular in-class instruction. I received little to none. It wasn't like my teachers could be the class they were teaching and come teach me a lesson as well.

. . .

Q:   And what were your grades like from this period of working from home and working at ISS? What happened to your grades?

A:   My grades had dropped dramatically. I was getting to—my grades were lowering. I wasn't getting that same in-class experience that I was supposed to be getting.

Transcript of preliminary injunction hearing, day one, pages 65–69.

K.B. has clearly shown a substantial threat of irreparable injury. He has accordingly satisfied the second of the four equitable factors required to obtain preliminary injunctive relief.

### c. Relative weight of threatened harm

K.B. has clearly shown that the threat of harm he faces if his motion for a preliminary injunction is denied outweighs the threat of harm faced by BHISD if K.B.'s motion for a preliminary injunction is granted. Again, K.B. has shown a substantial likelihood that his rights under the Equal Protection Clause and the First Amendment will be violated if his motion for a preliminary injunction is denied, and he has additionally shown that he will receive either inferior instruction or no instruction if his motion is denied. On the other hand, there is no evidence that BHISD will suffer any harm if K.B.'s motion is granted: Principal Kana and Kirven Tillis testified that, when a male Native American high school student was given an exemption from the BHISD hair-length policy, there was no apparent effect on the school or its students. Kirven Tillis also conceded that a male student could wear uncut locs let down without interfering with BHISD's goals.

K.B. has satisfied the third of the four equitable factors required to obtain preliminary injunctive relief.

### d. The public interest

Finally, K.B. has clearly shown that granting his motion for a preliminary injunction will not disserve the public interest. K.B. has shown a substantial likelihood that his rights under the Equal Protection Clause and the First Amendment will be

violated if his motion for a preliminary injunction is denied. "It is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Organization v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (quotation marks and brackets omitted). Conversely, "[p]ublic interest is never served by a state's depriving an individual of a constitutional right." *Kite v. Marshall*, 454 F. Supp. 1347, 1351 (S.D. Tex. 1978).

## IV.    **CONCLUSION**

Accordingly, for all the reasons stated above, K.B.'s motion for a preliminary injunction (Dkt. 44) is **GRANTED**.

SIGNED at Houston, Texas, this 17th day of August, 2020.

George C. Hanks Jr.

GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE