## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| EVERETT DE'ANDRE ARNOLD, K.B., a minor by and through his mother and next friend, CINDY BRADFORD, and SANDY ARNOLD ) ) ) ) | |
| Plaintiffs, ) | CIVIL ACTION NO. 4:20-CV-01802 |
| ) | |
| v. ) | JURY TRIAL REQUESTED |
| ) | |
| BARBERS HILL INDEPENDENT SCHOOL DISTRICT ) ) | |
| ) | |
| Defendant. ) | |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

Plaintiffs Everett De'Andre Arnold ("De'Andre"), Sandy Arnold, and Cindy Bradford on behalf of her minor son K.B. (collectively, the "Plaintiffs"), file this action for declaratory judgment, permanent injunctive relief, damages, costs, and attorneys' fees stemming from the unlawful infringement on their constitutional rights and violations of federal and state statutes by Defendant Barbers Hill Independent School District ("BHISD," "District," or "Defendant"). BHISD consented in writing to Plaintiffs filing this Second Amended Complaint without needing to seek the Court's leave.  *See* Dkt. No. 135; *see also* Fed. R. Civ. P. 15(a)(2) (providing that a party may amend its pleading with the opposing party's written consent).

## PRELIMINARY STATEMENT

1.      Black students in the United States are and have been disproportionately targeted and penalized for violating facially race-neutral grooming policies that are designed to, or have the effect of, profiling, singling out, and burdening Black children for wearing their hair in its natural

1

state, including in locs.[1]  Many grooming restrictions, including limitations on students' hair length, have no bearing on students' capacity to learn.  Yet these wholly arbitrary grooming policies often lead to disciplinary action that limits the mobility of Black children in public and private spaces, deny them equal educational opportunities, and strike at the freedom and dignity of Black people.

2.  Grooming policies that regulate hair length ultimately present Black students with an unfair choice: *either* wear their hair in natural formations and be deprived of equal educational opportunities, *or* alter their natural hair to conform to predominant Eurocentric hair aesthetics to receive the same educational opportunities as their white peers.  These grooming policies also often facially discriminate based on gender by imposing sex-based restrictions on how students can wear their hair, thereby visiting harm upon Black students based on race and gender.

3.  De'Andre and K.B., both Black males, were faced with the impossible choice of either suppressing their cultural heritage and Black identity by cutting their natural hair or forfeiting their right to equal educational and extracurricular opportunities.  BHISD's arbitrary and discriminatory hair policy, which prohibited male students from growing hair below their earlobes, eyebrows, or shirt collar, was arbitrarily implemented and discriminatorily applied to De'Andre and K.B.  De'Andre and K.B. were also subject to discrimination based on their gender because of the hair policy's expressed limitation to male students.

4.  BHISD is a predominantly white school district, with a student population that is 65% white and only 3.5% Black.[2]  De'Andre and K.B. started growing their locs as an important

---

[1] The term "locs" is used in place of the more common term "dread locks." The term "dread" in the word "dread locks" comes from the word "dreadful" used by English slave traders to refer to Africans' hair, which researchers believe "locked" naturally on its own during the Middle Passage.  *See* April Williams, *My Hair is Professional Too!: A Case Study and Overview of Laws Pertaining to Workplace Grooming Standards and Hairstyles Akin to African Culture*, 12 S. J. POL'Y & JUST. 138, 16566 (2018).

[2] *See infra*, note 11.

symbol of their Black identity and cultural heritage while attending middle school within BHISD. De'Andre's locs are an outward expression of his paternal West Indian roots and overall Black identity and culture; similarly, K.B.'s locs are an expression of his Black identity and culture. De'Andre's and K.B.'s culturally significant locs have never disrupted the educational environment at BHISD nor inhibited De'Andre's and K.B.'s academic and extracurricular success.

5.     For several years and culminating in the middle of the 2019–2020 school year, BHISD acted to suppress De'Andre's and K.B.'s expression of their Black and, in De'Andre's case, West Indian, identity and heritage through their natural hair by (1) continually monitoring De'Andre's and K.B.'s hair, (2) promulgating arbitrary and discriminatory hair policies that targeted De'Andre and K.B. to force them to cut their culturally significant locs, and (3) selectively enforcing the hair policies against De'Andre and K.B.  The hair policy crafted and enforced by BHISD has no legitimate purpose, is wholly arbitrary, and impermissibly regulates how students can wear their hair both inside *and outside* of school.  BHISD's promulgation and selective enforcement of this policy constitutes intentional race and sex discrimination, and violates Plaintiffs' First and Fourteenth Amendment rights, as well as state and federal anti-discrimination laws.

6.     De'Andre and K.B. continually complied with the changing iterations of BHISD's hair policy.  Yet, BHISD administrators routinely removed De'Andre and K.B. from class and disrupted their other school activities to check their hair and reprimand them for anticipated non-compliance with the school's hair policy.

7.     BHISD administrators did not target and surveil non-Black students in the same manner or frequency that they monitored De'Andre and K.B.  The District's targeted monitoring

and inspection of De'Andre and K.B. ostracized them and singled them out from their white classmates.

8.      Specifically, BHISD, as well as Superintendent Dr. Greg Poole ("Superintendent Poole"), Barbers Hill High School Principal Rick Kana ("Principal Kana"), and Assistant Principal Ryan Rodriguez, Assistant Principal Doug Anderson, and former Assistant Principal Kirven Tillis, engaged in a focused and continued effort to force De'Andre and K.B. to cut their culturally significant locs or withdraw from BHISD because of the BHISD's stated view that De'Andre's and K.B.'s natural Black hair is "messy" and contrary to BHISD's "high standards."

9.      De'Andre's and K.B.'s natural hair began forming into locs in 2014 and 2017, respectively.  Beginning in 2015, BHISD anticipated De'Andre's locs would become a "problem" as his locs grew, and serially amended the hair policy in a continued effort to force him and K.B. to withdraw or cut their locs.  The amendments to the hair policy prohibited male students from wearing hair accessories *after* De'Andre started wearing thin, black headbands to secure his locs above his eyebrows.  Principal Kana, who, based on the dress and grooming code, wielded wide discretion in enforcing the hair policy, permitted De'Andre to wear the headband to secure his hair above his eyebrows.  When K.B.'s hair was long enough to extend below his ear lobes, he, too, started wearing thin black headbands to keep his hair within the hair length limitations.  Principal Kana affirmed that De'Andre's and K.B.'s use of headbands to keep their hair above their ear lobes satisfied the hair policy.

10.     In response to De'Andre's and K.B.'s continued expression of pride in their Black identity through their locs, before the start of the 2019–2020 school year, BHISD revised the hair policy again to prohibit male students' hair from extending *at any time* below their eyebrows, earlobes, or shirt collar.  De'Andre and K.B. continued to wear their locs tied up above their

4

eyebrows, earlobes, and shirt collar, and they were assured by Principal Kana that their locs remained in compliance with the hair policy when worn in this manner.

11.     However, BHISD believed that De'Andre's and K.B.'s locs, as worn, were out of compliance with the hair policy, and the boys needed to cut their culturally significant locs to comply with BHISD's expectations for students.

12.     During the Fall of 2019, BHISD announced that it intended to further amend its hair policy—this time in the middle of the school year—to prohibit male students from having hair that could fall below the eyebrow, earlobe or top of a t-shirt collar "when let down."

13.     Mrs. Arnold voiced her concerns to BHISD and the Board that the hair policy in effect as of Fall 2019 was wholly arbitrary and was selectively enforced against, and had a discriminatory effect on, Black male students like De'Andre and K.B.  Mrs. Arnold also raised these concerns with regard to BHISD's proposed revision of the hair policy.

14.     At least in part in retaliation against Mrs. Arnold, in December 2019, BHISD adopted a new hair policy that targeted De'Andre's and K.B's natural locs by prohibiting male students from having hair that "was gathered or worn in a style that would allow the hair to extend below the top of a t-shirt collar, below the eyebrows, or below the ear lobes *when let down*." (emphasis added).  The revised policy also removed language from the previous policy that expressly permitted cornrows and locs.

15.     Following the adoption of the December 2019 policy, Principal Kana told De'Andre and K.B. that, pursuant to the new hair policy, they would have to cut their locs if they wanted to return to regular classroom instruction for the Spring 2020 semester.  If De'Andre and K.B. chose not to cut their locs, they would be immediately and indefinitely placed in in-school

suspension ("ISS") or sent to alternative school [3], and banned from participating in extracurricular events and activities (including De'Andre's upcoming graduation ceremony).

16.     As a result, De'Andre and K.B. were forced to withdraw from BHISD, relocate to another city, and enroll in a new high school to avoid further discrimination and disruption to their education, which caused significant emotional trauma and adversely affected their emotional health and development.

17.     De'Andre was denied the opportunity to graduate from BHISD and to participate in the BHISD graduation ceremony with his peers.  In the final semester of his high school career, De'Andre was denied access to certain educational resources and critical college counseling and support services that were provided to his peers at Barbers Hill High School.  And, on information and belief, his school record was marred by disciplinary infractions related to the discriminatory hair policy.

18.     K.B. was unable to remain in BHISD during the second half of his sophomore year of high school and was denied access to certain educational resources, as well as the opportunity to continue to participate in Barbers Hill High School's award-winning Soaring Eagle Marching Band.  K.B. was permitted to return to BHISD as a result of a preliminary injunction granted by this Court on August 17, 2020.

19.     BHISD's hair policy is wholly arbitrary, intentionally discriminatory based on race and gender (including facially gender-based discriminatory language), and unfairly and selectively enforced against Black male students.  There is no legitimate educational motive or goal furthered by (a) the hair policy's arbitrary length requirement for male students, or (b) BHISD's discriminatory and retaliatory conduct against De'Andre, K.B., and their families.

---

[3] BHISD operates one alternative school "for students who have violated certain provisions of the student Code of Conduct."  BHISD 2020–2021 Student Handbook, p. 95.

20.     BHISD's promulgation and enforcement of its hair policy, along with its retaliatory response to Mrs. Arnold's complaints about the same, are unlawful, discriminatory, and punitive violations of Plaintiffs' constitutional rights, as well as state and federal law.  Plaintiffs bring this civil rights action against BHISD for:

(1)     Race discrimination in violation of the Fourteenth Amendment right to equal protection;

(2)     Race discrimination in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* ("Title VI");

(3)     Sex discrimination in violation of the Fourteenth Amendment right to equal protection;

(4)     Sex discrimination in violation of Title IX the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX");

(5)     Violation of the First Amendment right to free speech and freedom of expression;

(6)     Retaliation in violation of the First Amendment right to free speech and freedom of expression;

(7)     Retaliation in violation of Title IX;

(8)     Violation of the Fourteenth Amendment's Due Process Clause;

(9)     Race discrimination in violation of Texas Civil Practice and Remedies Code § 106.001;

(10)    Sex discrimination in violation of Texas Civil Practice and Remedies Code § 106.001;

(11)    Declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202; and

(12)    Damages, costs, and fees.

21.     Accordingly, Plaintiffs seek (1) a declaratory judgment holding that BHISD's hair policy violates state and federal law; (2) an order permanently enjoining BHISD from enforcing its hair policy; (3) an order permanently enjoining BHISD from retaliating against students'

7

parents for publicly commenting on the discriminatory and unlawful nature of the BHISD hair policy; (4) an order directing BHISD to expunge any disciplinary sanctions on Plaintiffs' school records related to the hair policy; (5) compensatory damages for the injuries caused by BHISD's unlawful conduct; and (6) punitive damages assessed to deter BHISD's intentional or reckless violations of the law.

## JURISDICTION AND VENUE

22.     Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 to redress the deprivation of Plaintiffs' rights as secured by the First and Fourteenth Amendments to the U.S. Constitution. Plaintiffs also seek relief under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, 28 U.S.C. §2201 *et seq.*, and Texas Civil Practice and Remedies Code § 106.001.

23.     This Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. § 1331, as this case involves questions of federal law.  This Court also has jurisdiction under 28 U.S.C. § 1343(a) because Plaintiffs seek damages for violations of their civil rights. Supplemental jurisdiction over Plaintiffs' state law claims is proper under 28 U.S.C. § 1367.

24.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because the events giving rise to this action occurred in the Southern District of Texas.

## PARTIES

25.     Plaintiff De'Andre Arnold is a 19-year-old recent graduate of Ross S. Sterling High School in Goose Creek Consolidated Independent School District ("Goose Creek ISD"). De'Andre previously attended Barbers Hill High School in BHISD until he was forced to leave in January 2020 because BHISD's new hair policy would have required De'Andre to continually cut his locs.  De'Andre has not cut his locs since he began growing them in 2014 as an expression of his Black identity and culture and West Indian heritage.

8

26.     Plaintiff K.B. is a 17-year-old who recently completed his junior year at Barbers Hill High School in BHISD.  K.B. briefly attended Ross S. Sterling High School in Goose Creek ISD after he was forced to leave Barbers Hill High School in February 2020 because the District's new hair policy would have required him to continually cut his locs.  K.B. has not cut his locs since he began growing them in 2017 as an expression of his Black identity and cultural heritage. K.B. appears by and through his mother and next friend, Cindy Bradford ("Ms. Bradford"), who brings this suit on his behalf. K.B. and De'Andre are maternal cousins.

27.     Plaintiff Sandy Arnold is De'Andre's mother and K.B.'s aunt.  Mrs. Arnold has at all times supported De'Andre's and K.B.'s decisions to form their natural hair into locs as expressions of their Black identities and cultural heritage.  When the District indicated its intent to change its hair policy in the Fall of 2019 to prohibit De'Andre and K.B. from maintaining their locs, Mrs. Arnold challenged the impending change during the public forum portion of BHISD's November 18, 2019 and December 16, 2019 Board meetings, where she notified the Board and Superintendent Poole that De'Andre's father is from Trinidad and Tobago, that De'Andre's hair is a reflection of his culture and Trinidadian heritage, and that changing the hair policy would subject Black male students with locs like De'Andre and K.B. to race and gender discrimination and violations of the right to free expression.  BHISD did not address Mrs. Arnold's comments. At the December 16, 2019 Board meeting, BHISD adopted a new version of the hair policy that intentionally targeted De'Andre and K.B. and was harshly enforced against them, in part, because Mrs. Arnold criticized the policy in a public forum.

28.     Defendant Barbers Hill Independent School District is a public school district in Chambers County, Texas, where Barbers Hill High School is located.  BHISD receives federal financial assistance for its programs, services, and activities.  Pursuant to Texas Education Code

§ 11.151, BHISD's Board of Trustees[4] has "the exclusive power and duty to govern and oversee the management of the public schools of the district."[5]   At the beginning of each school year, the Board creates and adopts a Student Code of Conduct, which sets forth BHISD's standards of conduct, consequences for misconduct, and procedures for administering discipline.[6]   In an irregular act, in December 2019, the Board unanimously modified and adopted a new version of BHISD's hair policy to specifically target De'Andre and K.B. because of their culturally significant locs.   On July 20, 2020, the Board unanimously and without deliberation rejected De'Andre's and K.B.'s administrative grievances related to the hair policy.   BHISD has appeared in this lawsuit through counsel.

## FACTUAL BACKGROUND

### A.    Racial Discrimination in BHISD

29.    BHISD is a school district in Mont Belvieu, Texas, approximately 30 miles east of Houston, Texas.

30.    The geographic area BHISD serves is relatively racially homogenous: 90.8% of the 18,196 people[7] who live within BHISD's attendance zones are white and just 5.8% are Black.[8]

---

[4] *See* TEX. EDUC. CODE § 11.151(a) ("The trustees of an independent school district constitute a body corporate and in the name of the district may . . . sue and be sued . . . .").

[5] *See* Barbers Hill ISD Board Policy Manual, Board Legal Status Powers and Duties, BAA (LEGAL), https://pol.tasb.org/Policy/Download/280?filename=BAA(LEGAL).pdf.

[6] *See also* Barbers Hill ISD Student Code of Conduct: 2019–20 School Year, https://resources.finalsite.net/images/v1566951946/bhisd/bucyejyptqmhj6ysekly/BHISDStudentCodeofConduct2019-2020finalupdatePDF.pdf.

[7] U.S. Census Bureau, Sex by Age, 2018 American Community Survey Five-Year Estimates Detailed Tables, retrieved from https://data.census.gov/cedsci/table?q=barbers%20hill%20independent%20school%20district&t=Populations%20and%20People&g=9700000US4809450&tid=ACSDT5Y2018.B01001&hidePreview=false.

[8] *Compare* U.S. Census Bureau, Sex By Age (White Alone), 2018 American Community Survey Five-Year Estimates Detailed Tables, retrieved from https://data.census.gov/cedsci/table?q=barbers%20hill%20independent%20school%20district&t=Populations%20and%20People&g=9700000US4809450&tid=ACSDT5Y2018.B01001A&hidePreview=false *with* U.S. Census Bureau, Sex By Age (Black or African American Alone), 2018 American Community Survey Five-Year Estimates Detailed Tables, retrieved from https://data.census.gov/cedsci/table?q=barbers%20hill%20independent%20school%20district&t=Populations%20and%20People&g=9700000US4809450&tid=ACSDT5Y2018.B01001B&hidePreview=false.

31.     BHISD receives a total of $20,940 in revenue per student each school year.[9]  Of the total revenue per student, $488 is from the federal sources, $1,094 is from state sources, and $19,358 is from local sources, including property and non-property taxes.[10]

32.     The District serves approximately 6,424 students[11] in eight schools: one high school, two middle schools, two elementary schools, two early childhood centers, and one alternative school.

33.     As of the 2020–2021 school year, Barbers Hill High School served 1,778 students, 1,175 (66%) of whom are white, 59 (3.3%) of whom are Black, <40 (<2.2%) of whom are Asian American, 453 (25.5%) of whom are Hispanic or Latino, and <10 (<0.6%) of whom are American Indian, Alaska Native, or Native Hawaiian/Other Pacific.[12]

34.     Black students are overrepresented in disciplinary enforcement at BHISD.[13]  As of the 2019-2020 school year, while only about 4% of BHISD's student population was Black, Black

---

[9] Institute of Education Studies, National Center for Education Statistics, 2018–2019 Public School District Finance Peer Search, https://nces.ed.gov/edfin/search/peergroupdata.asp?dataid=1&mt=0&subdataid=1&bleaid=4809450&jobid={0AF92 CD1-46A5-4D4B-9F13-18F10AFF7FF5}.

[10] *Id.*

[11] Texas Educ. Agency, 2020–2021 Student Enrollment: Totals by District for District: 036902 (Barbers Hill ISD), https://rptsvr1.tea.texas.gov/cgi/sas/broker?_service=marykay&_program=adhoc.addispatch.sas&endyear=21&majo r=st&minor=e&format=w&selsumm=id&linespg=60&charsln=120&grouping=e&loop=2&key=036902&_debug=0 .

[12] *Compare* Texas Educ. Agency, 2020–2021 Student Enrollment: Totals by Campus for District: 036902 (disaggregated by gender), https://rptsvr1.tea.texas.gov/cgi/sas/broker?_service=marykay&_program=adhoc.addispatch.sas&major=st&minor= e&charsln=120&linespg=60&loop=1&countykey=&_debug=0&endyear=21&selsumm=ic&key=036902&grouping =s+&format=W *with* Texas Education Agency, 2020–2021 Student Enrollment: Totals by Campus for District: 036902 (disaggregated by ethnicity), https://rptsvr1.tea.texas.gov/cgi/sas/broker?_service=marykay&_program=adhoc.addispatch.sas&major=st&minor= e&charsln=120&linespg=60&loop=1&countykey=&_debug=0&endyear=21&selsumm=ic&key=036902&grouping =e+&format=W.

[13] National studies have shown that Black and Latinx students do not misbehave more often than white students, but Black and Latinx students are more often disciplined and bear the brunt of harsh, exclusionary punishment. *See* Russell J. Skiba, Ph. D. & Natasha T. Williams, *Are Black Kids Worse? Myths and Facts about Racial Differences in Behavior—A Summary of the Literature*, EQUITY PROJECT AT IND. UNIV. (Mar. 2014), https://indrc.indiana.edu/tools-resources/pdf-disciplineseries/african_american_differential_behavior_031214.pdf.

students accounted for 6% - or nearly twice their representation in the population – of in-school suspensions.   .[14]   That school year, 40% percent of the students forced to attend BHISD's alternative school were non-white, yet non-white students only made up 34% of the District's total population.[15]   Moreover, during the 2015-2016 school year at one of BHISD's middle schools, Black students were over 20 times more likely than white students to be suspended.[16]

35.   In 2017, BHISD constructively expelled a Native American child because of his hair length.  Upon information and belief, this incident is currently being investigated by the United States Department of Justice's Civil Rights Division as a potential act of sex, national origin, and/or religious discrimination.

36.   For at least the past year, racial tension within BHISD and Barbers Hill High School has swelled for reasons both related and unrelated to the facts underlying this Complaint.

37.   At the start of the 2020–2021 school year, when BHISD resumed in-person instruction, white students wore masks with the Confederate flag as a show of support for Donald Trump.

38.   Beginning in November 2020, racist graffiti reading "Black Lives Don't Matter" was etched onto one of the walls in a student bathroom.[17]  The District did not discuss the incident with the students.  Barbers Hill High School administrators said they would remove the graffiti, but the graffiti remained on the bathroom wall until at least February 9, 2021.

---

[14] Texas Educ. Agency, PEIMS 2019-2020 Data: Counts of Students and Discipline Actions by Discipline Action Groups, Barbers Hill ISD 036902, https://rptsvr1.tea.texas.gov/cgi/sas/broker?_service=markkay&prev_htrefer=https%3A%2F%2Frptsvr1.tea.texas.gov%2Fadhocrpt%2FDisciplinary_Data_Products%2FDAG_Summaries%2FDownload_DAG_District_Summaries.html&agg_level=DISTRICT&school_yr=20&report=01&report_type=html&_debug=0&_program=adhoc.DAG_dynamic_reports.sas&district=036902.
[15] Id.
[16] Lena V. Groeger, Annie Waldman, and David Eads, *Miseducation, Is there racial inequality at your school, Barbers Hill Independent School District,* PROPUBLICA (October 16, 2018), https://projects.propublica.org/miseducation/district/4809450.
[17] *See* Exhibit 1.

12

39.     On February 1, 2021, Barbers Hill High School's Pupil Council put up posters of Michelle Obama, Kamala Harris, and other prominent and accomplished Black people in celebration of Black History Month.[18]  On February 11, 2021, at the instruction of Superintendent Poole, Barbers Hill High School administrators removed the posters of Michelle Obama and Kamala Harris.  The poster of Michelle Obama had the quote, "Don't be afraid. Be focused. Be determined. Be hopeful. Be empowered. When they go low, we go high."[19]  The poster of Kamala Harris had a quote stating, "Our Unity is our strength & our diversity is our power.  We reject the myth of us vs. them.  We are in this together."[20]  Superintendent Poole later explained that he directed the removal of the posters because he wanted to replace them with more positive, unifying messages.

40.     In or about May 2021, the phrase "I hate niggers" was written in marker on the wall of a Barbers Hill High School bathroom.[21]  The phrase "I hate niggers" was also carved into a stall in a Barbers Hill High School bathroom.[22]  Upon information and belief, as of the date of this filing, BHISD has not removed these racial slurs from the Barbers Hill High School bathroom walls, instead allowing them to stay in place for approximately two weeks.  Upon information and belief, as of the date of this filing, BHISD has not taken any corrective action concerning these racial slurs.

**B.     BHISD's Hair Policy**

> **i.     BHISD's Board Approves the Hair Policy**

---

[18] *See* <u>Exhibit 2</u>.
[19] *Id.*
[20] *Id.*
[21] *See* <u>Exhibit 3</u>.
[22] *See* <u>Exhibit 4</u>.

41.     BHISD maintains a Student Code of Conduct, which sets forth BHISD's standards of conduct, consequences for misconduct, and procedures for administering discipline.  BHISD's Board is responsible for adopting the Student Code of Conduct before each school year, as well as the standards for enforcing the policies set forth in the Student Code of Conduct.

42.     Since at least the late 1970s, BHISD's Student Code of Conduct has included a hair policy that expressly restricts the length of male students' hair while permitting female students to maintain long hair.

43.     BHISD's hair-length restriction does not further an important government interest because there is no legitimate, important, and substantial reason to permit female students to wear their hair long when male students are not so permitted.

44.     The hair policy adopted by the Board at the start of the 2014–2015 school year provided as follows:

> **Hair**
> - Hair must be neat, clean and well-groomed.
> - Geometric or unusual patterns (including Mohawks and Faux hawks) shaved or cut in the hair are not permitted.
> - Unnatural hair color or color variation in hair (i.e. scarlet, purple, blue, green, orange, etc.) will not be permitted.
> - Ribbons or other types of hair accessories must be worn in good taste and only when appropriate to hairstyle.
> - Boy's hair will not extend below the eyebrows, below the ear lobes, or below the top of a t-shirt collar.  Corn rows and/or dread locks are permitted if they meet the aforementioned lengths.
> - Ponytails or tails are not acceptable on male students.
> - Boys are not permitted to wear hair accessories deemed inappropriate.

Under the hair policy in place for the 2014–2015 school year, male students were restricted from wearing hair below the eyebrows, earlobes or shirt collar, or any hair accessories "deemed inappropriate."  The hair policy expressly permitted "corn rows and/or dread locks" if such hair was otherwise above the eyebrows, earlobes, or shirt collar.  This iteration of the hair policy remained in place for BHISD through the 2015–2016 school year.

45.     Since the 2016–2017 school year, BHISD has repeatedly changed its hair policy in an effort to force De'Andre and K.B. to cut their culturally significant locs.

46.     The Board revised the hair policy at the start of the 2016–2017 school year to provide as follows:

---

**Hair**
- Hair must be neat, clean and well-groomed.
- Geometric or unusual patterns (including Mohawks and Faux hawks) shaved or cut in the hair are not permitted.
- Unnatural hair color or color variation in hair (i.e. scarlet, purple, blue, green, orange, platinum white, etc.) will not be permitted.
- Ribbons or other types of hair accessories must be worn in good taste and only when appropriate to hairstyle.
- Boy's hair will not extend below the eyebrows, below the ear lobes, or below the top of a t-shirt collar.  Corn rows and/or dread locks are permitted if they meet the aforementioned lengths.
- Ponytails or tails are not acceptable on male students.
- Boys are not permitted to wear hair accessories.

---

The hair policy was similar in most respects to the policy operative during the 2015–2016 school year.   However, the 2016–2017 hair policy restricted male students from wearing *any* hair accessories.[23]   At the time, De'Andre and K.B. both used hair accessories to gather their hair up in compliance with the previous iteration of the policy.   This language for the hair policy remained in place for the 2017–2018 and 2018–2019 school years.

47.     The Board revised the hair policy again at the start of the 2019–2020 school year to provide as follows:

---

[23] The Barbers Hill Middle School North Student Handbook permitted students to wear hair accessories not "deemed inappropriate" during the 2016–2017 school year.

**Hair**
- Hair must be neat, clean and well-groomed.
- Geometric or unusual patterns (including Mohawks and Faux hawks) shaved or cut in the hair are not permitted.
- Unnatural hair color or color variation in hair (i.e. scarlet, purple, blue, green, orange, etc.) will not be permitted.
- Ribbons or other types of hair accessories must be worn in good taste and only when appropriate to hairstyle.
- Boy's hair will not extend, at any time, below the eyebrows, below the ear lobes, or below the top of a t-shirt collar.  Corn rows and/or dread locks are permitted if they meet the aforementioned lengths.
- Boys are not permitted to wear hair accessories.

48.     Under the hair policy adopted for the start of the 2019–2020 school year, male students' hair could not extend *at any time* below the eyebrows, earlobes, or shirt collar.  This iteration of the hair policy continued to restrict male students from wearing *any* hair accessories. However, it also allowed students until the following school day to correct any violations of the hair policy.[24]

49.     To comply with the new policy, De'Andre and K.B. gathered their locs up using either locs of their own hair or the thin black headbands that Principal Kana had approved.

50.     Midway through the 2019–2020 school year, the Board unanimously voted to adopt new standards for the hair policy.  The hair policy that was approved by the Board in December 2019 and became effective as of January 2020 provides as follows:

**Hair**
- Hair must be clean and well-groomed.
- Geometric or unusual patterns (including Mohawks and Faux hawks) shaved or cut in the hair are not permitted.

---

[24] The 2019–2020 BHISD dress and grooming code, which contains the language of the hair policy, provides, "Students will be given until the following school day to correct hair violations."

- Unnatural hair color or color variation in hair (i.e. scarlet, purple, blue, green, orange, etc.) will not be permitted.
- Ribbons or other types of hair accessories should not distract from the learning environment and be appropriate to hairstyle.
- Male students' hair will not extend, at any time, below the eyebrows, or below the ear lobes. Male students' hair must not extend below the top of a t-shirt collar or be gathered or worn in a style that would allow the hair to extend below the top of a t-shirt collar, below the eyebrows, or below the ear lobes when let down.

Under this revised version of the hair policy, male students cannot have hair that would extend at any time below the eyebrows, earlobes, or shirt collar *when let down*, regardless of the manner in which the student wears his hair while at school.

51.     BHISD administrators have conceded that the hair policy adopted by the Board in December 2019 regulates male students' hair both inside *and* outside of school.  Principal Kana has stated that under this version of the hair policy, if students "want to come to Barbers Hill High School and be in class, it has to be cut.  [I]f they choose to want to have the long hair outside of school, then Barbers Hill High School is not the school for them . . . ."

52.     To ensure the December 2019 hair policy reflected the Board's discriminatory intent of targeting De'Andre and K.B., the Board also removed the provision from prior policies that expressly allowed cornrows or locs that complied with the hair length restriction.

53.     BHISD's hair policy restriction is wholly arbitrary and completely untethered to any legitimate pedagogical or disciplinary outcomes.  Principal Kana has conceded that granting a male Native American high school student an exemption from the hair policy resulted in no apparent adverse effect on BHISD's educational goals.  Former Assistant Principal Tillis concurred with this assessment and conceded that a male student could wear uncut locs let down without interfering with BHISD's goals.  Principal Kana also acknowledged that the length of a

male student's hair has no bearing on the student's hygiene or whether they can or do display discipline.

54.     The hair policy adopted by the Board in December 2019 has remained in place since it became effective in January 2020.

55.     Upon information and belief, the Board had never adopted changes to BHISD's hair policy in the middle of a school year prior to December 2019.

### ii.     BHISD's Administrators Enforce the Hair Policy

56.     BHISD's administrators—including Superintendent Poole, Deputy Superintendent Duree, Principal Kana, Assistant Principals Rodriguez and Anderson, and then-Assistant Principal Tillis—are given unfettered discretion to enforce the hair policy. Each administrator determines whether a student complies with BHISD's hair policy. If the administrator decides that the student has violated the hair policy, it is left to the administrator's discretion whether to give an informal verbal warning to the student, issue a formal written warning, dispense some other form of discipline to the student, or take no action at all.

57.     Most forms of discipline for hair policy violations are recorded in BHISD's "Skyward" computer system. Informal verbal warnings are not recorded in the Skyward system.

58.     The Board's recently enacted changes to the hair policy have led directly to increasing levels of enforcement against all students. In the 2016–2017 school year, Barbers Hill High School recorded approximately 36 disciplinary referrals for violations of the hair policy. The number of disciplinary referrals for hair policy violations at Barbers Hill High School increased to approximately 43 for the 2017–2018 school year and 66 for the 2018–2019 school year. In the Fall semester of 2019 alone, Barbers Hill High School issued approximately 81 disciplinary referrals for violations of the hair policy.

59.     However, after the latest iteration of the hair policy took effect in the Spring semester of 2020, Barbers Hill High School issued approximately 140 disciplinary referrals for hair policy violations.  Notably, all of the disciplinary referrals in the Spring semester of 2020 were issued before BHISD transitioned entirely to distance learning (and stopped enforcing the hair policy) from early March 2020 through the end of the Spring 2020 semester as a result of the COVID-19 pandemic.

60.     The Board's changes to the hair policy were also intended to, and did, result in disproportionate enforcement by BHISD's administration against Black male students.

61.     Records contained in BHISD's Skyward system confirm the unequal treatment of Black students in relation to enforcement of the hair policy.  These records reveal that Black students were more likely than white students to be punished, and to be punished more harshly, because of the hair policy.

62.     BHISD administrators have testified that a student's first offense for violating the hair policy typically results in a written warning, the second offense results in after-school detention, the third offense results in Saturday school, and the fourth offense results in ISS.  This is largely consistent with the disciplinary scheme laid out in BHISD's Code of Conduct.  BHISD administrators also testified that they are typically more lenient at the beginning of the school year.  However, BHISD administrators have also acknowledged these consequences are not universally applied and that some students are afforded more latitude than others.

63.     The actual consequences that Barbers Hill High School administrators issued to Black students departed from the progressive escalation of consequences set out in BHISD's Code of Conduct, which administrators normally adhered to for white students.  In fact, Barbers Hill High School administrators were approximately eight times more likely to give white students in

violation of the hair policy a warning, a "talk," or a parent conference than Black students, which insulated those white students from missing valuable instructional time.  By contrast, Barbers Hill High School personnel subjected Black students in violation of the hair policy to immediate ISS without any warning, depriving them of valuable instructional time.  For example, De'Andre was sent to ISS on the first day of the Fall 2019 semester without any warning even though it was the first day of school following a new change to the BHISD hair policy.

64.     During the 2019–2020 school year, Black students at Barbers Hill High School were approximately three times more likely to lose one or more days of instruction to ISS for hair-related violations than their white classmates.  Once subjected to ISS due to a hair-related violation during the 2019–2020 school year, Black students at Barbers Hill High School lost an average of approximately 3.5 days of instruction, while white students lost an average of one day of instruction.

65.     BHISD has applied and enforced the hair policy in an unlawful manner to target Black, male students with culturally significant hair.  The actions and conduct of BHISD's administrators and personnel were taken in furtherance of, and pursuant to, the policies and practices adopted by BHISD and the Board.  BHISD and the Board adopted, approved, endorsed, and ratified the unlawful actions and conduct of the individual administrators and personnel described herein as being taken in furtherance of, and pursuant to, the policies and practices of BHISD and the Board.

**C.     BHISD's Constructive Expulsion of De'Andre Arnold**

66.     De'Andre started attending school in BHISD in August 2006, when he was in pre-kindergarten.

67.     As a student in BHISD, De'Andre had an A/B grade average and was actively involved in extracurricular activities, including marching band and basketball.

68.     De'Andre started growing his hair into locs in 2014 while he was a seventh-grade student at Barbers Hill Middle School North.

69.     De'Andre began growing locs as an outward expression of his Black identity and cultural heritage, as well as to pay homage to his and his father's Trinidadian roots.

70.     Locs demonstrate reverence, obedience, strength, and respect for De'Andre's West Indian ancestors.

71.     As De'Andre testified, his locs "represent[] who I am as a person and who I have grown to be."  Consistent with Trinidadian and Black cultural traditions, the length of his locs signify his growth as a person as he gradually matured from a child to a young adult.

72.     De'Andre's cultural heritage prohibits cutting or trimming natural locs.

73.     BHISD administrators, including Principal Kana, were specifically aware that De'Andre was expressing his Black and West Indian identity by maintaining uncut locs.

74.     When De'Andre formed his hair into locs, BHISD's hair policy required male students' hair to be off the shoulders, above the earlobes, and out of the eyes.

75.     When De'Andre began growing his locs in 2014 while at Barbers Hill Middle School North, his hair did not extend below his eyebrows, earlobes, or the top of his shirt collar. Still, Barbers Hill Middle School North staff members repeatedly made negative, derisive comments about his hair.

76.     During the 2015–2016 school year, when De'Andre was in the eighth grade, BHISD Deputy Superintendent of Curriculum and Instruction, Sandra Duree, entered De'Andre's classroom specifically to check his hair.  Ms. Duree did not check any other student's hair in that classroom.

21

77.     On another occasion during the 2015–2016 school year, Ms. Duree told De'Andre that wearing his hair in locs did not reflect BHISD's "image of excellence" and would be a "problem" when he started high school. Her comments made De'Andre feel othered, unwelcome and inferior.

78.     Within days of Ms. Duree making these comments, De'Andre and his mother met in person with Superintendent Poole about the negative attention De'Andre was receiving from school administrators because of his hair.  During this meeting, Mrs. Arnold told Superintendent Poole that she believed the negative comments and attention De'Andre received were attempts to force De'Andre to assimilate to the District's arbitrary standards of acceptable grooming and appearance.  She also told Superintendent Poole that De'Andre's father and paternal relatives are from Trinidad and Tobago, and that De'Andre wore his locs as part of his family's heritage and culture.  Mrs. Arnold offered to show Superintendent Poole her husband's birth certificate as proof of De'Andre's ancestry.  Superintendent Poole rejected this request.

79.     BHISD, Superintendent Poole, Deputy Superintendent Duree, and Board members anticipated that De'Andre's hair would grow past his eyebrows by the time he entered high school in the 2016–2017 school year.

80.     In anticipation of De'Andre's loc growth, in advance of the 2016–2017 school year and for the first time since De'Andre began growing his locs, BHISD modified its hair policy to prohibit male students from wearing hair accessories of any kind.

81.     Upon information and belief, this change to the hair policy was proposed and endorsed by Superintendent Poole and Deputy Superintendent Duree, and unanimously adopted by BHISD's Board to specifically target De'Andre because of his culturally significant locs for

discriminatory purposes in violation of clearly-established anti-discrimination laws and constitutional rights.

82.   BHISD failed to offer any justification for the policy change.

83.   The new hair policy provided, "[b]oy's [sic] hair will not extend below the eyebrows, below the earlobes, or below the top of a t-shirt collar. Corn rows and/or dread locks are permitted if they meet the aforementioned lengths," and "[b]oys are not permitted to wear hair accessories."

84.   De'Andre started his freshman year at Barbers Hill High School in August 2016. As Superintendent Poole and Deputy Superintendent Duree had predicted had predicted, De'Andre's locs had grown to a length that fell below his eyebrows when loose.

85.   The 2016–2017 dress and grooming code, which contains the hair policy, also provided, "All rules and regulations are at the discretion of the campus principal."

86.   On multiple occasions during the 2016–2017 school year, Principal Kana assured De'Andre and Mrs. Arnold that De'Andre's hair was appropriate and complied with the hair policy when utilizing a headband to gather his hair up so that it was secured above his eyebrows, earlobes, and shirt collar.

87.   Accordingly, De'Andre complied with BHISD's hair policy by gathering his locs up in a thin black headband so they were secured above his eyebrows, earlobes, and shirt collar.

88.   Nevertheless, De'Andre's Assistant Principal, Ryan Rodriguez, and then-Assistant Principal Kirven Tillis, consistently surveilled De'Andre while he was in the lunchroom with his friends. Teachers and administrators would often stand near his lunch table and stare at De'Andre and his friends while they ate. These actions made De'Andre feel uncomfortable and unnerved.

89.     In one meeting with De'Andre's parents that school year, Mr. Tillis described De'Andre's hair as "messy" and said that De'Andre "looked like a girl" because of his culturally significant locs.

90.     The policy remained the same for the 2017–2018 school year.  The dress and grooming code continued to provide "[a]ll rules and regulations are at the discretion of the campus principal."

91.     During the 2017–2018 school year De'Andre used rubber hair bands in addition to his headband to pull his hair back in a tight bun while in school or at after-school events.

92.     Principal Kana told De'Andre that his locs styled this way—pulled back with a headband and secured up with a rubber band—complied with the then-operative hair policy.

93.     Notwithstanding Principal Kana's approval, school administrators continued to track and monitor De'Andre in the classroom and ask about his hair.  Indeed, Superintendent Poole admitted that BHISD personnel admonished De'Andre and K.B. about their locs "countless" times, even though they were not in violation of the hair policy as written.

94.     This intense observation and harassment did not happen to other students.  De'Andre felt that he was being targeted because of his culturally significant locs and that school administrators treated him differently than other students who had hair of similar length.

95.     Before the start of the 2019–2020 school year, BHISD modified its hair policy for the second time since De'Andre began growing his locs to further restrict the manner in which male students could wear their hair, stating in relevant part that, "[b]oy's hair will not extend, *at any time,* below the eyebrows, below the earlobes, or below the top of a t-shirt collar.  Corn rows and/or dread locks are permitted if they meet the aforementioned lengths."  (Emphasis added).

This new hair policy was also modified to provide "[s]tudents will be given until the following school day to correct hair violations."

96.     Upon information and belief, these changes to the hair policy were proposed and endorsed by Superintendent Poole and Deputy Superintendent Duree, and unanimously adopted by BHISD's Board to specifically target De'Andre and K.B because of their culturally significant locs for discriminatory purposes in violation of clearly-established anti-discrimination laws and constitutional rights.

97.     BHISD failed to offer any justification for the policy change.

98.     De'Andre started his senior year at Barbers Hill High School on August 15, 2019.

99.     When De'Andre arrived at school that day, his hair was gathered up such that it did not extend below his eyebrows, earlobes or shirt collar.

100.     During the school day, two of De'Andre's locs loosened and fell below his collar; he immediately refastened his locs to comply with the hair policy.

101.     De'Andre was nevertheless removed from class by Barbers Hill High School Assistant Principal Alicia Brooks and placed in ISS for the remainder of the school day for allegedly violating—however briefly—the hair policy.

102.     Although the then-operative version of the hair policy stated that students would be given until the following school day to correct hair violations, unlike other students, De'Andre was not given that courtesy.

103.     De'Andre was not provided any opportunity to avoid discipline that would deprive him of valuable instructional time.  Even though De'Andre was able to immediately come back into compliance with the hair policy simply by re-securing his hair back, De'Andre was not

afforded a written warning or any other lower-level disciplinary action afforded to white students and provided for in BHISD's code of conduct.

104.    Upon information and belief, BHISD has not placed any female or non-Black students in ISS for any similar alleged temporary violation of BHISD's hair policy.

105.    On August 16, 2019, De'Andre, Mrs. Arnold, and David Arnold, De'Andre's father, met with Principal Kana and BHISD Coordinator of Student Services, Mandy Malone, regarding De'Andre's ISS and hair policy compliance.

106.    At this meeting, Principal Kana reiterated that De'Andre's hair complied with the hair policy as long as it was gathered up without rubber bands or hair adornments such that it did not extend below his eyebrows, earlobes, or top of a t-shirt collar.

107.    At this meeting, Ms. Malone commented that De'Andre's locs were "just a hairstyle."  In response, Mrs. Arnold explained that De'Andre's hair was not just a "style"—his locs were culturally and personally significant to his heritage.

108.    De'Andre returned to school the following day, on August 17, 2019, with his hair tied back with a single loc from his own head.

109.    Despite De'Andre's compliance with the hair policy as written, BHISD's administration and Board believed that De'Andre needed to cut his culturally significant locs in order to conform to their "high expectations."

110.    Superintendent Poole has testified that both he and BHISD's "Board thought [De'Andre and K.B.] were out of compliance [in the Fall of 2019] because intuitively how can you be in compliance if you're never going to cut your hair . . ."

111.    As a result, BHISD modified its hair policy again midway through the 2019–2020 school year in an effort to force De'Andre and K.B. to cut their culturally significant locs.  This

26

mid-year change to the hair policy was an anomaly.  Principal Kana testified that, in his eight years as a high school principal, he has never seen the hair policy revised in the middle of the school year.

112.    The revised policy states, in relevant part, that "[m]ale students' hair will not extend, *at any time*, below the eyebrows, or below the ear lobes.  Male students' hair must not extend below the top of a t-shirt collar or be gathered or worn in a style that would allow the hair to extend below the top of a t-shirt collar, below the eyebrows, or below the ear lobes *when let down*."  (Emphasis added).

113.    The hair policy does not similarly regulate female students' unencumbered hair.

114.    The revised policy also removed language from the previous version of the policy that expressly permitted cornrows and locs.

115.    Upon information and belief, this latest change to the hair policy was proposed and endorsed by Superintendent Poole, Deputy Superintendent Duree, and Ms. Malone, and unanimously adopted by BHISD's Board to specifically target De'Andre and K.B. because of their culturally significant locs for discriminatory purposes in violation of clearly-established anti-discrimination laws and constitutional rights.

116.    BHISD has failed to offer any justification for the policy change.

117.    On December 17, 2019, De'Andre learned from Principal Kana that BHISD's new hair policy would be strictly enforced after students returned from Winter break in January 2020.

118.    Principal Kana further stated that if De'Andre was not in compliance with the hair policy upon his return from Winter break, he would be sent to ISS or the alternative high school.

119.    On January 7, 2020, the first day of the Spring 2020 semester, De'Andre returned to school with his hair in a headband and gathered in a way to ensure that his hair did not fall below

27

his eyebrows, earlobes, or shirt collar.  De'Andre immediately went to the office so he could have his hair approved without the threat of being called out of class.  Principal Kana and Ms. Duree were in the office.  Ms. Duree told De'Andre that his hair was out of dress code because it would be too long if let down.  Principal Kana suggested that De'Andre braid his locs up to comply with the hair policy.

120.    De'Andre missed school on January 8 and January 9 to braid his locs in the manner suggested by Principal Kana.

121.    De'Andre returned to school on January 10, 2020 with his locs cornrowed such that they did not extend below his eyebrows, earlobes, or shirt collar.  Principal Kana told De'Andre again that, according to his superiors, De'Andre's hair was out of dress code.

122.    Principal Kana then suggested that De'Andre return to school with his locs cornrowed in a spiral to comply with the hair policy.

123.    De'Andre subsequently braided and styled his locs in the manner suggested by Principal Kana.

124.    De'Andre returned to school on the morning of January 14, 2020, with his locs cornrowed into a spiral such that it did not extend below his eyebrows, earlobes or shirt collar. However, Principal Kana told De'Andre that, according to his superiors, De'Andre's hair was still out of dress code.

125.    Principal Kana demanded that De'Andre send him a picture of De'Andre's hair down at home before returning to school again so that he could determine whether De'Andre's hair, unencumbered while De'Andre was at home, complied with the District's new hair policy. Principal Kana advised that if De'Andre's hair extended below De'Andre's eyebrows, earlobes or shirt collar when let down, De'Andre would be placed in ISS and barred from attending all school-

28

related activities, including sporting events, prom, and graduation.  Principal Kana told De'Andre that he did not believe De'Andre would be allowed to return to regular classroom instruction without cutting his hair.

126.    Upon information and belief, no female students were targeted in this manner and specifically asked to send photographs of their hair *prior* to entry into Barbers Hill High School. Moreover, Black students were approximately seventeen times more likely than their white classmates to be asked by BHISD administrators to provide a picture of their hair before they could return to school for the Spring 2020 semester.

127.    De'Andre, in consultation with his parents, opted to not cut his locs because of their personal and cultural significance, and left Barbers Hill High School's campus that morning on January 14, 2020.

128.    De'Andre returned to school later that day with his cousin, K.B., and his mother, Sandy Arnold.

129.    Although BHISD knew De'Andre's locs are an expression of his Black and West Indian heritage and were not disruptive to the District's educational goals, De'Andre was instructed that he could not return to class unless he cut his locs.

130.    De'Andre was required to complete all schoolwork from home because he was not allowed to return to regular classroom instruction without cutting his locs.  While De'Andre was forced to study from home, he was denied in-person access to qualified teachers, an interactive learning environment, educational resources, and instruction.  De'Andre could not obtain class assignments and homework after the last revision to the hair policy forced him out of school.

131.    As a result of BHISD's actions, De'Andre's emotional health suffered.  Since being prohibited from attending school unless he cut his locs, De'Andre has experienced extreme isolation, stress and depression.

132.    In addition, De'Andre missed many senior year activities, such as Senior Panoramic, BHISD's Career Fair, SAT Day, college pre-counseling opportunities, and college recruiting events.

133.    On Friday evening, January 17, 2020, De'Andre appeared on a local television program where he was interviewed about the impact of BHISD's hair policy on him.

134.    Fearful that its racially discriminatory selective enforcement of its hair policy had been publicly exposed, BHISD attempted to cover up its misdeeds by immediately enforcing the hair policy against non-Black students who had previously been allowed to flout the hair policy without consequence.  In the first nine school days following De'Andre's interview, Barbers Hill High School issued 91 disciplinary referrals for violations of the hair policy.[25]  In those nine days alone, Barbers Hill High School personnel eclipsed the total number of disciplinary referrals issued pursuant to the challenged hair policy during the entirety of each of the three prior school years.[26] In contrast, in the nine school days of the Spring 2020 semester before De'Andre's interview, Barbers Hill High School issued just two disciplinary referrals pursuant to the hair policy.

---

[25] Barbers Hill High School had a student holiday and no classes on Monday, January 20, 2020.  *See* Barbers Hill Independent School District, District Calendar (noting that Monday, January 20, 2020 was a student holiday), https://www.bhisd.net/district/district-calendar?cal_date=2020-01-01.

[26] The 91 disciplinary referrals issued during the nine school days following De'Andre's interview doubled the total referrals for violations of the hair policy issued in each of the 2017–2018 and 2016–2017 school years.



See Ds. App. 263-344

135.    BHISD continued to insist that De'Andre either cut his locs or he would be forced to attend school in ISS or transfer to the alternative school.

136.    On or about January 24, 2020, De'Andre's parents were forced to withdraw De'Andre from BHISD because he was not allowed to attend regular classroom instruction or participate in school activities without cutting his locs.

137.    Following his withdrawal from BHISD, De'Andre completed his senior year at Ross S. Sterling High School in Goose Creek CISD.

138.    De'Andre did not want to withdraw from BHISD but was compelled to do so because of BHISD's punitive and discriminatory enforcement of its hair policy.

139.    De'Andre missed the opportunity to enjoy all of the culminating milestones of senior year—including graduation—with his lifelong friends at Barbers Hill High School as a result of BHISD's refusal to allow him to attend class and participate in school activities without cutting his culturally significant locs.

**D.      BHISD's Constructive Expulsion of K.B.**

140.    K.B. started attending school in BHISD in August 2010 as a first-grade student.

141.    In 2017, K.B. formed his natural hair into locs. K.B. decided to grow locs as an outward expression of his Black culture and to pay homage to his family's heritage.

142.    BHISD administrators, including Principal Kana, were specifically aware that K.B. was expressing his Black identity by maintaining uncut locs.

143.    In August 2018, K.B. started as a freshman at Barbers Hill High School.

144.    When he started high school, his locs had grown past his earlobes.  At the time, BHISD's hair policy stated in relevant part, "[b]oy's [sic] hair will not extend below the eyebrows, below the earlobes, or below the top of a t-shirt collar.  Corn rows and/or dread locks are permitted if they meet the aforementioned lengths," and "[b]oys are not permitted to wear hair accessories."

145.    To comply with BHISD's hair policy—which expressly permitted locs if they did not extend below the student's earlobes, eyebrows, or shirt collar—K.B. began wearing a thin black headband and tying his locs up and back.

146.    Principal Kana acknowledged that K.B.'s hair worn in this manner was permissible under the hair policy as long as the hair accessory was not visible.

147.    During the 2018–2019 school year, K.B. was called out of class approximately once per week so that Assistant Principal Ryan Rodriguez could determine whether K.B.'s hair followed the hair length policy.  K.B. was typically called down to the office in the middle of the last period of the day, right before he was about to go home.  Assistant Principal Rodriguez regularly called K.B.'s mother, Ms. Bradford, to admonish her that K.B. must comply with the hair policy.

148.    Before the start of the 2019–2020 school year, BHISD modified its hair policy to further restrict the manner in which male students could wear their hair, stating in relevant part that, "[b]oy's [sic] hair will not extend, *at any time,* below the eyebrows, below the earlobes, or

below the top of a t-shirt collar.  Corn rows and/or dread locks are permitted if they meet the aforementioned lengths." (Emphasis added).  This new hair policy was also modified to allow students until the following school day to correct any hair violation.

149.    Upon information and belief, these changes to the hair policy were proposed and endorsed by Superintendent Poole and Deputy Superintendent Duree, and unanimously adopted by BHISD's Board to specifically target K.B. and De'Andre because of their culturally significant locs for discriminatory purposes in violation of clearly-established anti-discrimination laws and constitutional rights.

150.    BHISD failed to offer any justification for the policy change.

151.    On August 15, 2019, K.B. started his sophomore year at Barbers Hill High School.

152.    Throughout the Fall semester of the 2019–2020 school year, K.B. was regularly called out of class so that Assistant Principal Doug Anderson could check K.B.'s hair for compliance with the hair policy.  After these disruptions to his education, K.B. was allowed to return to class because his hair was gathered up and back so as not to extend past his earlobes, eyebrows, or t-shirt collar, in compliance with the hair policy.

153.    During K.B.'s freshman and sophomore year, upon information and belief, no female or non-Black students were similarly monitored, harassed, or stalked by BHISD personnel concerning compliance with BHISD's hair policy.

154.    Although K.B. wore his hair off his collar and above his eyebrows and earlobes, school officials routinely approached K.B. concerning the need to keep his hair up, even at after-school events like football games and band practice.

155.    Indeed, Superintendent Poole admitted that BHISD personnel admonished K.B. and De'Andre about their locs "countless" times and Principal Kana testified that BHISD

personnel had admonished K.B. about his locs "many, many" times, even though neither K.B. nor De'Andre was in violation of the hair policy as written.

156.    BHISD modified its hair policy again midway through the 2019–2020 school year in an effort to force K.B. to cut his culturally significant locs.

157.    The revised policy states, in relevant part, that "[m]ale students' hair will not extend, *at any time*, below the eyebrows, or below the ear lobes.  Male students' hair must not extend below the top of a t-shirt collar or be gathered or worn in a style that would allow the hair to extend below the top of a t-shirt collar, below the eyebrows, or below the ear lobes *when let down*."  (Emphasis added).

158.    The hair policy does not similarly regulate female students' unencumbered hair.

159.    The revised policy also removed language from the previous version of the policy that expressly permitted cornrows and locs.

160.    Upon information and belief, this latest change to the hair policy was proposed and endorsed by Superintendent Poole, Deputy Superintendent Duree, and Ms. Malone, and unanimously adopted by BHISD's Board specifically to target K.B. and De'Andre because of their culturally significant locs for discriminatory purposes in violation of clearly-established anti-discrimination laws and constitutional rights.

161.    BHISD failed to offer any justification for the policy change.

162.    On or about December 17, 2019, K.B. learned from Principal Kana that BHISD's new hair policy would be strictly enforced after students returned from Winter break in January 2020.

163.    Principal Kana stated that if K.B. was not in compliance with the new hair policy upon his return from Winter break, he would be sent to ISS or an alternative school.

164.    Principal Kana advised K.B. and his mother, Ms. Bradford, to braid K.B.'s locs into cornrows and wear them up to comply with the new policy.

165.    In January 2020, Principal Kana asked K.B. to send him a picture of his hair down while at home to ensure it complied with the new hair policy.

166.    Principal Kana advised that if K.B.'s hair was too long, he would have to go to ISS and would be barred from attending all school-related activities, including sporting events and band.

167.    Upon information and belief, no female students were targeted in this manner and specifically asked to send photographs of their hair *prior* to entry into Barbers Hill High School. Moreover, Black students were approximately seventeen times more likely than their white classmates to be asked by BHISD administrators to provide a picture of their hair before they could return to school for the Spring 2020 semester.

168.    K.B. did not immediately return to school when classes resumed after Winter break on January 7, 2020, because he did not have an opportunity to have his locs styled into cornrows as Principal Kana recommended.

169.    When she was able to incur the expense, Ms. Bradford took a day off from work— without pay—and spent approximately $75 for a hairstylist to braid K.B.'s hair into cornrows to comply with BHISD's new hair policy.

170.    After braiding his locs into cornrows, K.B. returned to school on January 14, 2020, with his cousin, De'Andre, and his aunt, Mrs. Arnold.

171.    Despite following the instructions of Principal Kana concerning how to comply with the new hair policy, Principal Kana would not allow K.B. to return to class until his locs were cut.

172.   K.B. was forced to forego attending school and returned home.  He was deeply upset that he was being punished for his culturally significant locs.

173.   On the evening of January 14, 2020, after K.B. returned home, Ms. Bradford called Principal Kana to ask about their previous conversation in which Principal Kana instructed K.B. and Ms. Bradford on how to style K.B.'s hair so that it would remain in compliance with the new hair policy.

174.   During this call, Principal Kana acknowledged that he told K.B. and Ms. Bradford that braiding K.B.'s locs into cornrows would be permissible under the new hair policy.  However, Principal Kana stated there was nothing he could do about BHISD's enforcement of the new hair policy because his boss, Superintendent Poole, wanted the policy strictly enforced against K.B. and De'Andre.  As a result, K.B.'s braided hairstyle would not be acceptable.

175.   K.B. did not return to school for nearly three weeks because of BHISD's discriminatory hair policy.

176.   While K.B. was out of school, Ms. Bradford had to retrieve homework packets from Barbers Hill High School for K.B. to complete.  The homework packets did not contain instructions, and K.B. was not given any guidance on the subject of the homework or what happened during in-class instruction.  The homework was difficult for K.B. to complete without the instruction afforded other students in class. K.B. did not understand most of the assignments.

177.   On or around January 29, 2020, K.B. returned to school because Ms. Bradford was worried K.B. would face truancy and grade retention issues if he accrued additional absences.

178.   K.B. was immediately sent to ISS by Assistant Principal Anderson when he returned to campus because of his locs.

179.   K.B. remained in ISS each school day until on or around February 5, 2020.

180.    In ISS, K.B. was confined to a room for the entire day, where he was expected to complete homework without instruction from his regular teachers or from the ISS monitors, who themselves did not understand K.B.'s assignments.  In addition, K.B. could not interact with other students, talk, or leave the classroom without permission, and he had to eat lunch at his desk.

181.    K.B was denied access to qualified teachers, an interactive learning environment, educational resources, and instruction in ISS.

182.    While in ISS, K.B. was also prohibited from participating in any of the extracurricular activities he typically took part in, including band.

183.    K.B.'s time in ISS took a significant emotional toll on him.  As a result of being placed in ISS, K.B. felt extremely isolated; he could not see his friends and was forced to study alone in a small room, which he said felt like a prison.  As a result, K.B. lost his appetite and interest in activities he enjoyed.  K.B.'s grades, confidence, and friendships suffered.  He also experienced extreme isolation, stress, and depression.

184.    On February 7, 2020, Ms. Bradford withdrew K.B. from BHISD because the District continued to insist that K.B. would either be forced to sit in ISS or attend an alternative school if he did not cut his locs.

185.    K.B. did not want to withdraw from BHISD but was compelled to do so because of BHISD's punitive and discriminatory enforcement of its hair policy.

186.    K.B. enrolled at Ross S. Sterling High School in Goose Creek CISD on or around February 21, 2020.

187.    K.B. returned to Barbers Hill High School for his junior year in August 2020 because of an order issued by this Court.  Like generations of his family members, K.B. intends to

earn his high school diploma at Barbers Hill High School, so long as BHISD is enjoined from enforcing its discriminatory hair policy.

**E.    BHISD's Retaliation Against Mrs. Arnold's Exercise of Free Speech**

188.    Shortly after the August 2019 meeting between the Arnolds, Principal Kana, and Ms. Malone after De'Andre was sent to ISS when two of his locs momentarily fell below his collar on the first day of school, BHISD's Board announced it planned to change the hair policy.

189.    Pursuant to BHISD's 2019–2020 Student Handbook, changes to BHISD policies affecting student conduct are revised annually by the Board, and any mid-year changes to the Student Handbook are discussed and voted on at Board meetings.

190.    Based on BHISD's prior changes to, and selective enforcement of, the hair policy, Mrs. Arnold was concerned that any additional changes would disproportionately and adversely affect De'Andre, K.B., and other Black male students at BHISD.

191.    On November 18, 2019, Mrs. Arnold attended a Board meeting to express her concerns about the impact of modifications to the hair policy.

192.    During the public forum portion of the meeting, Mrs. Arnold described how De'Andre and K.B. had been monitored and targeted because of their locs and described some of the negative comments De'Andre received because of his hair.

193.    Mrs. Arnold stated that the policy was unfair for Black students, including De'Andre and K.B., and for male students in general.  Mrs. Arnold notified the Board and Superintendent Poole that De'Andre's father is from Trinidad and Tobago, that De'Andre's locs are a reflection of his Black culture and Trinidadian heritage, and that changing the hair policy as proposed would subject K.B. and other Black male students with locs to race and gender discrimination.

194.    BHISD Superintendent Poole refused to discuss the modifications to the policy and their potential impact on Black and male students.

195.    Superintendent Poole told Mrs. Arnold that she would need to obtain approval from the Board to be added to the agenda and discuss the matter at any future meeting.

196.    On November 19, 2019, the day after the Board meeting, Mrs. Arnold called Superintendent Poole's office and spoke with Ms. Duree.

197.    Ms. Duree told Mrs. Arnold during this call that she only needed one Trustee to approve her agenda item to be added to the Board meeting agenda.

198.    Ms. Duree also told Mrs. Arnold that she would need to receive approval from a Trustee a month in advance of the next Board meetingin order for Ms. Arnold's proposed agenda item to be discussed at the next Board meeting.  However, the next Board meeting was scheduled for December 16, 2019, less than a month after the November 18, 2019 Board meeting, making it impossible for Mrs. Arnold to have an item added to the December 16, 2019 agenda.

199.    Ms. Duree's instructions to Mrs. Arnold were inconsistent with BHISD policy, which states "the deadline for submitting items for inclusion on the agenda is the seventh calendar day before regular meetings and the third calendar day before special meetings."

200.    BHISD, afraid that Mrs. Arnold's comments at the November 19, 2019 Board meeting exposed their racially discriminatory selective enforcement of the hair policy, attempted to cover up their transgressions by strictly enforcing the hair policy as soon as students returned from Thanksgiving break.  *See* graph on page 35.

201.    Meanwhile, Mrs. Arnold attempted to follow up with Superintendent Poole's office several times over the ensuing two weeks to express her concerns about the discriminatory nature of the hair policy.

202.     On many of these occasions, Ms. Malone answered the phone when Mrs. Arnold called Superintendent Poole's office.   Ms. Malone refused to connect Mrs. Arnold with Superintendent Poole via telephone or provide his email address.

203.     Superintendent Poole never returned any of Mrs. Arnold's calls nor did he respond through any other medium.

204.     On one of her attempts to reach Superintendent Poole by telephone, Mrs. Arnold connected with Ms. Malone, who told Mrs. Arnold that Superintendent Poole refused to follow up with Mrs. Arnold due to an ongoing investigation into BHISD's enforcement of the hair policy against a Native American student.

205.     Mrs. Arnold attended the BHISD Board meeting on December 16, 2019.

206.     At the meeting, Ms. Malone presented the revised student hair policy to the Board, which states in relevant part that "[m]ale students' hair will not extend, *at any time*, below the eyebrows, or below the ear lobes.  Male students' hair must not extend below the top of a t-shirt collar or be gathered or worn in a style that would allow the hair to extend below the top of a t-shirt collar, below the eyebrows, or below the ear lobes *when let down*."  (Emphasis added).

207.     Mrs. Arnold spoke during the public forum portion of this meeting and contended that the proposed hair policy—prohibiting long hair worn in any manner for male students—would unfairly target De'Andre, K.B., and other Black male students with natural styles, such as locs.

208.     Mrs. Arnold also publicly asserted that De'Andre's locs were culturally significant and connected to the family's Black and Trinidadian roots.

209.     Mrs. Arnold also directly addressed Superintendent Poole's refusal to meet with her concerning the changes to the policy and his refusing her calls to his office.

210.    The Board voted 6-0 to approve the modified hair policy as presented by Ms. Malone for discriminatory purposes in violation of clearly-established anti-discrimination laws and constitutional rights.

211.    The new version of the hair policy became effective on January 6, 2020.

212.    Immediately after the December 16, 2019, meeting, Superintendent Poole approached and reprimanded Mrs. Arnold for publicly commenting on her inability to contact him.

213.    Superintendent Poole told Mrs. Arnold "that is not the way I run my meetings."

214.    Superintendent Poole also said that Mrs. Arnold should not have aired those concerns in front of his colleagues.

215.    Superintendent Poole was very close to Mrs. Arnold's body, used a raised tone, and pointed at her in a threatening manner when making these statements.  As a result, Ms. Arnold felt threatened and unsafe.

216.    On December 17, 2019, Principal Kana called Mrs. Arnold and Ms. Bradford.

217.    Principal Kana said that BHISD's new hair policy would be strictly enforced after students returned from Winter break in January 2020.

218.    Principal Kana further stated that if De'Andre and K.B. were not in compliance with the new hair policy upon their return from Winter break, they would be sent to ISS or an alternative school.

219.    Mrs. Arnold accompanied her son, De'Andre, and nephew, K.B., to the Barbers Hill High School on January 14, 2020.

220.    Mrs. Arnold attempted to speak with BHISD administrators about the discriminatory nature of the hair policy.  Ms. Duree told Mrs. Arnold that she would have to present

her complaints at a Board meeting, and Ms. Duree told her again that she would need the approval of at least one Board member to be added to a meeting's agenda.

221.    BHISD denied De'Andre's and K.B.'s attempts to return to the classroom without cutting their culturally significant locs.

222.    From January 14 to 16, 2020, Mrs. Arnold emailed BHISD Board members Fred Skinner, Eric Davis, Becky Tice, George Barrera, Benny May, and Clint Pipes, asking to be added to the January 20, 2020 Board meeting agenda.

223.    Mr. Skinner replied on January 19, 2020, stating that he could not accommodate Mrs. Arnold's request and that the hair policy would remain unchanged.

224.    Mrs. Arnold sent at least two emails to each Board member; the rejection from Mr. Skinner is the only response she received.

225.    On January 20, 2020, Mrs. Arnold attended the Board meeting.

226.    During the public forum portion of this meeting, Mrs. Arnold described the harm the hair policy caused De'Andre and K.B., and how the policy was being unfairly enforced against them.

227.    No one from the Board offered any justification for the hair policy or any response to Mrs. Arnold's explanation of its discriminatory enforcement against De'Andre or K.B.

228.    Each time Mrs. Arnold visited either the BHISD District office or Barbers Hill High School following the Board meeting held on November 18, 2019, Kenny Widner, Chief of the BHISD Police Department, shadowed Mrs. Arnold without her consent.

229.    Upon information and belief, Chief Widner maintains an office at Barbers Hill High School but is sometimes dispatched to BHISD's administrative office.

230.    On approximately six or seven occasions between November 2019 and February 2020, Chief Widner followed Mrs. Arnold during the entire time that she was at the BHISD administrative office or Barbers Hill High School.  Chief Widner generally stood watch over Mrs. Arnold as she conducted her business, then followed her to her car when she was exiting the property.

231.    Upon information and belief, Chief Widner was dispatched to the BHISD administrative office or Barbers Hill High School by BHISD on these occasions for the purpose of intimidating Mrs. Arnold and monitoring her movements, including following her until she left the property.

232.    The constant presence of a uniformed police officer fully outfitted with a firearm, taser, and handcuffs within arms-distance of Mrs. Arnold each time she visited either BHISD property greatly upset Mrs. Arnold.  She felt physically threatened and intimidated.  These actions also deeply distressed De'Andre and K.B., who were worried about Mrs. Arnold's safety.

233.    Upon information and belief, no other parent of a BHISD student was treated in a similar manner.

## F.    BHISD's Exemption and Grievance Proceedings

234.    BHISD maintains a dress code exemption process which purports to allow students to request an exemption to the dress and grooming code.

235.    The Principal is given the authority to grant an exemption to BHISD's dress and grooming code.

236.    BHISD's "Dress Code Exemption Form" permits an exemption request on the following bases: (1) a medical condition or disability that impacts the student's ability to comply with the dress code, (2) a religious exemption, and (3) other.

43

237.     Principal Kana testified that he was not aware of Barbers Hill High School granting any exemptions to BHISD's hair policy on religious grounds in the eight years he has served as principal of Barbers Hill High School.

238.     Principal Kana testified that he provided an exemption to the hair policy for a high school student because he was a Native American.

239.     Principal Kana testified that allowing the male Native American student to maintain uncut hair did not interfere with the school's culture of discipline or present a safety threat.

240.     On January 23, 2020, Ms. Bradford completed a dress code exemption request on behalf of K.B, citing the significance of K.B.'s hair to his Black identity and culture; the District received K.B.'s exemption request on January 27, 2020.

241.     De'Andre also requested an exemption from the hair policy on January 21, 2020, citing his Trinidadian heritage and cultural significance of his hair; the District received De'Andre's exemption request on January 27, 2020.

242.     BHISD represented to the Arnolds and Bradfords that a decision would be made on the exemption requests by February 6, 2020.

243.     Despite that representation, BHISD did not respond to the exemption requests until February 18, 2020, which was 28 days after the District received De'Andre's exemption request and 22 days after the District received K.B.'s exemption request.

244.     Superintendent Poole acknowledged that BHISD refrained from taking any action on the exemption requests because BHISD believed that De'Andre and K.B. would withdraw from the District.

245.     However, neither De'Andre, K.B., nor their parents had indicated that De'Andre or K.B. intended to withdraw from BHISD.  Instead, K.B. languished in ISS while awaiting resolution of the exemption request.

246.     On January 27, 2020, De'Andre and K.B. filed administrative grievances with BHISD per the District's policy.

247.     In their Level One grievance complaints, De'Andre and K.B. each contended that BHISD's hair policy was selectively and discriminatorily enforced against them and that, on its face, the policy unlawfully discriminated against all male students.  De'Andre and K.B. also asked to return to regular in-class instruction without penalty (including without having to cut their locs); that De'Andre be allowed to participate in commencement activities; and that BHISD amend its hair policy to eliminate its discriminatory provisions.

248.     De'Andre's and K.B.'s Level One grievance conference was held on or about February 6, 2020.

249.     On February 7, 2020, BHISD and Principal Kana declined to consider De'Andre's and K.B.'s exemption requests, opting instead to resolve the exemption requests through the grievance proceedings.

250.     On February 18, 2020, Principal Kana denied De'Andre's and K.B.'s grievance complaints.

251.     Principal Kana's response stated, in relevant part, that De'Andre would not be allowed to participate in graduation ceremonies and De'Andre and K.B. would be placed in ISS if they did not cut their locs to comply with the new hair policy.  The letter also stated that the hair policy would not change in response to the students' request.

252.     That same day, De'Andre and K.B. appealed the preliminary grievance determination and requested a Level Two hearing and determination before Superintendent Poole or a proxy.

253.     De'Andre's and K.B.'s Level Two hearings were initially scheduled for March 20, 2020.  However, these in-person hearings were cancelled due to the COVID-19 pandemic.

254.     At several points in April and May 2020, De'Andre and K.B. requested that BHISD schedule a virtual convening for the Level Two hearings.  However, BHISD refused on the ground that the District was not open for official business, although the District did conduct other official business during that time.

255.     On May 5, 2020, the District finally rescheduled the Level Two hearings for June 4, 2020—a week after the end of BHISD's 2019–2020 school year and graduation.

256.     As a result of the continued delay to their grievance process, De'Andre, Mrs. Arnold, and K.B. sent a letter to BHISD dated May 4, 2020, demanding (a) immediate and unconditional re-admission of De'Andre and K.B. into BHISD, and (b) that BHISD rescind the hair policy.[27]

257.     BHISD responded to the demand letter on May 14, 2020, stating that (a) De'Andre and K.B. would not be allowed to return to regular classroom instruction and school activities without cutting their locs, and (b) the hair policy would not be rescinded.

258.     Plaintiffs initiated this lawsuit by filing their Original Complaint on May 22, 2020.

259.     De'Andre's and K.B.'s Level Two grievance hearings occurred on June 4, 2020 before Ms. Malone.

---

[27] A true and correct copy of the letter dated May 4, 2020 (redacted to remove minor K.B.'s name) is attached as Exhibit 5 and incorporated by reference as if fully set forth herein.

260.    On June 23, 2020, Ms. Malone denied De'Andre's and K.B.'s Level Two grievances on behalf of BHISD.

261.    De'Andre and K.B. requested a Level Three grievance hearing before BHISD's Board, which was held on July 20, 2020.

262.    Following the presentations by each party at the hearing, no member of the Board asked a single question or made any statement, nor did the Board members deliberate before casting their votes.   Instead, the Board immediately and unanimously voted to deny each of De'Andre's and K.B.'s grievances.

263.    On August 6, 2020, K.B. re-enrolled in Barbers Hill High School.

264.    On August 17, 2020, the Court issued a preliminary injunction enjoining BHISD from enforcing the hair policy against K.B. or otherwise seeking to force K.B. to cut his locs.

**G.     Plaintiffs' Psychological Harm and Mental Anguish**

265.    De'Andre and K.B. both have suffered, and continue to suffer, humiliation and emotional distress as a direct result of BHISD's unlawful monitoring, targeting, and constructive expulsion of the students.

266.    Over the past seven years of monitoring and targeting, BHISD's actions have made De'Andre and K.B. feel unwelcome, inferior, and ostracized.   In addition, De'Andre and K.B. were effectively expelled when they were forced to leave school because of the hostile and inhospitable environment created by BHISD.

267.    Since their constructive expulsion, De'Andre and K.B. have exhibited despondent behavior symptomatic of trauma and depression, such as loss of appetite, withdrawal, and excessive fatigue throughout the day.

268.    On January 19, 2020, Superintendent Poole made a public statement on the Twitter account @BarbersHillSoup implying that De'Andre and K.B.—by wearing culturally significant uncut locs—had fallen short of the "high expectations" that made BHISD a "state leader."[28]

269.    On January 22, 2020, Superintendent Poole doubled down on this message with another Twitter post, boasting that "our overall passing scores are the highest in the state" and insisting that BHISD's "high level of expectations on all things & dress code"—which sought to force Black students to assimilate to discriminatory grooming norms—were good for Black students.[29]

270.    Superintendent Poole's disingenuous characterization of BHISD's academic ranking and its correlation to the hair policy is grossly misguided and misleading.  Contrary to Superintendent Poole's representations, Barbers Hill High School is ranked 156 overall among Texas public high schools based on academic performance and testing scores.[30] Of the top five Texas high schools, none have a dress and grooming policy like BHISD's.  Of the top five open enrollment public high schools, none restrict male students from wearing hair accessories and ponytails and only one has a hair length restriction.

271.    The faux correlation BHISD created between hair length and academic performance is based solely on personal and racial biases and discredits the actual academic efforts

---

[28] https://twitter.com/BarbersHillSoup/status/1218927008136253440?s=20 ("Re a recent Fox 26 segment, Fox didn't attempt to contact our PR Dir. which is irresponsible journalism. FTR, BH DOES allow dreadlocks. However we DO have a community supported hair length policy & have had for decades. BH Is a State leader with high expectations in ALL areas!"), attached hereto as Exhibit 6.  *See also* https://twitter.com/FOX26Houston/status/1219319951841951744?s=20 (replying to Supt. Poole's tweet: "Hello, I'm reaching out from Fox26. We actually did reach out to you last week via phone and email. We would love to interview you on-camera. Please reach out to our newsdesk at 713-479-2801. Just ask for Lee.")

[29] https://twitter.com/BarbersHillSoup/status/1220160056160899072?s=20 ("BH has received scrutiny regarding our high level of expectations on all things & dress code. Yet our African American students beat the state average on passing STAR by 22% & our overall passing scores are the highest in the state. Sounds like high expectations work!"), attached hereto as Exhibit 7.

[30] *Texas Public High Schools: 2020 Texas Public High School Rankings*, H. DAVID BALLINGER, https://www.hdavidballinger.com/high-schools-texas.php.

of its students and educators.  Rather, Superintendent Poole's statements on Twitter expressly concede that BHISD's hair policy is directed to forcing Black male students to assimilate to arbitrary "high standards" that are not recognized by, and are inconsistent with, standards enacted at the highest ranked high schools in the State of Texas.

272.    On February 11, 2020, Superintendent Poole wrote an opinion piece in the local newspaper[31] arguing that De'Andre had failed to meet BHISD's high expectations and was seeking preferential treatment by wearing his natural hair in locs in honor of his Trinidadian and Black heritage.  Superintendent Poole further publicized his opinion piece by posting a link to the @BarbersHillSoup Twitter account.

273.    On December 15, 2020, BHISD issued a press release wherein Superintendent Poole again belittled K.B.'s and De'Andre's expression of pride in their racial heritage as a mere incident of "students [who] would prefer not to adhere to [BHISD's] high standards."[32] Superintendent Poole further implied that K.B. and De'Andre wearing locs in homage to their Black and, in De'Andre's case, West Indian, heritage was emblematic of the "corrosive effect of eroding expectations."[33]

274.    On December 16, 2020, Superintendent Poole publicly stated on Twitter that "Students are 10 times as likely to commit violent offenses in HS's with no hair code," implying that there is a link between De'Andre's and K.B.'s locs and a proclivity towards violence.[34]

---

[31] Greg Poole, *Separate is still not equal*, Baytown Sun (Feb. 11, 2020), attached hereto as Exhibit 8.
[32] Carla Rabalais (or Barbers Hill ISD), *Dress Code & Student Success Statewide study shows link* (Dec. 15, 2020), attached hereto as Exhibit 9.
[33] *Id.*
[34] https://twitter.com/BarbersHillSoup/status/1339390124233244678 ("BH Board asked for a study of all Tx HS's & HS's with a hair code like ours are safer & stronger academically. Students are 10 times as likely to commit violent offenses in HS's with no hair code. BH is the fastest growing in Houston & high standards in ALL areas are the reason."), attached hereto as Exhibit 10.

275.     Superintendent Poole followed up this public statement with another on December 17, 2020, implying that De'Andre's and K.B.'s failure to acquiesce to BHISD's attempt to force them to assimilate to discriminatory grooming norms "has a corrosive effect in eroding" their ability to succeed academically and otherwise.[35]

276.     Upon information and belief, BHISD shared their press release with multiple news outlets, including the local paper, the Baytown Sun, leading to further dissemination of these harmful and offensive public statements.

277.     Indeed, KPRC Channel 2 aired a television news story on December 17, 2020, reporting that Superintendent Poole had "created quite the firestorm over social media" and that BHISD was claiming that it had done research that proved that students were "more violent because of [their] hairstyle."[36]

278.     On information and belief, numerous hostile social media posts and an antagonistic newspaper advertisement from the local community and others followed BHISD's public statements, including some threatening bodily harm to De'Andre and/or K.B.

279.     BHISD—by unlawfully discriminating against De'Andre and K.B. and then publicly accusing De'Andre and K.B. of seeking preferential treatment—incited this groundswell of hostility that caused the Arnold and Bradford families to fear for De'Andre's and K.B.'s safety.

280.     De'Andre and K.B. had to modify their lifestyles significantly to ensure their physical safety and avoid potential danger resulting from the threats and hostility caused by

---

[35] https://twitter.com/BarbersHillSoup/status/1339605740416364545?s=20 ("The BH Board sanctioned study showed statistically significant correlations of higher academic success & safer schools of HS's which had more stringent dress codes. It appears the lack of a high expectation in one area has a corrosive effect in eroding expectations in others."), attached hereto as Exhibit 11.

[36] Bill Barajas, *Barbers Hill ISD says study shows 'significant correlation' between academic success, schools with dress codes*, KPRC HOUSTON (Dec. 17, 2020, 11:13 P.M.), https://www.click2houston.com/news/local/2020/12/18/barbers-hill-isd-says-study-shows-significant-correlation-between-academic-success-schools-with-dress-codes/.

BHISD's conduct.  For example, De'Andre and K.B. limited travel outside of their respective homes and avoided going anywhere unaccompanied whenever possible.  De'Andre also changed the car he typically drove in an effort to avoid being recognized and cancelled his gym membership because he no longer felt safe going to the gym.  As a safety precaution, Mrs. Arnold insisted that De'Andre call and remain on the phone with her while walking to his car after his evening dual credit English class, which he was forced to take at a nearby community college because, unlike Barbers Hill High School, Sterling High School did not offer the course.

281.    Goose Creek CISD also perceived the threats to be credible, as demonstrated by officials quickly ushering the Arnold family inside of the school and into a backroom so that they could complete the enrollment process for De'Andre in January 2020.

282.    Whereas De'Andre and K.B. used to enjoy going to the movies with friends, they ceased doing so.  When they did go out with family members, for example, to the grocery store, people pointed and stared or made negative comments that left them feeling stigmatized.  K.B. felt especially stressed and became reluctant to leave home.

283.    Mrs. Arnold has also suffered, and continues to suffer, significant emotional harm and mental anguish as a direct result of the actions BHISD took in response to her complaints about the discriminatory hair policy. BHISD's retaliatory conduct—such as stigmatizing, humiliating, and constructively expelling Mrs. Arnold's son and nephew, depriving her son of his high school graduation, and subjecting Mrs. Arnold to a constant intimidating police presence anytime she was on school district property—caused severe harmful effects to Mrs. Arnold's daily life, resulting in emotional distress and other harm. BHISD's actions and the foreseeable consequences of its actions have caused, and continue to cause, Mrs. Arnold to live in constant anxiety and fear about her, De'Andre's, and K.B.'s safety, future, and emotional wellbeing.

284.     As of the filing of this Second Amended Complaint, De'Andre, K.B., and Mrs. Arnold continue to exhibit signs of trauma directly related to BHISD's conduct.

## **FIRST CAUSE OF ACTION**

**Violation of the Fourteenth Amendment's Equal Protection Clause
Pursuant to 42 U.S.C. § 1983
(Intentional Race Discrimination)**

285.     De'Andre and K.B. bring this Fourteenth Amendment race discrimination claim against BHISD for the discriminatory construction and selective enforcement of BHISD's hair policy against De'Andre and K.B.

286.     Plaintiffs reallege and incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

287.     The Equal Protection Clause of the Fourteenth Amendment prohibits States from denying "any person within its jurisdiction the equal protection of the laws." This direction requires all similarly situated persons to be treated alike. *Priester v. Lowndes Cnty.*, 354 F.3d 414, 424 (5th Cir. 2004).

288.     Prohibited racial discrimination includes reliance on racial prejudice or stereotypes. *See, e.g., Batson v. Kentucky*, 476 U.S. 79, 104 (1986).

289.     A school's use of race or ethnicity that is in any way motivated by prejudice or stereotype against a group constitutes intentional discrimination and violates the Equal Protection Clause of the Fourteenth Amendment.

290.     Furthermore, treating similarly situated students differently because of "ethnic hair" constitutes discrimination in violation of the Equal Protection Clause. *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 415 (5th Cir. 2015); *Hollins v. Atlantic Co.,* 188 F.3d 652, 661–62 (6th Cir. 1999).

291.    "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

292.    Pursuant to BHISD's Board Policy Manual and Student Code of Conduct, Superintendent Poole and the BHISD Board possess final authority to establish standards and policy with respect to student dress and grooming.

293.    BHISD's Board, as the official policymaker for the school district, adopted a series of hair policies that targeted De'Andre and K.B. and their natural hair growth, making it increasingly difficult and ultimately impossible for them to comply with the dress code.

294.    Specifically, BHISD's Board and its members believed that De'Andre and K.B. should be required to cut their hair in order to conform to their expectations of "excellence," which led directly to the changes in the hair policy adopted in December 2019.

295.    Each of the Board Trustees voted to adopt the latest iteration of the hair policy in December 2019 that led to De'Andre's and K.B.'s withdrawal from BHISD.

296.    Upon information and belief, the revisions made in the December 2019 hair policy were also encouraged by Superintendent Poole, Deputy Superintendent Duree, and Ms. Malone because of De'Andre's and K.B.'s culturally significant locs for discriminatory purposes in violation of clearly-established anti-discrimination laws and constitutional rights.

297.    BHISD monitored De'Andre and K.B. and, with discriminatory intent to force them to conform to racially discriminatory views of "excellence," "cleanliness," and "professionalism," and to reflect the District's discriminatory perception of "high standards," adopted a hair policy and practice that is motivated, at least in part, by the racially discriminatory goal of restricting Black students from wearing their natural hair or culturally significant hair formations.

298.    Ms. Duree repeatedly entered De'Andre's classroom during regular instruction to monitor him and used her observations to modify the discriminatory hair policy.  Other non-Black students were not similarly observed in the classroom for their hair.

299.    Assistant Principals Rodriguez, Anderson, and Tillis frequently monitored De'Andre and K.B. during school hours and removed them from learning spaces to evaluate their hair, even when De'Andre and K.B. followed the hair policy.  Non-Black students were not similarly targeted, surveilled, or removed from learning spaces so that administrators could scrutinize their hair.

300.    Principal Kana required De'Andre and K.B. to submit photos of their hair before returning to school in January 2020.  Non-Black students were not asked to submit photos at the same rate as Black students.

301.    In defending its hair policy, BHISD has repeatedly alleged that "high expectations for academic instruction" are related to how De'Andre and K.B. wear their hair.  BHISD insinuates that natural Black hair or culturally significant locs are unprofessional and linked to bad performance, criminality, or low expectations.  This presumption is based on racial stereotypes about natural Black hair, such as locs.

302.    Superintendent Poole also indicated that De'Andre's uncut locs fall short of the "high expectations" BHISD students are expected to exemplify in an op-ed he submitted to the Baytown Sun, a local newspaper.  These assumptions were based on racially discriminatory stereotypes that natural Black hair formation and cultural practices have a negative impact on educational standards.

54

303.    BHISD's hair policy was constructed in direct response to De'Andre's and K.B.'s hair journey and based on negative stereotypes about Black hair in a natural state of uncut locs, constituting discrimination based on race.

304.    As intended, the hair policy has been disproportionately enforced against Black students as compared to white students.

305.    Each modification closely followed actions De'Andre and K.B. took to be in compliance with the policy and avoid disciplinary action.   Yet, BHISD did not provide a justification for the multiple changes to the policy.

306.    Additionally, BHISD's current hair policy is wholly arbitrary because it admittedly regulates how students' hair is worn while at school *and* how the hair is hypothetically worn "when let down," even off of school premises.

307.    BHISD has no legitimate bases or concerns to regulate De'Andre's, K.B.'s, or any other student's hair as it could be worn "when let down," especially if the hair is not worn in such a manner at school or extracurricular events.

308.    BHISD enforced the current hair policy against De'Andre and K.B. and did not similarly enforce such policy against white male students as frequently or as harshly.

309.    Moreover, at least one male student with long hair attending Barbers Hill High School with De'Andre and K.B. has alleged that BHISD did not start enforcing the hair policy against him or other students until *after* BHISD's discriminatory enforcement of the hair policy against De'Andre became publicized and the focus of attention.[37]   This is confirmed by BHISD's own disciplinary records, which indicate that approximately 98% of the disciplinary referrals for

---

[37] Keith Garvin and Tierra Smith, *More Barbers Hill students angered by school dress code, forced to cut their hair as well*, KPRC HOUSTON (Jan. 24, 2020, 9:28 P.M.), https://www.click2houston.com/news/local/2020/01/24/more-barbers-hill-students-angered-by-school-dress-code-forced-to-cut-their-hair-as-well/.

hair policy violations issued by Barbers Hill High School in January 2020 occurred in the nine school days immediately following De'Andre's interview with a local television program on January 17, 2020.  In those nine days alone, Barbers Hill High School eclipsed the total number of disciplinary referrals for hair violations issued during the entirety of each of the three prior school years.

310.    By acting under color of state law to deprive Plaintiffs of their Fourteenth Amendment rights, BHISD has violated 42 U.S.C. § 1983.

311.    As a direct and proximate result of BHISD's discriminatory construction and selective enforcement of the hair policy, De'Andre and K.B. have suffered and will continue to suffer compensable harm, including violations of their Fourteenth Amendment rights, humiliation, and emotional distress, and are entitled to declaratory relief announcing that BHISD's hair policy violates federal law and the Constitution, an order enjoining BHISD from enforcing its hair policy, an order enjoining BHISD from discriminatorily enforcing its hair policy, an order expunging any disciplinary sanctions on Plaintiffs' school records related to the hair policy, damages, costs, and attorneys' fees.

## SECOND CAUSE OF ACTION

### Violation of Title VI
### (Intentional Race Discrimination)

312.    De'Andre and K.B. bring this Title VI race discrimination claim against BHISD for the discriminatory construction and selective enforcement of its hair policy against De'Andre and K.B.

313.    Plaintiffs reallege and incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

314.     Title VI of the Civil Rights Act of 1964 provides that recipients of federal financial assistance may not discriminate based on race, color, or national origin. 42 U.S.C. § 2000d.

315.     BHISD is a federally funded program or activity under 42 U.S.C. § 2000d. BHISD receives $488 per student in federal funding each fiscal year.

316.     As a recipient of federal financial assistance, BHISD and all its programs and activities are subject to Title VI of the Civil Rights Act of 1964.

317.     Like the Fourteenth Amendment's Equal Protection Clause, Title VI bars intentional discrimination.  *See Alexander v. Choate*, 469 U.S. 287, 292–93 (1985); *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 607–08 (1983); *Hollins*, 188 F.3d at 661–62.  A recipient's use of race or ethnicity that is in any way motivated by prejudice or stereotype against a particular group therefore violates both the Fourteenth Amendment and Title VI.  28 C.F.R. § 42.104(b).

318.     De'Andre and K.B. were both subject to the discriminatory enforcement of BHISD's hair policy based on their race and color.

319.     Ms. Malone repeatedly entered De'Andre's classroom during regular instruction to monitor him and used her observations to modify the discriminatory hair policy.  Other non-Black students were not similarly observed in the classroom for their hair.

320.     Assistant Principal Rodriguez frequently monitored De'Andre and K.B. during school hours and removed them from learning spaces to evaluate their hair, even when De'Andre and K.B. followed the hair policy.  Other non-Black students were not similarly targeted, surveilled, or removed from learning spaces for hair evaluations.

321.     Principal Kana required De'Andre and K.B. to submit photos of their hair before returning to school in January 2020.  Non-Black students were not similarly required to submit photos of their hair to administrators at the same rate in order to receive an education.

322.     De'Andre and K.B. were told by Principal Kana that they were following the hair policy in place at the start of the 2019–2020 school year by wearing their locs cornrowed above their eyebrows, earlobes, and shirt collars, but they were later penalized for following Principal Kana's instructions.

323.     BHISD adopted the current hair policy to push De'Andre and K.B. out of compliance with the policy and force them to either cut their culturally significant locs or withdraw from BHISD.

324.     Additionally, BHISD's current hair policy is wholly arbitrary because it admittedly regulates how students' hair is worn while at school *and* how the hair is hypothetically worn "when let down," even off of school premises.

325.     BHISD has no legitimate bases or concerns that allow it to exercise the authority to regulate De'Andre's, K.B.'s, or any other student's hair as it could be worn "when let down," especially when their hair is not worn in such a manner at school or extracurricular events.

326.     BHISD enforced the current hair policy against De'Andre and K.B. and did not similarly enforce such policy against white male students as frequently or as harshly.

327.     BHISD's discriminatory construction and selective enforcement of its hair policy constitute a violation of Title VI.

328.     As a direct and proximate result of BHISD's discriminatory construction and selective enforcement of its hair policy, De'Andre and K.B. have suffered and will continue to suffer compensable harm, including humiliation, emotional distress, violations of their civil rights,

and are entitled to declaratory relief announcing that BHISD's hair policy violates federal law, an order enjoining BHISD from enforcing its hair policy, an order enjoining BHISD from discriminatorily enforcing its hair policy, an order expunging any disciplinary sanctions on Plaintiffs' school records related to the hair policy, costs, and attorneys' fees.

## THIRD CAUSE OF ACTION

**Violation of the Fourteenth Amendment's Equal Protection Clause**
**Pursuant to 42 U.S.C. § 1983**
**(Sex Discrimination)**

329.    De'Andre and K.B. bring this Fourteenth Amendment sex discrimination claim against BHISD for the discriminatory construction and enforcement of the District's hair policy against De'Andre and K.B.

330.    Plaintiffs reallege and incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

331.    The Constitution prohibits sex classifications based on "overbroad generalizations about the different talents, capacities, or preferences of males and females." *United States v. Virginia*, 518 U.S. 515, 533 (1996); *Miss. Univ. for Women v. Hogan*, 458 U.S. 718 (1982) (invalidating school's policy that perpetuates a stereotyped view of proper roles of men and women).

332.    Any policy or rule that discriminates on the basis of gender must undergo, and pass muster under, an intermediate scrutiny analysis. *Virginia*, 518 U.S. at 532-33.

333.    BHISD's hair policy on its face regulates male students' hair length but does not similarly regulate female students' hair length. Male students' violations can result in their exclusion from participation in a traditional academic setting and other educational extracurricular activities.

334.    BHISD's hair policy concerning length is expressly limited to males; BHISD does not have a similar restriction for female students.

335.    BHISD's application of its hair policy only to male students constitutes an illegal sex classification because such policy is impermissibly based on the stereotype that males must have short hair and only females have long hair.

336.    BHISD cannot provide the genuine justification for the original adoption of the facial sex discrimination exhibited in the hair policy.  Upon information and belief, BHISD failed to consider whether the hair policy's facial sex discrimination is substantially related to any of the District's stated objectives.

337.    BHISD's hair-length restriction does not further an important government interest because it has no legitimate, important, and substantial reason to permit female students to wear their hair long when male students are not so permitted.

338.    BHISD's hair policy restriction is wholly arbitrary.  Principal Kana conceded that granting a male Native American high school student an exemption from the hair policy resulted in no apparent adverse effect on BHISD's educational goals.  Former Assistant Principal Tillis concurred with this assessment and conceded that a male student could wear uncut locs let down without interfering with BHISD's goals.  Principal Kana also acknowledged that the length of a male student's hair does not have anything to do with the student's hygiene or whether they can display discipline.

339.    Before the current iteration of the hair policy was enacted, De'Andre and K.B. complied with the policy by gathering their locs up so that they did not fall below their eyebrows, earlobes, or shirt collar.  BHISD failed to provide any rationale to explain how De'Andre's and

K.B.'s practice of gathering their locs up had any adverse effect on BHISD or any of its students so as to justify amending the hair policy in December 2019.

340.   BHISD has attempted to force De'Andre and K.B. to conform to sex-based stereotypes (i.e., BHISD's perception of an acceptable hair length for *male* students), as well as race-based stereotypes (i.e., BHISD's perception of an acceptable hair formation for *Black* students).

341.   To bisect De'Andre's and K.B.'s identities as Black and male, BHISD has subjected them to an intersectional harm based on a combination of race and sex.  De'Andre's and K.B.'s identities as Black male students create a compounded burden not experienced by other students at BHISD.

342.   The hair policy facially discriminates based on sex.  And, BHISD personnel apply the hair policy to target Black male students with culturally significant locs.

343.   BHISD admits to monitoring male and female students for compliance with the hair policy differently based upon their sex.

344.   De'Andre and K.B. were subject to discipline under BHISD's policy because of their status as male.

345.   BHISD thus subjects male and female students to different standards of dress and grooming in violation of the Equal Protection Clause.

346.   As a direct and proximate result of BHISD's discriminatory construction and enforcement of its hair policy, De'Andre and K.B. have suffered and will continue to suffer compensable harm, including humiliation, emotional distress, and violations of their Fourteenth Amendment and statutory rights, and are entitled to declaratory relief announcing that BHISD's hair policy violates federal law and the Constitution, an order enjoining BHISD from enforcing its

hair policy, an order enjoining BHISD from discriminatorily enforcing its hair policy, an order expunging any disciplinary sanctions on Plaintiffs' school records related to the hair policy, damages, costs, and attorneys' fees.

### FOURTH CAUSE OF ACTION

**Violation of Title IX**
**(Sex Discrimination)**

347.   De'Andre and K.B. bring this Title IX sex discrimination claim against BHISD for the discriminatory construction and enforcement of its hair policy against De'Andre and K.B.

348.   Plaintiffs reallege and incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

349.   Title IX states that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

350.   Like the Fourteenth Amendment's Equal Protection Clause, a plaintiff bringing a claim under Title IX may use either direct or circumstantial evidence of intentional discrimination. *Cf. Portis v. First Nat'l Bank of New Albany, Miss.*, 34 F.3d 325, 328 (5th Cir. 1994).

351.   BHISD's hair policy on its face regulates male students' hair length but does not similarly regulate female students' hair length. Violations of the hair length requirement by male students can result in the students' exclusion from participation in a traditional academic setting, extracurricular, and other school activities.

352.   BHISD's hair policy concerning length is expressly limited to males; BHISD does not have a similar restriction for female students.

353.    Applying a hair-length restriction only to male students constitutes an illegal sex classification because such policy is impermissibly based on the stereotype that males must have short hair and only females have long hair.

354.    BHISD's hair policy is wholly arbitrary because there is no legitimate, important, and substantial reason to permit female students to wear their hair long when male students are not so permitted.

355.    Further, BHISD has attempted to force De'Andre and K.B. to conform to sex-based stereotypes (i.e., BHISD's perception of an acceptable hair length for *male* students), as well as race-based stereotypes (i.e., BHISD's perception of an acceptable hair formation for *Black* students).

356.    The hair policy facially discriminates based on sex, and BHISD applies the hair policy to target Black male students with culturally significant locs.

357.    BHISD admittedly monitors male and female students for compliance with the hair policy differently based upon their sex.

358.    Neither De'Andre nor K.B. would have been disciplined by BHISD for violating the hair policy but for their status as male.

359.    BHISD thus subjects male and female students to different standards of dress and grooming in violation of Title IX.

360.    As a direct and proximate result of BHISD's discriminatory construction and enforcement of its hair policy, De'Andre and K.B. have suffered and will continue to suffer compensable harm, including humiliation, emotional distress, and violations of their statutory rights, and are entitled to declaratory relief announcing that BHISD's hair policy violates federal law, an order enjoining BHISD from enforcing its hair policy, an order enjoining BHISD from

discriminatorily enforcing its hair policy, an order expunging any disciplinary sanctions on Plaintiffs' school records related to the hair policy, costs, and attorneys' fees.

## FIFTH CAUSE OF ACTION

### Violation of the First Amendment
### Pursuant to 42 U.S.C. § 1983
### (Freedom of Expression)

361.     De'Andre and K.B. bring this First Amendment free expression claim against BHISD for its infringement on De'Andre's and K.B.'s First Amendment right to express themselves freely without repercussions from the government.

362.     Plaintiffs reallege and incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

363.     The First Amendment prohibits the abridgment of speech.  The general right to freedom of expression applies to conduct revealing an intent to convey a particularized message, and the likelihood that the message would be understood by those exposed to it.  *Canady v. Bossier Par. Sch. Bd.*, 240 F.3d 437, 440 (5th Cir. 2001).  Pursuant to the Fourteenth Amendment, the prohibition extends to rules imposed by state-authorized actors, such as public school districts. *See* U.S. Const. amend. XIV.

364.     De'Andre and K.B. wear their natural hair in locs as an expression of their heritage, identity, and ethnicity—a symbol widely understood as a natural Black hair formation connected to Black identity and heritage.

365.     De'Andre's locs are representative of his Black and West Indian culture and are worn by De'Andre as a symbol of such cultures and kinship with his family.

366.     K.B.'s locs are similarly a symbolic expression of his Black culture and connection to his Black community.

367. De'Andre and K.B. wear their locs to the natural length to communicate their affinity with their cultural and family backgrounds.

368. BHISD was aware of the messages communicated by De'Andre and K.B. through their locs.

369. These communicative cultural hair formations do not impinge upon the rights of other students and do not interfere with any educational objective. Yet, BHISD repeatedly targeted and made changes to its official hair policy to ensure that the only way De'Andre and K.B. could comply was by cutting off their locs altogether, or else they would face repercussions.

370. The disciplinary actions that BHISD has enforced on De'Andre and K.B. for expressing their culture, heritage, and background through their locs are unconstitutional infringements on both students' First Amendment right to free speech. De'Andre's and K.B.'s right to freely express their heritage by wearing culturally significant locs in a non-distracting or offensive manner is clearly established.

371. As a direct and proximate result of BHISD's infringement on De'Andre's and K.B.'s First Amendment right to express themselves, De'Andre and K.B. have suffered and will continue to suffer compensable harm, including humiliation, emotional distress, and violations of their constitutional rights, and are entitled to declaratory relief announcing that BHISD's hair policy violates federal law and the Constitution, an order enjoining BHISD from enforcing its hair policy, an order expunging any disciplinary sanctions on Plaintiffs' school records related to the hair policy, damages, costs, and attorneys' fees.

## SIXTH CAUSE OF ACTION

**Violation of the First Amendment
Pursuant to 42 U.S.C. § 1983
(Retaliation)**

372. Mrs. Arnold brings this First Amendment retaliation claim against BHISD.

373.    Plaintiffs reallege and incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

374.    The First Amendment guarantees that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  Pursuant to the Fourteenth Amendment, the prohibition extends to rules imposed by state-authorized actors, such as public school districts. U.S. Const. amend. XIV.

375.    Mrs. Arnold engaged in constitutionally protected speech when she made statements in BHISD Board meetings—public, state-sponsored forums—that the hair policy is discriminatory, and that Superintendent Poole failed to acknowledge her grievances regarding this policy.

376.    After the November 2019 Board meeting, Mrs. Arnold was subjected to police surveillance and intimidation.

377.    Shortly after Mrs. Arnold spoke at the December 16, 2019 Board meeting, she was informed by Principal Kana that Superintendent Poole demanded strict enforcement of the policy against Mrs. Arnold's family members, De'Andre and K.B.

378.    BHISD's exclusion of De'Andre and K.B. from regular instruction; assignment of K.B. to ISS; Superintendent Poole's threatening, public reprimand of Mrs. Arnold; and Chief Widner's constant surveillance and intimidation of Mrs. Arnold any time she visited BHISD property after the November 2019 Board meeting are actions that would dissuade an ordinary person from continuing to voice concerns about BHISD's discriminatory hair policy.

379.    The adverse actions of the District and its officials were substantially motivated by Mrs. Arnold's constitutionally protected speech.  Superintendent Poole made this clear when he

reprimanded Mrs. Arnold.  Shortly after such reprimand, BHISD forced De'Andre and K.B. to either cut their locs or be sent to ISS.

380.    BHISD's retaliatory enforcement of its hair policy constitutes a violation of the First Amendment of the United States Constitution.

381.    As a direct and proximate result of BHISD's retaliatory enforcement of its hair policy, Mrs. Arnold has suffered and will continue to suffer compensable harm, including humiliation, emotional distress, and violations of her constitutional rights, and is entitled to an order enjoining BHISD from retaliating against persons who express concerns about race and sex discrimination, damages, costs, and attorneys' fees.

## SEVENTH CAUSE OF ACTION

### Violation of Title IX
### (Retaliation)

382.    Mrs. Arnold brings this Title IX retaliation claim against BHISD for enforcing its hair policy against De'Andre and KB and for subjecting her to police surveillance and intimidation after she made complaints against the hair policy.

383.    Plaintiffs reallege and incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

384.    Title IX prohibits retaliation for exercising a right protected by that title, such as raising concerns about discriminatory behavior.

385.    At the BHISD Board meeting, Mrs. Arnold made a verbal complaint about the likely discriminatory effect of the District's modified hair policy on Black and male students, including her son De'Andre and nephew K.B.

386.    Mrs. Arnold had a good faith belief that the District's actions were discriminatory.

387.    Mrs. Arnold's complaints were made at a public school Board meeting with Superintendent Poole and other school Trustees present. After Mrs. Arnold offered her complaints, Superintendent Poole reprimanded her for her public statements.

388.    Shortly after Mrs. Arnold's complaints, BHISD removed De'Andre and K.B. from school activities and regular classroom instruction. BHISD was aware of Mrs. Arnold's complaints and based its decision to selectively enforce the hair policy against De'Andre and K.B., at least in part, on Mrs. Arnold's complaints.

389.    BHISD's retaliatory enforcement of its hair policy constitutes a violation of Title IX under color of state law.

390.    As a direct and proximate result of BHISD's retaliatory enforcement of its hair policy, Mrs. Arnold has suffered and will continue to suffer compensable harm, including humiliation, emotional distress, and violations of her statutory rights, and is entitled to an order enjoining BHISD from retaliating against students' parents for critiquing school policies, damages, costs, and attorneys' fees.

## EIGHTH CAUSE OF ACTION

### Violation of the Fourteenth Amendment's Due Process Clause
### Pursuant to 42 U.S.C. § 1983

391.    De'Andre and K.B. bring this claim for violation of their Fourteenth Amendment rights against BHISD for depriving De'Andre and K.B. of their rights without due process of law.

392.    Plaintiffs reallege and incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

393.    The Fourteenth Amendment of the United States Constitution prohibits government from depriving a person of property without due process of law.

394.     Pursuant to 42 U.S.C. § 1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…"

395.     The State of Texas created a property right or entitlement to public education by electing by statute to provide free public school education and to compel all youths under 18 years of age to attend school.  *See Goss v. Lopez*, 419 U.S. 565 (1975).  Specifically, the State of Texas elected to provide all youths with education meeting certain standards, including the opportunity to learn through instruction by certified teachers.  Having been established, "the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause."  *Id.* at 574–75.

396.     Property rights are affected and due process protections are required when the discipline imposed on a student amounts to a deprivation of access to public education.  *Riggan v. Midland Indep. Sch. Dist.*, 86 F. Supp. 2d 647, 655 (W.D. Tex. 2000).  A student is effectively deprived of this property right when the government effectively denies the student satisfactory instruction and the opportunity to learn, thereby disadvantaging the student in the educational process.  *See id*.

397.     In recognition of the important property rights implicated by access to public education, Section 37.005 of the Texas Education Code prohibits the government from excluding

a student from regular public school classes by placing the student in in-school or out-of-school suspension for a period longer than three (3) days.

398.   Due process requires that the government provide students with notice and hearing before imposing disciplinary actions on a student that infringe on the student's right to access a public school education.  *Goss*, 419 U.S. at 574–75.  The government must provide a student with formal notice and hearing procedures prior to enforcing a disciplinary action that excludes a student from regular public school classes for more than a de minims period.  *See id.* at 575.

399.   The requisite notice and hearing must comprise of a fundamentally fair procedure. *Davis v. Angelina Coll. Bd. of Trs.*, No. 9:17-CV-00179, 2018 WL 10111001, at *10 (E.D. Tex. June 1, 2018).  Bias by the disciplinary authority can result in a fundamentally unfair procedure. *See id*.

400.   BHISD deprived De'Andre and K.B. of the right of access to a public education without due process of law.  BHISD excluded De'Andre and K.B. from regular school classes for an extended period without providing Plaintiffs with instruction substantially similar to that which they would have received in regular BHISD classes.

401.   BHISD did not provide Plaintiffs with proper notice and hearing before imposing this disciplinary action.  The grievance process that was afforded to De'Andre and K.B. after they were placed in ISS and constructively expelled was impermissibly biased, as the factfinders and ultimate decision makers were the same individuals who promulgated the discriminatory hair policy (i.e., the Board) and enforced such policy against De'Andre and K.B. (i.e., the administrators).   De'Andre's grievance process was also impermissibly delayed until after De'Andre had already graduated from high school.

402.    BHISD excluded De'Andre and K.B. from their regular public school classes indefinitely—far longer than the Texas three day statutory maximum—without providing them with an educational program instructed by certified teachers or otherwise providing De'Andre and K.B. with educational opportunities substantially equivalent to which they would have received in regular BHISD classes.  The disciplinary measures imposed by BHISD affected De'Andre's and K.B.'s property interest in the right to free public education that is statutorily guaranteed to all youths by the State of Texas and that is protected by the Due Process Clause.

403.    At the start of the Spring 2020 semester, on or around January 7, 2020, Principal Kana prohibited De'Andre and K.B. from attending their regular classes and instructed them to leave school until their locs could be styled in ways that Principal Kana stated would comply with the hair policy.  It took K.B. five school days and De'Andre one school day to have their locs styled as instructed by Principal Kana.  During this time, BHISD excluded De'Andre and K.B. from their regular classes and failed to provide them with instruction or learning materials.

404.    On January 14, 2020, De'Andre and K.B. returned to school with their locs styled as instructed by Principal Kana.  BHISD nonetheless determined De'Andre and K.B. still violated the hair policy and indefinitely imposed disciplinary sanctions that excluded De'Andre and K.B. from regular classes, access to certified teachers, and other educational opportunities.

405.    As a result of BHISD's January 14, 2020, decision, De'Andre was excluded from his regular classes for an additional eight days, during which time De'Andre was required to complete his class assignments from home.  BHISD did not provide De'Andre with any instructions and made it difficult for De'Andre to obtain his class assignments.  On January 24, 2020, De'Andre was forced to withdraw from BHISD and move to another school district so that he could obtain access to the public education to which he was entitled.

406.     As a result of BHISD's January 14, 2020 decision, K.B. was excluded from his regular classes for an additional fourteen days.   From January 14 to January 29, 2020, K.B. attempted to continue his public education at home.   BHISD made it difficult for K.B. obtain his class assignments and did not provide K.B. with any instructions.

407.     From January 29, 2020 to February 5, 2020, K.B. was placed in ISS at Barbers Hill High School.   In ISS, K.B. was not provided with certified teachers, instruction, or educational opportunities.   ISS, as manifested at Barbers Hill High School, was not an educational program, did not satisfy the standards imposed by the State of Texas for public school education, and was not equivalent to regular public school classes.

408.     K.B. remained in ISS while he awaited BHISD's decision on his exemption request. Unbeknownst to K.B., BHISD had no intention of taking any action on the exemption request. Rather, BHISD hoped that its calculated campaign of sex and race discrimination and harassment—including Superintendent Poole's public reprimand of Mrs. Arnold, Chief Widner's show of force towards Mrs. Arnold, BHISD's constant surveillance of De'Andre and K.B., the countless admonitions of De'Andre and K.B., the multiple times De'Andre and K.B. were pulled out of class, the insults, the exclusion from school activities, confining K.B. to ISS, Superintendent Poole's social media posts and opinion piece, the denial of educational opportunities—would make life so untenable for the Arnolds and Bradfords that the families would be forced to withdraw De'Andre and K.B. from BHISD.

409.     On or about February 7, 2020, K.B. was forced to withdraw from BHISD and move to another school district so that he could obtain access to public education.

410.     BHISD deprived De'Andre and K.B. of their property interest in public school education for a period longer than three days.

411.    De'Andre and K.B. were significantly disadvantaged in the educational process because BHISD excluded them from regular classes, or their equivalent, for an extended period longer than three days.  BHISD deprived De'Andre and K.B. of their property interest in a free public education without prior notice and hearing.

412.    BHISD was required to provide De'Andre and K.B. with formal notice and hearing procedures prior to excluding them from regular classes for over three days.

413.    BHISD failed to provide De'Andre and K.B. with notice of their right to challenge the disciplinary action prior to excluding them from classes for violation of the hair policy.  BHISD did not inform De'Andre and K.B. of the hair policy exemption, disciplinary appeal, or "grievance" process, until after K.B. and De'Andre had been excluded from the educational setting.  As a result, De'Andre and K.B. submitted the exemption form and disciplinary grievance two to three weeks after they were first excluded from BHISD classes.  BHISD's failure to provide notice and hearing prior to depriving De'Andre and K.B. of the right to public education was a violation of their due process protections.

414.    The grievance process was only afforded to De'Andre and K.B. after they were placed in ISS and constructively expelled.

415.    BHISD did not hold a hearing on K.B.'s and De'Andre's Level One grievances until on or about February 6, 2020—a month after K.B. and De'Andre were first excluded from BHISD classes and after De'Andre was forced to move to a different school district to obtain access to public education.  K.B. and De'Andre were not afforded hearing on their Level Two grievances until June 4, 2020, and not afforded hearing on their Level Three grievances until July 20, 2020.  BHISD rejected De'Andre's and K.B.'s requests to hold hearings for their Level Two and Level Three grievances in a more expedited fashion.  By the time the Level Three

grievance hearing was held, De'Andre had already graduated high school and been denied the opportunity to receive a Barbers Hill High School diploma and graduate with his peers at BHISD.

416.    BHISD did not respond to K.B.'s or De'Andre's exemption requests until after they had been forced to withdraw from BHISD and move to another school district to obtain access to public education.

417.    In addition, the grievance procedure provided to De'Andre and K.B. was impermissibly biased, as the factfinders and ultimate decision makers were the same individuals who promulgated the discriminatory hair policy (i.e., the Board) and enforced such policy against De'Andre and K.B. (i.e., the administrators).  BHISD therefore deprived De'Andre and K.B. of their property right of access to education without due process of law.

418.    By acting under color of state law to deprive De'Andre and K.B. of their Fourteenth Amendment rights, BHISD has violated 42 U.S.C. § 1983.

419.    As a direct and proximate result of BHISD's deprivation of De'Andre's and K.B.'s property rights without due process of law, De'Andre and K.B. have suffered and will continue to suffer compensable harm, including violations of their Fourteenth Amendment rights, humiliation, and emotional distress, and violations of their constitutional rights, and are entitled to an order expunging any disciplinary sanctions on De'Andre's and K.B.'s school records related to the hair policy, damages, costs, and attorneys' fees.

## NINTH CAUSE OF ACTION

### Violation of Texas Civil Practice and Remedies Code § 106.001
### (Intentional Race Discrimination)

420.    De'Andre and K.B. bring this claim for race discrimination under Texas Civil Practice and Remedies Code § 106.001 against BHISD for the discriminatory construction and selective enforcement of BHISD's hair policy against De'Andre and K.B.

421.     Plaintiffs reallege and incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

422.     Texas law provides that an officer or employee of the state, or a political subdivision of the state, may not, because of a person's race or color: (1) refuse to permit the person to use facilities; (2) refuse to permit the person from participating in a program managed by the state or political subdivision; (3) refuse to grant a benefit to the person; or (4) impose an unreasonable burden on the person.  *See* Tex. Civ. Prac. & Rem. Code §§ 106.001(a)(3)–(6).

423.     De'Andre and K.B. were both subject to the discriminatory enforcement of BHISD's hair policy because of their race and color.  De'Andre and K.B. were denied state facilities, state-operated programs, and benefits by being forced to go to ISS due to their natural Black hair.  BHISD's actions in attempting to force De'Andre and K.B. to cut their culturally significant locs and placing them in ISS imposed unreasonable burdens on the Plaintiffs.

424.     Before BHISD promulgated the current, December 2019 iteration of the hair policy, the District strictly monitored and enforced the hair policy against De'Andre and K.B. without similarly monitoring and enforcing such policy against white male students.

425.     BHISD adopted and enforced the current hair policy to push De'Andre and K.B. out of compliance and force them to cut off their culturally significant locs or withdraw from BHISD.

426.     BHISD enforced the current hair policy against De'Andre and K.B. and did not similarly enforce such policy as harshly or frequently against white male students.

427.     BHISD's enforcement prevented De'Andre and K.B. from using state facilities and enjoying state-operated programs, such as extracurricular activities and graduation, which are state-sponsored benefits.  BHISD's punishment for growing culturally significant locs also

imposed an unreasonable burden on De'Andre and K.B. by forcing them to either cut their locs or attend ISS and be sent to an alternative school.

428.    As a direct and proximate result of BHISD's discriminatory construction and enforcement of its hair policy, De'Andre and K.B. have suffered and will continue to suffer compensable harm, including humiliation, emotional distress, and violations of their statutory rights, and are entitled to declaratory relief announcing that BHISD's hair policy violates state law, an order enjoining BHISD from enforcing its hair policy, an order enjoining BHISD from discriminatorily enforcing its hair policy, an order expunging any disciplinary sanctions on Plaintiffs' school records related to the hair policy, costs, and attorneys' fees.

## TENTH CAUSE OF ACTION

### Violation of Texas Civil Practice and Remedies Code § 106.001
### (Sex Discrimination)

429.    De'Andre and K.B. bring this claim for sex discrimination under Texas Civil Practice and Remedies Code § 106.001 against BHISD for the enforcement of its hair policy against De'Andre and K.B.

430.    Plaintiffs reallege and incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

431.    Texas law provides that an officer or employee of the state, or a political subdivision of the state, may not, because of a person's sex: (1) refuse to permit the person to use facilities; (2) refuse to permit the person to participate in a program managed by the state or political subdivision; (3) refuse to grant a benefit to the person; or (4) impose an unreasonable burden on the person.  *See* Tex. Civ. Prac. & Rem. Code §§ 106.001(a)(3)–(6).

432.    BHISD's hair policy on its face regulates male students' hair length but does not similarly regulate female students' hair length.  Male students' violations can result in their exclusion from state facilities, state-operated programs, and benefits.

433.    BHISD's hair policy concerning length is expressly limited to males; BHISD does not have a similar restriction for female students.  Applying a hair-length restriction only to male students constitutes an illegal sex classification because such policy is impermissibly based on the stereotype that males must have short hair and only females have long hair.

434.    De'Andre and K.B. were subjected to the discriminatory enforcement of BHISD's hair policy because of their sex.  De'Andre and K.B. were denied state facilities, state-operated programs, and benefits by being forced to go to ISS and excluded from school activities due to their sex and culturally significant uncut locs.  BHISD's attempts to force De'Andre and K.B. to cut their locs because of their sex and placing them in ISS and excluding them from school activities imposed unreasonable burdens on the Plaintiffs.

435.    Before BHISD promulgated the current iteration of the hair policy in December 2019, BHISD strictly monitored and enforced the hair policy against De'Andre and K.B. without similarly monitoring and enforcing such policy against female students.

436.    BHISD adopted the current hair policy in December 2019 to push De'Andre and K.B. out of compliance and force them to cut off their natural hair or withdraw from BHISD.

437.    BHISD enforced the current hair policy against De'Andre and K.B. and did not similarly enforce such policy against female students.

438.    BHISD's policy and enforcement prevented De'Andre and K.B. from using state facilities and prevented them from enjoying state-operated programs, such as extracurricular activities and graduation, which are state-sponsored benefits.  BHISD's punishment of males for

growing culturally significant uncut locs also imposed an unreasonable burden on the Plaintiffs by forcing them to either cut their locs or be deprived of extracurricular activities and regular classroom instruction.

439.     As a direct and proximate result of BHISD's discriminatory construction and enforcement of its hair policy, De'Andre and K.B. have suffered and will continue to suffer compensable harm, including humiliation, emotional distress, and violations of their statutory rights, and are entitled to declaratory relief announcing that BHISD's hair policy violates state law, an order enjoining BHISD from enforcing its hair policy, an order enjoining BHISD from discriminatorily enforcing its hair policy, an order expunging any disciplinary sanctions on Plaintiffs' school records related to the hair policy, costs, and attorneys' fees.

## ELEVENTH CAUSE OF ACTION

### Declaratory Judgment
### Pursuant to 28 U.S.C. §§ 2201 and 2202

440.     Plaintiffs reallege and incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

441.     Plaintiffs seek a declaratory judgment in their favor pursuant to 28 U.S.C. §§ 2201 and 2202, finding and determining that the BHISD hair policy:

(1)     Discriminates based on race in violation of the Fourteenth Amendment right to equal protection;

(2)     Discriminates based on race in violation of Title VI;

(3)     Discriminates based on sex in violation of the Fourteenth Amendment right to equal protection;

(4)     Discriminates based on sex in violation of Title IX;

(5)     Violates the First Amendment right to free speech and freedom of expression;

(6)     Discriminates based on race in violation of Texas Civil Practice and Remedies Code § 106.001; and

(7)     Discriminates based on sex in violation of Texas Civil Practice and Remedies Code § 106.001.

442.    Plaintiffs further seek a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 finding and determining that De'Andre's and K.B.'s rights were deprived without due process of law, and Plaintiffs' rights will be irreparably harmed without injunctive or declaratory relief from this Court.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter the following relief:

(1)     Order permanent reinstatement of K.B. in Barbers Hill High School without being subjected to enforcement of BHISD's discriminatory hair policy;

(2)     Judgment against BHISD finding and declaring that BHISD's actions violate Plaintiffs' rights, as protected by the Fourteenth and First Amendments to the Constitution of the United States, and other applicable federal and state statutes;

(3)     Order all appropriate injunctive relief as warranted, including but not limited to, ordering BHISD to rescind its hair policy and put in place policies and procedures to ensure that such discriminatory conduct does not recur;

(4)     Order all disciplinary sanctions stemming from BHISD's hair policy expunged from De'Andre's and K.B.'s school records;

(5)     Award Plaintiffs compensatory damages in an amount to be determined at trial, plus pre- and post-judgment interest;

(6)     Award Plaintiffs nominal and punitive damages against BHISD in an amount to be determined at trial, plus pre- and post-judgment interest;

(7)     Award Plaintiffs reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and 29 U.S.C. § 794a; and

(8)     Grant such other and further relief to Plaintiffs as the Court deems just and equitable.

## <u>JURY DEMAND</u>

Plaintiffs hereby demand a trial by jury on all issues of fact and damages stated herein.

DATED: June 1, 2021.

Respectfully Submitted,

  _/s/ Janai S. Nelson_  
Janai S. Nelson*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, New York 10006
Tel: (212) 965-2200
Fax: (212) 226-7592
jnelson@naacpldf.org

Michaele N. Turnage Young*
Mahogane Reed*
Texas Bar No. 24110259
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC
700 14th Street N.W., Ste. 600
Washington, D.C. 20005
Tel: (202) 682-1300
Fax: (202) 682-1312
mturnageyoung@naacpldf.org
mreed@naacpldf.org

Stephen Baldini*
AKIN GUMP STRAUSS
HAUER & FELD LLP
One Bryant Park
Bank of America Tower
New York, NY 10036
Tel: (212) 872-1062
Fax: (212) 872-1002
sbaldini@akingump.com

Roxanne Tizravesh
Texas Bar No. 24091141
Southern District of Texas Bar No. 2618739
Nicholas E. Petree (attorney-in-charge)
Texas Bar No. 24083657
Southern District of Texas Bar No. 1778181

Christina Hightower
Texas Bar No. 24101231
Southern District of Texas Bar No. 3229705
Alyx Eva
Texas Bar No. 24116334
Southern District of Texas Bar No. 3544812
AKIN GUMP STRAUSS
HAUER & FELD LLP
1111 Louisiana Street, Ste. 44
Houston, Texas 77002
Tel: (713) 220-5800
Fax: (713) 236-0822
rtizravesh@akingump.com
npetree@akingump.com
chightower@akingump.com
aeva@akingump.com

*Admitted *Pro Hac Vice*

**PRO BONO COUNSEL FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document was served on all counsel of record via electronic filing in compliance with the Federal Rules of Civil Procedure on this 1st day of June, 2021.

 */s/ Janai S. Nelson*
Janai S. Nelson