## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| EVERETT DE'ANDRE ARNOLD, *et al.*, | ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. 4:20-CV 01802 |
| v. | ) | |
| BARBERS HILL INDEPENDENT SCHOOL DISTRICT, | ) | JURY TRIAL REQUESTED |
| Defendant. | ) | |

**<u>PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL DISCOVERY OR IN THE ALTERNATIVE MOTION TO EXCLUDE</u>**

Plaintiffs submit this reply to Barbers Hill Independent School District's (the "District") Response to Plaintiffs' Motion to Compel Discovery or in the Alternative Motion to Exclude ("Response") pursuant to Federal Rules of Civil Procedure 30(b)(6), 33, 34, and 37.

The District's Response fails to address Plaintiffs' main arguments, cites inapposite caselaw, and provides a misleading recitation of the facts as it relates to the substance of its discussions with Plaintiffs over the discovery dispute.  The District has not met its burden of establishing how or why Plaintiffs' requests are overly broad, unduly burdensome, or not proportional to the needs of the case.  Additionally, the District wholly neglected to address Plaintiffs' request for alternative relief regarding their motion to exclude.  For these reasons, Plaintiffs request that the Court grant their Motion.[1]

## I.  The Requests Are Relevant and Proportional to the Needs of This Case Based on Controlling Supreme Court Precedent, *United States v. Virigina*, 518 U.S. 515 (1996)

Controlling Supreme Court precedent confirms that Plaintiffs' requests are relevant, proportional to the needs of the case, not overly overbroad, and not unduly burdensome. As Plaintiffs reiterated to the District through various letters and in several meet and confers,[2] *United States v. Virginia,* 518 U.S. 515 (1996) is the benchmark for this discovery dispute.  In that case, the Supreme Court held:

> Focusing on the differential treatment for denial of opportunity for which relief is sought, the reviewing court must determine whether the proffered justification is

---

[1] Note, all capitalized terms not otherwise defined shall have the meaning set forth in Plaintiffs' Motion to Compel Discovery or in the Alternative Motion to Exclude, ECF No. 211 ("Motion").

[2] *See e.g.,* ECF Nos. 211-6 and 211-10.

"exceedingly persuasive." The burden of justification is demanding and it rests entirely on the State. The State must show "at least that the [challenged] classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.'" *Ibid.* (quoting *Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 150, 100 S.Ct. 1540, 1545, 64 L.Ed.2d 107 (1980)). **The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation.** And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females.

*Id.* at 532–33 (emphasis added and internal citation omitted). This Court has essentially said the same.[3] Tellingly, in its Response, the District at no point acknowledges, let alone explains, how the documents are not discoverable in light of the *United States v. Virginia* standard for adjudicating sex-based discrimination claims.

Instead, the District asserts that Plaintiffs' request for documents, deposition testimony, and information must be denied because, in the District's view, *Arlington Heights* sets forth the controlling standard and, under *Arlington Heights* and its progeny, the documents are purportedly not relevant.[4] But, contrary to the District's assertion, *Arlington Heights* is not the controlling standard vis-à-vis the gender discrimination claims when, as here, a policy is not facially gender-neutral. All of the cases cited by the District in its Response are inapposite for this reason: they are all cases addressing facially neutral laws. *See, e.g., Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274 (1979) (citing to *Arlington Heights* and holding that "[w]hen a statute [that is] **gender-neutral on its face** is challenged . . . a twofold inquiry is [ ] appropriate. The first question is whether the

---

[3] ECF No. 98 at 12. ("Accordingly, the Court will apply the intermediate-scrutiny standard articulated in *J.E.B.*, *Virginia*, and *Morales-Santana*.").
[4] ECF No. 215 at 12.

statutory classification is indeed neutral in the sense that it is not gender-based . . . [T]he second question is whether the adverse effect reflects invidious gender-based discrimination.") (emphasis added).  The policy at issue here treats males and females differently *on its face*.  Therefore, the legal standard is different, and this Court must look to *United States v. Virginia*.

Even if *Arlington Heights* controlled—and it does not—the District would still be required to produce documents evidencing the original justification of the Policy. *Arlington Heights* requires, inter alia, an examination of the historical background, as well as the specific sequence of events leading up to the passage of the challenged decision. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977).  Plaintiffs do not seek to discover the entire landscape of evidence showing the District's broader longstanding history of gender discrimination; rather, Plaintiffs only seek documents evidencing the origin of and justification for the challenged policy's gender discrimination.

## II.    **Plaintiffs' Procedural Basis for Filing a Motion to Compel Is Accurate**

Perhaps recognizing that it is unable to meet its burden and cannot demonstrate that Plaintiffs' discovery requests are unduly burdensome, broad, or not proportional to the needs to the case, in its Response, the District focuses much of its attention on the timeline of its discussions with Plaintiffs.   Specifically, the District focuses on document productions and the 30(b)(6) deposition notice.  In so doing, the District mischaracterizes the substance of its conversations with Plaintiffs and ignores correspondence that refutes its inaccurate statements.  As Plaintiffs made clear in their Motion and the proposed order, because the District has repeatedly objected to Plaintiffs' request for discovery related to

4

the original justification for the differential treatment of males and females, Plaintiffs now seek a motion to compel specific discovery, deposition testimony, and information.[5]

Plaintiffs address the following factual misstatements raised in the District's Response, which relate to when Plaintiffs first raised their concerns regarding the relevant time period for document production and the 30(b)(6) deponent.

a.  In September and October 2021, Plaintiffs Raised the Time Frame Dispute.

The District contends that "between October 2021 and July 2022, the Parties have conferred on a variety of discovery disputes . . . **but not specifically regarding Plaintiffs' disagreement with the District's 2014 cutoff date for production**."[6]  This is not true. First, the District does not mention in its Response that Plaintiffs first raised the relevant time frame issue in a September 16, 2021 letter, following a September 10, 2021 meet and confer.[7]  Plaintiffs raised the issue again in October.[8]  The October 6, 2021 letter stated:

> [W]e must reiterate that the original justification for the Hair Policy and/or justifications for any changes or modifications to the Hair Policy affecting the differential treatment of males and females are discoverable . . .  To reiterate from our September 16 Letter, the relevant time frame in this case is three-fold (collectively as the "Relevant Time Period"): (**1) The period of time during which the original Hair Policy was enacted; (2) Any period during which the Hair Policy enacted, changed, or modified the differential treatment in the policy as between males and females**; and (3) Any period of time during which De'Andre and K.B. were growing their locs (2014 to present).[9]

---

[5] ECF No. 211-11.
[6] ECF No. 215 at 9 (emphasis added).
[7] ECF No. 211-6.
[8] ECF No. 211-8.
[9] *Id.* at 3–4 (emphasis added).

5

Additionally, the District's assertion that "the reason the District produced responsive documents from 2014 and beyond" was in part because "*Plaintiffs' own requests for production* (that actually state a time limitation) only request documents as far back as 2014" is also misleading.[10]  While Plaintiffs did request certain information and documents regarding current policies and practices from school year 2014-2015 to present, as explained in Plaintiffs' Motion, Plaintiffs also requested documents dating back to when the Policy was first proposed.  And, as Plaintiffs have explained many times to the District, as to the more historical information, Plaintiffs are primarily focused on understanding the original justification, purpose, and rationale of the sex-based classifications in the Hair Policy.  An express date, however, is not feasible, because the District has not provided a date as to when the Policy took effect.[11]

    b.  <u>Between January and March 2022, Plaintiffs Sought to Resolve the Dispute on the Time Frame Relevant to Document Production, Interrogatories, and 30(b)(6) Testimony Via a Proposed Stipulation.</u>

The District's assertion that "Plaintiffs have not raised the issue of a 30(b)(6) deponent with the District since [the] agreement to withdraw their notice" in February 2022 is also incorrect.[12]  Even if the District's timeline were correct (it is not), the 30(b)(6) dispute remains unresolved.  The District has not agreed to present or educate a witness, has not produced documents related to the origins of and justification for the Policy, and has not changed its position on the scope of information sought (as demonstrated by its

---

[10] ECF No. 215 at 8.
[11] ECF No. 211 at 10; *See also* ECF No. 211-1.
[12] ECF No. 215 at 11.

Response).    Therefore, Plaintiffs seek a ruling from the Court compelling 30(b)(6) testimony (and any related documents) that pertain to the original justification of the policy.

On or about December 17, 2021, Plaintiffs served the District with its 30(b)(6) notice, which among other things, included topics related to the original implementation and justification for the hair policy.[13]  Approximately one week after the January 4, 2022 meet and confer, Plaintiffs sent a draft stipulation regarding the District's efforts to locate documents from prior to 2012 and limiting the 30(b)(6) deposition topics to time periods after 2012.[14]  Plaintiffs believed and still believe that this is a reasonable approach to this discovery dispute.    Plaintiffs followed up with the District on at least five separate occasions to confirm the District's position, but did not receive a response, other than a comment from the District that it would review the proposed stipulation.[15]

Given the pending mediation in March 2022, on March 3, 2022, the Parties entered an agreement to take the four depositions that were scheduled to take place prior to the scheduled mediation and "to treat all other outstanding deposition notices issued by the parties as withdrawn."[16]  Just seven days following the March 10, 2022 mediation, which was unsuccessful, Plaintiffs reached out to the District, requesting a meet and confer to

---

[13] ECF No. 211-3.
[14] The District also falsely claims that in response to its objections regarding the topics listed in the 30(b)(6) notice, Plaintiffs never served an amended list of topics.  ECF No. 215 at 7.  On January 10, 2022, Plaintiffs provided amendments to certain topics based on the parties meet and confer and attached a stipulation regarding information prior to 2012. *See* Jan. Email Exchange Between Plaintiffs and the District (attached hereto as "Exhibit A").
[15] *See* Exhibit A.
[16] ECF No. 215-2.

discuss a plan of action for moving ahead with the case.  In that email, Plaintiffs noted that the 30(b)(6) stipulation was one of three topics to be discussed.[17]  A call in March 2022 followed.  As demonstrated above and in the numerous emails and letters on this issue, the District's assertion that Plaintiffs' Motion is the "first time" Plaintiffs have raised the 30(b)(6) scope since agreeing to withdraw its notice is simply false, nor does it matter, given that this is a live dispute.

## III.   The Motion to Exclude Should Be Granted in the Alternative

In its Response, the District fails to address Plaintiffs' request for alternative relief— that in the alternative, the Court preclude the District from introducing any new documents, testimony, or other evidence at trial regarding the Policy's origins and any subsequent modifications.  The District either should be compelled to produce documents evidencing the original justification for the policy or be prohibited from entering into the record any evidence beyond the specific facts produced to Plaintiffs to date.

For the very first time since the inception of this case, in its Response, the District suggests that it may not know the original justification for the Policy.  It then provides vague statements about the original policy that appear to be entirely based on speculation.

Without any sort of documentary evidence, the District states:

Barbers Hill ISD was established in 1929 . . . It is highly likely that the District had dress and grooming policies, including provisions governing hair length, from the time the District was established more than 90 years ago, as hair length policies have been universal in public schools since inception.[18]

---

[17] *See* Mar. Email Exchange Between Plaintiffs and the District (attached hereto as "Exhibit B").
[18] ECF No. 215 at 5.

8

Then, without citing to any evidence or providing any explanation for its conclusion, it states:

> Three to four generations have passed since the founding of the District and the genesis of the District's specific hair length policy is lost to historical memory. But it is reasonable to assume the original justifications for the policy are not different than they were for any other public school system in the nation.[19]

The District also does not explain what the justification is for the "other public schools systems" that it references. It is precisely this type of conjecture that should be excluded from trial or other submissions of evidence into the record.

The District cannot refuse to produce the information relevant to the origination of the policy *and* seek to admit additional evidence of the same during trial. The Federal Rules relating to discovery, specifically Rule 37, state in no uncertain terms: "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *see also CQ, Inc. v. TXU Min. Co.*, 565 F.3d 268, 279 (5th Cir. 2009) (affirming that the district court did not abuse its discretion in excluding the evidence after plaintiffs failed to disclose evidence of damages).

## IV. <u>Conclusion</u>

After all of this, the District concedes in a footnote that, contrary to assertions made during a previous pre-motion hearing, it has not produced all Board minutes and agendas

---

[19] *Id.* at 6.

in its possession related to the Hair Policy.[20]  And, at the end of its Response, the District agrees to amend its interrogatory answers and produce additional documents.  But, after a dispute spanning eleven months in which the District has repeatedly refused to provide these documents, Plaintiffs maintain that the proposed order in Plaintiffs' Motion compelling the District to provide specific discovery, witnesses, and information relating to the origin of and justifications for the Policy is necessary.

For all of the aforementioned reasons, and any others that the Court deems appropriate, Plaintiffs respectfully request that the Court grants their motion to compel or in the alternative, excludes any new evidence presented by the District that relates to the Policy's origins and any subsequent modifications.

DATED: August 23, 2022

---

[20] ECF No. 215 at 7 n.1.

*/s/ Ashley Burrell*
Janai Nelson*
Romane Paul*
Ashley Burrell*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, New York 10006
Tel: (212) 965-2200
Fax: (212) 226-7592
jnelson@naacpldf.org
rpaul@naacpldf.org
aburrell@naacpldf.org

Michaele N. Turnage Young*
Victor Jones*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC
700 14th Street N.W., Ste. 600
Washington, D.C. 20005
Tel: (202) 682-1300
Fax: (202) 682-1312
mturnageyoung@naacpldf.org
vjones@naacpldf.org
Stephen Baldini
Evan Frohman
AKIN GUMP STRAUSS
HAUER & FELD LLP
One Bryant Park
Bank of America Tower
New York, NY 10036
Tel: (212) 872-1062
Fax: (212) 872-1002
sbaldini@akingump.com
efroghman@akingump.com

Roxanne Tizravesh
Texas Bar No. 24091141
Southern District of Texas Bar No.
2618739
Nicholas E. Petree (attorney-in-charge)
Texas Bar No. 24083657

11

Southern District of Texas Bar No.
1778181
Alyx Eva
Texas Bar No. 24116334
Southern District of Texas Bar No.
3544812
R. Conor Tomalty
Texas Bar No. 24121170
Southern District of Texas Bar No.
3623592
AKIN GUMP STRAUSS
HAUER & FELD LLP
1111 Louisiana Street, Ste. 44
Houston, Texas 77002
Tel: (713) 220-5800
Fax: (713) 236-0822
rtizravesh@akingump.com
npetree@akingump.com
aeva@akingump.com
ctomalty@akingump.com


* admitted pro hac vice
PRO BONO COUNSEL FOR
PLAINTIFFS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document was served on all counsel of record via electronic filing in compliance with the Federal Rules of Civil Procedure on this 23rd day of August, 2022.

*/s/ Ashley Burrell*
Ashley Burrell

U.S. Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Ave., N.W., Rm. 7246
Washington, D.C. 20530-0001

August 22, 2022

**VIA CM/ECF**

Patricia S. Dodszuweit
Office of the Clerk
United States Court of Appeals for the Third Circuit
21400 United States Courthouse
601 Market Street
Philadelphia, PA 19106

      Re:    *Mack v. Yost, et al.*, No. 21-2472 (3d Cir.) (scheduled for oral argument
              September 7, 2022)

Dear Ms. Dodszuweit:

      The government respectfully submits this supplemental letter brief in response to this

Court's order, which directed the parties to address whether and under what circumstances a

defendant sued under the Religious Freedom Restoration Act (RFRA) may assert qualified

immunity as a defense to liability.   As the government noted in its response brief (pp. 9-10

& n.1), and as explained further below, there is little doubt that qualified immunity is

available in RFRA cases, and courts across the country have held that qualified immunity is

available to individual defendants sued for damages under RFRA on the same terms and

conditions that it would be available to individual government officials sued for damages

under 42 US.C. § 1983: when the officials' conduct does not violate "clearly established" law.

*See, e.g.*, *Ajaj v. Federal Bureau of Prisons*, 25 F.4th 805, 813-14 (10th Cir. 2022) (holding

qualified immunity is available as a defense under RFRA and recognizing that "many circuits have applied qualified immunity to individual-capacity suits" under RFRA); *infra* pp. 4-5.

**I.  A.**  Qualified immunity protects government officials from civil damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The Supreme Court has made clear that this immunity applies to "statutory" claims as well as to constitutional ones.  *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow*, 457 U.S. at 818).  The doctrine reflects "common law protections," *e.g.*, *Filarsky v. Delia*, 566 U.S. 377, 383-84, 389 (2012), and it generally applies "across the board" to executive officers unless clearly abrogated by Congress, *Anderson v. Creighton*, 483 U.S. 635, 642 (1987) (quoting *Harlow*, 457 U.S. at 821); *see Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993) (explaining that certain immunities, including qualified immunity, are so "well grounded in history and reason" that it is "presume[d]" that if Congress "wished to abolish them," it would say so "specifically" (internal quotation marks omitted)).

Nothing in the text or history of RFRA suggests that Congress intended to abrogate the defense of qualified immunity.  To the contrary, RFRA provides only for "*appropriate relief*" against government officials.  42 U.S.C. § 2000bb-1(c) (emphasis added).  As the Supreme Court has explained, "what relief is 'appropriate' is inherently context dependent," and with respect to RFRA, the relevant context is "suits against Government officials."

2

*Tanzin v. Tanvir*, 141 S. Ct. 486, 491 (2020) (internal quotation marks omitted); *accord Ajaj*, 25 F.4th at 814.   At the time of RFRA's enactment, the Supreme Court had long interpreted 42 U.S.C. § 1983 to provide for monetary recovery against state officials for violations of federal law—but the Court had equally made clear that the doctrine of qualified immunity applied to such claims.   *See Tanvir*, 141 S. Ct. at 491 ("By the time Congress enacted RFRA, this Court had interpreted the modern version of § 1983 to permit monetary recovery against officials who violated '*clearly established*' federal law." (emphasis added)).   The Court had also long recognized that the doctrine of qualified immunity applied to implied damages claims against federal officials asserted under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), to the same extent that doctrine applied in suits under § 1983.   *See Butz v. Economou*, 438 U.S. 478, 500 (1978).

Congress enacted RFRA against this "legal backdrop," *Tanvir*, 141 S. Ct. at 491 (internal quotation marks omitted); and Congress "intended for courts to borrow concepts from § 1983 jurisprudence when construing RFRA," *Mack v. Warden Loretto FCI (Mack II)*, 839 F.3d 286, 302 (3d Cir. 2016).   Accordingly, by providing for "appropriate relief" against government officials under RFRA, 42 U.S.C. § 2000bb-1(c), Congress understood and intended that courts would recognize the defense of qualified immunity for RFRA claims, just as courts recognize the defense for claims under § 1983.   *See Ajaj*, 25 F.4th at 814.

"[T]he specific origin of RFRA makes" this even more apparent.   *Ajaj*, 25 F.4th at 815.   As explained in the government's brief (pp. 1-2), Congress enacted RFRA in order to

3

"restore the compelling interest test" for religious freedom claims that existed before the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990). *See* Pub. L. No. 103-141, § 2(b)(1) (1993); *Tanvir*, 141 S. Ct. at 489, 492. Through RFRA, Congress thus "reinstat[ed] both the pre-*Smith* substantive protections of the First Amendment *and* the right to vindicate those protections by a claim." *Tanvir*, 141 S. Ct. at 492. As discussed above, however, under the pre-*Smith* doctrine, it was well-established that the right to bring a First Amendment claim for damages against government officials was subject to the defense of qualified immunity. *See id.* ("[D]amages claims have always been available under § 1983 for *clearly established* violations of the First Amendment" (emphasis added)). "When it is so clear that RFRA was intended to reinstate what had been a pre-*Smith* damages action under § 1983, there is a strong implication that as venerable and important a component of § 1983 as qualified immunity was also incorporated" into RFRA, as well. *Ajaj*, 25 F.4th at 815.

Courts across the country have therefore recognized that the defense of qualified immunity applies in RFRA suits on the same terms as it applies under § 1983, and that a defendant is therefore not liable for damages under RFRA unless the conduct violates "clearly established" law. *See, e.g.*, *Ajaj*, 25 F.4th at 817 ("We conclude that qualified immunity can be invoked by officials sued for damages in their individual capacities under RFRA."); *Davila v. Gladen*, 777 F.3d 1198, 1209 (11th Cir. 2015) (concluding defendants were entitled to qualified immunity under RFRA because relevant law was not "clearly established"); *Lebron v. Rumsfeld*, 670 F.3d 540, 560 (4th Cir. 2012) ("[W]e hold that the

4

defendants have asserted a valid qualified immunity defense to [plaintiff's] RFRA claim.")).[1] And in *Tanzin v. Tanvir*, the Supreme Court recognized that all parties were in agreement that "government officials are entitled to assert a qualified immunity defense when sued in their individual capacities for money damages under RFRA," and the Court emphasized the plaintiff's argument that the "qualified immunity defense was created for precisely these circumstances." 141 S. Ct. at 492 n.* (internal quotation marks omitted).

    **B.** Plaintiff did not argue in his opening or reply brief that qualified immunity is unavailable for RFRA claims. Plaintiff's amici, however, urge (Br. 16-17) that qualified immunity is unavailable. Amici do not identify any case that has so held. Rather, amici assert (Br. 9) that the defense is unavailable because RFRA is a "modern" statute that does not explicitly mention qualified immunity. That gets it exactly backwards. RFRA *is* a modern statute—one that, as discussed above, was enacted against decades of precedent with respect to qualified immunity in general and its application to claims under § 1983 in

---

[1] *See also, e.g.*, *Fazaga v. FBI*, 965 F.3d 1015, 1061 (9th Cir. 2020) (affirming dismissal of RFRA claim because "it was not clearly established" at the time of the alleged conduct that it "would meet the RFRA standards for constituting a substantial religious burden"), *reversed on other grounds by FBI v. Fazaga*, 142 S. Ct. 1051 (2022); *Rasul v. Myers*, 563 F.3d 527, 533 n.6 (D.C. Cir. 2009) (per curiam) (concluding, in the alternative, that "defendants are entitled to qualified immunity against plaintiffs' RFRA claim."); *Weinberger v. Grimes*, No. 07-6461, 2009 WL 331632, at *5 (6th Cir. Feb. 10, 2009) (concluding district court "correctly concluded" that officer "was entitled to qualified immunity" on RFRA claim); *Jama v. USINS*, 343 F. Supp. 2d 338, 376 (D.N.J. 2004) ("Neither the text nor the legislative history of RFRA indicates that Congress intended in that statute to abrogate the qualified immunity to which executive officials were entitled under common law.").

particular. *See Tanvir*, 141 S. Ct. at 490. Again, Congress enacted RFRA against this "legal backdrop," and it did so in order to restore the pre-*Smith* legal framework that *included* the qualified immunity defense. *Ajaj*, 25 F.4th at 814-15 (quoting *Tanvir*, 141 S. Ct. at 490). In providing for "appropriate relief" against government officials, there can be little doubt that Congress intended to incorporate qualified immunity into RFRA, and Congress surely would have spoken explicitly had it wished to abolish that defense and depart from the "well-established" "background presumption" of its availability. *See id.* at 815-16.; *see also Buckley*, 509 U.S. at 268-69.

Amici's other arguments are similarly wide of the mark. Amici insist that RFRA is "emphatic and categorical" in providing that the "Government *shall not* substantially burden" the free exercise of religion. Br. 19 (quoting 42 U.S.C. 2000bb-1(a)). But RFRA's language is no more "emphatic and categorical" (*id.*) than § 1983's, which, as explained, has long been interpreted to incorporate the qualified immunity defense. *See* 42 U.S.C. § 1983 (providing that "[e]very person" who acts under color of state law to deprive federal rights "*shall be liable* to the party injured" (emphasis added)). Amici's reliance on RFRA's remedial purposes (Br. 19, 22) fails for similar reasons. Section 1983, too, is a remedial statute intended to provide compensation for state officials' violations of federal rights. Although that interest is undoubtedly an important one, the Supreme Court has also made clear that "permitting damages suits against government officials can entail substantial social costs," and that the doctrine of qualified immunity is intended to "accommodate[] these conflicting

concerns." *Anderson*, 483 U.S. at 638-39.   The need to balance those competing interests

is no less present in RFRA cases than in § 1983 cases.   *See Tanvir*, 141 S. Ct. at 492 n.*

(emphasizing the plaintiff's argument that "the qualified immunity defense was created for

precisely these circumstances" (internal quotation marks omitted)).   Finally, amici's

argument that the defense of qualified immunity is unavailable because RFRA was enacted

to restore the pre-*Smith* standard for First Amendment claims (Br. 20) is incorrect for the

reasons already explained, and indeed that point only confirms the availability of qualified

immunity under RFRA.   *See supra* pp. 3-4.

    **II.**   The Court's supplemental briefing order also directed the parties to address

whether and under what circumstances qualified immunity may be available under the

Religious Land Use and Institutionalized Persons Act (RLUIPA), which "imposes the same

general test as RFRA" on States and their instrumentalities in certain contexts.   *Burwell v.*

*Hobby Lobby Stores, Inc.*, 573 U.S. 682, 695-96 (2014).   Plaintiff does not assert a RLUIPA

claim, which "does not apply to a federal government action."   *Garraway v. Lappin*, 490 F.

App'x 440, 443 n.2 (3d Cir. 2012).   Moreover, this Court has held that RLUIPA "does not

permit an action against [officials] in their individual capacities" because, unlike RFRA, it

was enacted pursuant to Congress's power under the Spending Clause.   *Sharp v. Johnson*, 669

F.3d 144, 154-55 (3d Cir. 2012).   Because state officials are not direct recipients of the

federal funds, they are not personally bound by the conditions RLUIPA places on the

acceptance of those funds, and therefore "cannot be held individually liable under

RLUIPA." *Mack II*, 839 F.3d at 303-04; *see Sharp*, 669 F.3d at 154-55 (explaining that because the State "was the direct recipient of any federal funds," "RLUIPA cannot impose direct liability on [state officers], who were not parties to the contract created between [the State] and the federal government"). Given that RLUIPA does not provide for a cause of action against government officials in their individual capacities, the availability of the qualified immunity defense for RLUIPA claims would not appear to be relevant. *See Smith v. Allen*, 502 F.3d 1255, 1275 & n.11 (11th Cir. 2007) (concluding that RLUIPA does not provide for a cause of action against individual defendants for money damages and therefore recognizing the Court "need not address the secondary question of whether" qualified immunity would be available), *overruled on other grounds by Hoever v. Marks*, 993 F.3d 1353, 1364-65 (11th Cir. 2021).

s/ *Courtney L. Dixon*
Courtney L. Dixon
Attorney

cc: all counsel via CM/ECF

8