# APPENDIX F

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| EVERETT DE'ANDRE ARNOLD, et al.,<br>Plaintiffs,<br>v.<br>BARBERS HILL INDEPENDENT SCHOOL DISTRICT,<br>Defendant. | ) | CIVIL ACTION NO. 4:20-CV-01802<br><br>JURY TRIAL REQUESTED |

**PLAINTIFFS' TRIAL MEMORANDUM OF LAW**

Plaintiffs De'Andre Arnold, Kaden Bradford, and Sandy Arnold (collectively, "Plaintiffs"), by and through their undersigned counsel, respectfully submit this Trial Memorandum of Law to address the Contested Issues of Law listed in the Joint Pretrial Order.[1] The Contested Issues of Law are as follows:

1. Whether the Hair Policy violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, Title IX of the Education Amendments of 1972, and Texas Civil Practice and Remedies Code § 106.001 by discriminating against students on the basis of sex.
2. Whether Plaintiffs' sex discrimination claim is subject to intermediate scrutiny or rational-basis review.
3. Whether the Hair Policy furthers important governmental objectives and whether the discriminatory means employed are substantially related to the achievement of those objectives.
4. Whether the Hair Policy, as written—by codifying the 1920's-era gendered cultural norms of the surrounding white community (i.e. males should have short hair) to the exclusion of Black, Native American, and other cultural traditions (e.g., males should have uncut locs/hair)—discriminates by race in violation of the

[1] Plaintiffs incorporate by reference their responses to Barber Hills Independent School District's ("BHISD" or "the District") dispositive motions. *See* Dkt. Nos. 156, 338, and 348.

Fourteenth Amendment, Title VI of the Civil Rights Act of 1964, and Texas Civil Practice and Remedies Code § 106.001.

5. Whether the Hair Policy furthers a compelling interest and is narrowly tailored to achieve that interest.
6. Whether BHISD violated the Fourteenth Amendment, Title VI of the Civil Rights Act of 1964, and Texas Civil Practice and Remedies Code § 106.001 when it selectively enforced the Hair Policy and departed from its normal procedures to make increasingly restrictive amendments to the Hair Policy to target Black male students with uncut locs.
7. Whether the Hair Policy violates the First Amendment.
8. Whether the Hair Policy exceeds BHISD's constitutional authority by regulating expressive conduct even when students are not in school, thereby going far beyond what is necessary to further BHISD's alleged interests.
9. Whether BHISD violated the Due Process Clause of the Fourteenth Amendment when it removed De'Andre and Kaden from regular classroom instruction and extracurricular activities and constructively expelled them because they refused to cut their locs.
10. Whether a parent can seek relief under Title IX for retaliation directed at them by a federally-funded educational program or activity because they raised concerns that the federally-funded educational program or activity was discriminating against a student.

## ARGUMENT

### I. The Hair Policy discriminates against students on the basis of sex in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, Title IX of the Education Amendments of 1972, and Texas Civil Practice and Remedies Code § 106.001.

#### A. Equal Protection Clause

##### *1. Section 1983*

"To state a claim under [42 U.S.C.] § 1983, a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States and (2) demonstrate that the violation of rights was committed by a person acting under color of state law." *Piotrowski*

*v. City of Houston*, 51 F.3d 512, 515 (5th Cir. 1995). To state a claim under § 1983 against a public school district, a plaintiff must establish municipal liability pursuant to the Supreme Court's decision in *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978). Under Texas law, final policy-making authority in a public school district rests exclusively with the district's elected board of trustees. *Rivera v. Hou. Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003).

A showing of municipal liability requires three elements: (1) a policymaker; (2) an official policy or custom; and (3) a violation of constitutional rights whose "moving force" is the policy or custom. *See id.* A custom or official policy is: (1) an express policy officially adopted or promulgated by the policy-making authority; or (2) a persistent, widespread practice by employees, that the policymaker or official to whom that body has delegated policy-making authority had actual or constructive knowledge of, that is so common and well settled it constitutes a custom that fairly represents an official policy. *Eugene v. Alief Indep. Sch. Dist.*, 65 F.3d 1299, 1304 (5th Cir. 1995).

In addition, a governmental entity can be held liable for a single episode of misconduct by a non-policymaker where the final policymaker ratified the non-policymaker's conduct knowing that the non-policymaker had retaliatory intent. *Cambric v. City of Corpus Christi*, 170 F.4th 321, 325 (5th Cir. 2026); *Milam v. City of San Antonio*, 113 F. App'x 622, 626–27 (5th Cir. 2004). "Ratification occurs when a policymaker 'confirms, adopts, or fails to repudiate the acts' of a non-policymaking employee." *Maxwell v. Mesquite Indep. Sch. Dist.*, No. 3:20-CV-3581-S, 2021 WL 4260756, at *4 (N.D. Tex. Sep. 19, 2021) (citing *Prunty v. Ark. Freightways, Inc.*, 16 F.3d 649, 653 (5th Cir. 1994)).

### *2. Equal Protection Clause Prohibition on Sex Discrimination*

The Constitution prohibits sex classifications based on "overbroad generalizations about the different talents, capacities, or preferences of males and females." *United States v. Virginia*, 518 U.S. 515, 533 (1996). As this Court has previously correctly held, intermediate scrutiny is the appropriate standard of review for sex discrimination claims. *Arnold v. Barbers Hill Indep. Sch. Dist.*, 479 F. Supp .3d 511, 521 (S.D. Tex. 2020). The Court should again reject Defendant's argument that *Karr v. Schmidt*, 460 F.2d 609 (5th Cir. 1972), is the controlling case law when it (1) "does not address sex discrimination," *Arnold*, 479 F. Supp. 3d at 520, and (2) predates binding Supreme Court precedent holding that intermediate scrutiny applies to all sex-based classifications. *Id.* at 521 (citing *Virginia*, 518 U.S. at 558, for the proposition "that the Supreme Court has applied the intermediate-scrutiny standard to classifications by sex since 1976, when it issued *Craig v. Boren*, 429 U.S. 190, 197 (1976)"). As this Court has already noted, since *Karr* was decided, the Supreme Court has repeatedly held that "heightened scrutiny . . . attends all gender-based classifications." *Id.* at 520–21 (quoting *Sessions v. Morales-Santana*, 582 U.S. 47, 57 (2017)). Any policy that facially discriminates on the basis of sex—such as the Hair Policy challenged in this litigation—is thus subject to intermediate scrutiny under the Equal Protection Clause. *Id.* at 520–21.

In order to establish that a policy which distinguishes on the basis of sex satisfies intermediate scrutiny, Defendant must show (1) "an exceedingly persuasive justification for the classification," (2) that "the classification serves important governmental

objectives," and (3) "that the discriminatory means employed are substantially related to the achievement of those objectives." *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982) (internal quotations omitted). This burden "is demanding and . . . rests entirely on the State." *Virginia*, 518 U.S. at 533.

The justification provided by the government "must be genuine, not hypothesized or invented post hoc in response to litigation." *Id*. at 516. The classification "must substantially serve an important governmental interest today," *Morales-Santana*, 582 U.S. at 59 (quoting *Obergefell v. Hodges*, 576 U.S. 644, 673 (2015)). A factfinder need not accept the government objectives offered and may instead find that offered objectives are illegitimate post-hoc rationalizations. *See Virginia*, 518 U.S. at 535–36; *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 n.16 (1975). There must be a close relationship between the important government objectives and the discriminatory means employed in the policy "to assure that the validity of a classification is determined through reasoned analysis rather than through the mechanical application of traditional, often inaccurate, assumptions about the proper roles of men and women." *Hogan*, 458 U.S. at 725–26.

BHISD has argued that one of the justifications for the Hair Policy is to reflect some formulation of "community expectations," "conservative traditional values," or the "time-honored practice that there are gender-specific expectations" with respect to dress and grooming."[2] Even assuming, arguendo, that the Hair Policy does reflect some segment of

---

[2] *See* Dkt. No. 336 (Mot. Summ. J.) at 33; Dkt No. 336-1 (Poole 30(b)(6) Dep.) at 47:21–48:4, 55:19–56:7, 112:2–12.

the community's traditional values or expectations, such a motivation is not a legitimate basis for promulgating and enforcing a policy that unlawfully discriminates against other members of that community. *See Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.").

The school in *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104 (4th Cir. 2022), also cited "discipline," "traditional values," "chivalry," and "fostering 'traditional roles' for boys and girls" as the reason for a rule requiring female students to wear skirts to school. *Id*. at 125. Yet the Fourth Circuit held that the school lacked an "important government purpose" to maintain the gender-specific rule because the board's proffered justifications "rest[ed] on nothing more than conventional notions about the proper station in society for males and females." *Id*. at 125–26.

Similarly, BHISD's Hair Policy constitutes precisely the sort of "archaic and stereotypic notion[]" that the Equal Protection Clause is designed to protect against. *Id.* at 126 (quoting *Hogan*, 458 U.S. at 725); *see also Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp*., 743 F.3d 569, 581 (7th Cir. 2014) ("community standards . . . do not remain fixed in perpetuity."). Mere "traditional" beliefs cannot be a basis for discriminatory treatment in the absence of any empirical evidence of a connection between the government's objectives and the discriminatory policy. See *Hogan*, 458 U.S. at 725–26 ("The purpose of requiring that close relationship is to assure that the validity of a classification is determined through reasoned analysis rather than through the mechanical

application of traditional, often inaccurate, assumptions about the proper roles of men and women.”).

BHISD cites only two non-binding cases—*Woodley v. Tatum Independent School District*, C.A. No. 2:21-CV-00364-RWS (E.D. Tex. Oct. 13, 2023) Dkt. No. 119, and *George v. Abbott*, No. 3:24-cv-12, 2025 WL 1685239 (S.D. Tex. June 16, 2025)—holding that “community expectations” are an important governmental interest that withstands immediate scrutiny as a matter of law. Dkt. No. 336 at 33–34. However, both of these opinions relied, in part, on the fact that both sets of plaintiffs failed to cite legal authority to show why the school’s community expectations are not important governmental interests. Dkt No. 336-15 at 19–20; *George*, 2025 WL 1685239, at *3. Moreover, the plaintiffs in *Woodley* made no meaningful attempt to dispute the school district’s contention that “community expectations” surrounding hair length are an important governmental interest or that the school district’s hair policy furthered that interest. *See* Dkt. No. 81 at 13–18.

Defendant’s invocation of amorphous “community norms,” without a legitimate race-neutral or sex-neutral justification for enforcing those norms is an appeal to race-based and sex-based stereotypes regarding what types of hair are acceptable and cannot serve as a legitimating justification for a discriminatory policy. To the extent that the District chooses to offer evidence regarding this justification, the jury should be instructed that such a justification, if it relies on sex- or race-based stereotypes, must be disregarded.

In addition, The District has previously taken the position that one of the non-discriminatory justifications for the dress code is to “instill[] discipline.” *See, e.g.*, Def.’s

Mot. Summ. J., Dkt. No. 336 at 3. However, the relevant inquiry is not whether the dress code writ large is designed to teach discipline, but rather whether the discriminatory aspects of the Hair Policy—which impose different burdens on male students compared to female students and on Black students compared to students of other races—are justified by the desire to teach students discipline. *See Peltier*, 37 F.4th at 125 (explaining that the relevant inquiry is whether the sex-based classification within a charter school's dress code was justified by purported gender-neutral objective of "instill[ing] discipline and keep[ing] order," not whether the dress code as a whole was motivated by that purpose). And in order for the discriminatory aspects of the Hair Policy to be justified by the desire to teach students discipline, the decision to impose different burdens on males and females must satisfy intermediate scrutiny and the decision to impose different burdens on Black students compared to students of other races must satisfy strict scrutiny. *See infra* Section II. As such, to the extent that the District chooses to offer evidence regarding the justification that the dress code teaches discipline at trial, the jury should be instructed that such a justification regarding the purpose of the dress code as a whole is not relevant and instead the relevant determination is whether the discriminatory provision of the dress code—i.e., the Hair Policy—is justified by the purported sex- and race-neutral justification of instilling discipline.

### B. Title IX

Title IX states that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

A plaintiff may establish his or her Title IX claim for intentional sex discrimination by demonstrating sex was one "but-for" cause of their exclusion from educational programs. *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020).

### C. Texas Civil Practice and Remedies Code

Texas law provides that an officer or employee of the state, or a political subdivision of the state, may not, because of a person's race or color or because of a person's sex: (1) refuse to permit the person to use facilities; (2) refuse to permit the person from participating in a program managed by the state or political subdivision; (3) refuse to grant a benefit to the person; or (4) impose an unreasonable burden on the person. *See* Tex. Civ. Prac. & Rem. Code § 106.001(a)(3)–(6).

## II. The Hair Policy discriminates against students on the basis of race, in violation of the Fourteenth Amendment, Title VI of the Civil Rights Act of 1964, and Texas Civil Practice and Remedies Code § 106.001.

### A. Equal Protection Clause

To establish a 42 U.S.C. § 1983 claim for race discrimination, a plaintiff must prove that "racial discrimination was a substantial or motivating factor" behind the challenged policy. *Veasey v. Abbott*, 830 F.3d 216, 231 (5th Cir. 2016) (en banc); *Vill. of Arlington Heights v. Met. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). "However, racial discrimination need only be one purpose, and not even a primary purpose, of an official action for a violation to occur." *Veasey*, 830 F.3d at 230. The inquiry "concerns the actual considerations that provided the essential basis for the [challenged action], not post hoc justifications the legislature in theory could have used but in reality did not." *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 189–90 (2017). Prohibited racial discrimination

includes reliance on racial prejudice or stereotypes. *See, e.g.*, *Batson v. Kentucky*, 476 U.S. 79, 104 (1986) (Marshall, J., concurring).

Determining whether discriminatory purpose was a motivating factor demands "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. Relevant factors for assessing whether intentional discrimination took place include whether the policy "bears more heavily on one race than another," the historical background of the defendant's decision, the sequence of events leading up to the challenged decision, substantive departures, procedural departures from the normal decision-making process, and the legislative or administrative history of the decision. *Id.* at 266–68. Once Plaintiffs have established that racial discrimination was a substantial or motivating factor behind the challenged policy, the burden shifts to Defendant "to demonstrate the that [policy] would have been enacted without this factor." *Veasey*, 830 F.3d at 231 (internal quotation omitted).

Alternatively, Plaintiffs may prove their race discrimination claims via the *McDonnell Douglas* framework. Under this framework, the plaintiffs bear the initial burden of presenting sufficient evidence to allow a reasonable jury to determine that they have satisfied the elements of a prima facie case; if the school district offers a legitimate, non-discriminatory reason for the adverse action, the burden shifts back to the plaintiffs to show that the stated reason is mere pretext for unlawful discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).

If race was a motivating factor for the challenged policy, the inquiry turns to whether the policy can pass constitutional muster under strict scrutiny. *Hunt v. Cromartie*, 526 U.S.

541, 547 (1999). "If the government is found to have acted with a discriminatory purpose, strict scrutiny review places the burden on the government to prove that its actions are narrowly tailored to achieve a compelling government interest." *Lewis v. Ascension Par. Sch. Bd.*, 662 F.3d 343, 348 (5th Cir. 2011). If BHISD cannot meet this burden, then the policy violates Plaintiffs' right to equal protection. *See Hunter v. Underwood*, 471 U.S. 222, 233 (1985).

Please *see supra* Section I.A for further discussion of 1983 and legitimate non-discriminatory justifications.

### B. Title VI

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Discrimination that violates the Equal Protection Clause of the Fourteenth Amendment is also a violation of Title VI where that discrimination is committed by a federally-funded institution. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 198 n.2 (2023).

### C. Texas Civil Practice and Remedies Code

*See supra* Section I.C.

## III. BHISD violated De'Andre and Kaden's First Amendment Right to Freedom of Expression.

The general First Amendment right to freedom of expression applies to conduct revealing an intent to convey a particularized message where there is a likelihood that the

message would be understood by those exposed to it. *Canady v. Bossier Par. Sch. Bd*., 240 F.3d 437, 440 (5th Cir. 2001). "Visibly wearing one's hair in a particular manner is capable of communicating one's religion or heritage." *Gonzales v. Mathis Indep. Sch. Dist*, No. 2:18-CV-43, 2018 WL 6804595, at *7 (S.D. Tex. Dec. 27, 2018). When examining content-neutral restrictions on expressive activities, the Court must determine whether the restriction survives intermediate scrutiny; namely: (1) the restriction is within the Constitutional power of the government; (2) the restriction furthers an important or substantial governmental interest; (3) the government's important or substantial interest is unrelated to the suppression of student expression; and (4) the incidental restrictions on First Amendment activities are no more than is necessary to facilitate the government's important or substantial interest. *Littlefield v. Forney Indep. Sch. Dist*, 268 F.3d 275, 286 (5th Cir. 2001).

## IV. BHISD's treatment of Kaden and De'Andre deprived them of a property interest that required formal notice and a hearing prior to their exclusion from class and extracurricular activities, in-school suspension, and constructive expulsion.

A student's right to public education is a property interest protected under the Fourteenth Amendment. *Goss v. Lopez*, 419 U.S. 565, 573–74 (1975); Tex. Educ. Code §§ 4.001, 25.001, 25.085. Students may not be deprived of their property interest in education without fundamentally fair procedures—at the very least, notice and a hearing. *Goss*, 419 U.S. at 574, 576, 579–82. Importantly, a student can be deprived of access to education without being wholly ousted from all educational settings. "'The primary thrust of the educational process is classroom instruction;' therefore minimum due process

procedures may be required if an exclusion from the classroom would effectively deprive the student of instruction or the opportunity to learn." *Riggan v. Midland Indep. Sch. Dist.*, 86 F. Supp. 2d 647, 655 (W.D. Tex. 2000) (citing *Cole v. Newton Special Mun. Separate Sch. Dist*., 676 F. Supp. 749, 752 (S.D. Miss. 1987), *aff'd*, 853 F.2d 924 (5th Cir. 1988)).

To determine whether there was a deprivation of a property interest in education without due process, courts examine whether the alternative placement was significantly different from or inferior to that provided at the regular public school. *See Ala. & Coushatta Tribes of Tex. v. Trs. of Big Sandy Indep. Sch. Dist.*, 817 F. Supp. 1319, 1335 (E.D. Tex. 1993) (holding that students were denied procedural due process by being confined to in-school suspension ("ISS") for a month where students had little opportunity to ask their teachers questions and received minimal tutorial help or assistance with schoolwork, and where the students were not given notice and an opportunity to be heard).

BHISD has previously cited only one published Fifth Circuit case in support of its position that BHISD's treatment of Kaden and De'Andre did not deprive them of a property interest. *See* Def.'s Mot. for Summary Judgment, Dkt. No. 336 at 44. But because De'Andre's and Kaden's claims concern far more than a mere "transfer to an alternative learning placement," *see id*, that lone Fifth Circuit case is distinguishable. The other cases BHISD has cited to in its summary judgment motion are also distinguishable. Unlike De'Andre and Kaden, Plaintiffs in *Nevares*, *Esparza*, and *Zamora* were never deprived of access to public education. *See Nevares v. San Marcos Consol. Indep. Sch. Dist*., 111 F.3d 25, 26 (5th Cir. 1997) (plaintiff was reassigned from one school program to another program with stricter discipline—without any temporary loss of access to public

education); *Esparza v. Bd. of Trs.*, 182 F.3d 915, 1999 WL 423109, *1 (5th Cir. 1999) (unpublished, nonprecedential opinion) (school never enforced ISS punishment against plaintiffs); *Zamora v. Pomeroy*, 639 F.2d 662 (10th Cir. 1981) (student was transferred to another school with "about the same courses" within the district after receiving "numerous hearings" to discuss illegal contraband found on campus). Unlike the instant case, in *Doe*, the court found that the plaintiff, who was disciplined for making a terroristic threat, failed to plead sufficient facts at the motion to dismiss stage. *Doe v. Humble Indep. Sch. Dist.*, 2019 WL 3288385, *1 (S.D. Tex. July 22, 2019). In *Stafford*, the due process argument was narrow: the district had failed to inform the student of their right to appeal a transfer to an alternative education program. *Stafford Mun. Sch. Dist. v. L.P.*, 64 S.W.3d 559 (Tex. App. 14th 2001). Here, De'Andre's and Kaden's claims are far broader: BHISD deprived them of meaningful access to education through a pattern of exclusion, substandard alternative placement, and constructive expulsion—all without any notice or hearing. Thus, contrary to BHISD's position, De'Andre and Kaden were denied access to education in a manner that amounts to a deprivation of their property interest in education and were entitled to due process, including formal notice and a hearing, prior to that deprivation.

## V. BHISD retaliated against Mrs. Arnold after she raised concerns that the Hair Policy was discriminatory, in violation of the First Amendment and Title IX.

### A. First Amendment Retaliation

To establish a First Amendment retaliation claim, a plaintiff must show "(1) they were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage

in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct." *Robles v. Aransas Cnty. Sheriff's Dept.*, No. 2:15–CV–495, 2018 WL 1932742, at *5 (S.D. Tex. Apr. 23, 2018) (quoting *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002)). "[A]lleged First Amendment free speech violations are concrete and particular injuries for purposes of Article III standing." *Falcone v. Dickstein*, 92 F.4th 193, 203–04 (3d Cir. 2024). And parents have standing to bring First Amendment retaliation claims against school boards where adverse actions—motivated by their speech on behalf of their children—were taken to deter them from further speech on such issues. *See, e.g.*, *id.* (parent had standing to bring First Amendment retaliation claim where school board cancelled school board meeting to prevent parent from speaking); *Wray v. Greenburg*, 646 F. Supp. 3d 1084, 1106 (D. Ariz. 2022) (parents had standing to bring First Amendment retaliation claim where school district engaged in campaign of intimidation to prevent parents' criticism of district policies).

Complaints to a government body regarding discriminatory conduct by government officials are protected by the First Amendment. *See, e.g.*, *Charles v. Grief*, 522 F.3d 508, 514 (5th Cir. 2008) ("[i]t is well-established … that speech relating to official misconduct or racial discrimination almost always involves matters of public concern" and is thus protected by the First Amendment); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 273 (1964) (criticism of government officials is protected by the First Amendment). In determining whether a person of ordinary firmness would have been chilled by government conduct, courts consider the likely effect of that conduct on similarly situated individuals of ordinary

firmness. *See Washington v. Cnty. of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004); *Gaskin v. Northside Indep. Sch. Dist.*, No. SA-25-CA-00771-XR, 2026 U.S. Dist. LEXIS 38810, at *13–14 (W.D. Tex. Feb. 23, 2026) ("[W]hether a plaintiff has suffered an injury that would chill a person of ordinary firmness depends on the circumstances."). Nevertheless, "since there is no justification for harassing people for exercising their constitutional rights," the resulting "effect on freedom of speech" "need not be great in order to be actionable." *Gaskin*, 2026 U.S. Dist. LEXIS 38810, at *15 (citing *Keenan*, 290 F.3d at 259). *See also Rutan v. Republican Party of Ill.*, 497 U.S. 62, 76 n.8 (1990) (First Amendment protects plaintiffs from "even an act of retaliation as trivial as failing to hold a birthday party for a public employee ... when intended to punish her for exercising her free speech rights."). Moreover, the Fifth Circuit has recognized that a campaign of harassment and adverse, retaliatory action, "though trivial in detail, may have been substantial in gross." *Colson v. Grohman*, 174 F.3d 498, 513–14 (5th Cir. 1999). Notably, a showing of an adverse action that sufficiently chills a person of ordinary firmness requires plaintiff to show that "the defendant intended to interfere with the plaintiff's First Amendment rights," not that the plaintiff's "speech was actually suppressed or inhibited." *Wray v. Greenburg*, 646 F. Supp. 3d 1084, 1103 (D. Ariz. 2022) (internal citations omitted). In addition, "mere temporal proximity" between protected activity and adverse action may establish a prima facie case of retaliation where the timing is "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001); *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 305 (5th Cir. 2020) (same).

*See supra* Section I.A.1 for additional discussion of Section 1983.

### B. Title IX Retaliation

Title IX prohibits retaliation for exercising a right protected by that title, such as raising concerns about discriminatory behavior. *See Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 867 (9th Cir. 2014) (plaintiffs "engaged in protected activity when they complained about Title IX violations"). To establish a Title IX retaliation claim, a plaintiff must show the defendant retaliated against them because they complained of sex discrimination. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 169 (2005). "Title IX does not require that the victim of the retaliation must also be the victim of the discrimination that is the subject of the original complaint." *Id.* Notably, "[i]n order to establish the requisite causal link, a plaintiff need not prove that her protected activity was the sole factor in motivating the [] challenged decision." *Miles v. Port Arthur ISD*, 772 F. Supp. 3d 770, 788–89 (E.D. Tex. 2025) (citing *Wallace v. Seton Fam. of Hosps.*, 777 F. App'x 83, 91 (5th Cir. 2019)). "Rather, a causal link is established when the evidence demonstrates that the [] decision to take adverse action was based in part on knowledge of the [] protected activity." *Id.* (citing *Smith v. Kendall*, No. 23-50713, 2024 WL 4442040, at *7 (5th Cir. Oct. 8, 2024) (other citations omitted)).

September 25, 2026

Respectfully submitted,

AKIN GUMP STRAUSS HAUER & FELD LLP

Roxanne Tizravesh
Texas Bar No. 24091141
Southern District of Texas Bar No. 2618739
1111 Louisiana Street, 44th Floor
Houston, TX 77002
Tel: (713) 220-5800
Fax: (713) 236-0822
rtizravesh@akingump.com

Stephen Baldini*
Evan Frohman*
Abdiel Caballero*
Caroline Ellis
Texas Bar No. 24116322
Southern District of Texas Bar No. 3509759
Harris Stephens
Texas Bar No. 24141345
Southern District of Texas Bar No. 3892450
One Bryant Park
New York, NY 10036
Tel: (212) 872-1000
Fax: (212) 872-1002
sbaldini@akingump.com
efrohman@akingump.com
acaballero@akingump.com
cellis@akingump.com
hstephens@akingump.com

AHMAD, ZAVITSANOS & MENSING PLLC
Nicholas E. Petree
Texas Bar No. 24083657
Southern District of Texas Bar No. 1778181
1221 McKinney Street, Suite 2500
Houston, Texas 77010
Tel: (713) 655-1101
npetree@azalaw.com

NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.

*/s/ Michaele Turnage Young*
Michaele N. Turnage Young*
Joseph Wong*
700 14th Street NW, Suite 600
Washington, DC 20005
Tel: (202) 682-1300
Fax: (202) 682-1312
mturnageyoung@naacpldf.org
jwong@naacpldf.org

Mary Otoo*
40 Rector Street, 5th Floor
New York, NY 10006
Tel: (212) 965-2200
Fax: (212) 226-7592
motoo@naacpldf.org

*admitted pro hac vice

PRO BONO COUNSEL FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served on all counsel of record via electronic filing in compliance with the Federal Rules of Civil Procedure on this 25th day of September 2026.

*/s/ Michaele Turnage Young*
Michaele Turnage Young